**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

COURTHOUSE NEWS SERVICE,

      Plaintiff,

v.

KARL R. HADE, in his official
capacity as Executive Secretary of the Office
of Executive Secretary of the Supreme Court
of Virginia,

and

JACQUELINE C. SMITH, in her official
capacity as Clerk of the Circuit Court for
Prince William County, Virginia,

      Defendants.

Civil Action No. 3:21-cv-00460-HEH

**AMENDED COMPLAINT**
**ALLEGING VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983**
**AND SEEKING INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Courthouse News Service ("CNS"), by and through its undersigned attorneys, alleges the following in support of its Amended Complaint for Injunctive and Declaratory Relief against Defendant Karl R. Hade, in his official capacity as Executive Secretary (the "Executive Secretary") of the Office of Executive Secretary of the Supreme Court of Virginia ("OES"), and Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia ("Prince William Clerk," and with the "Executive Secretary," the "Defendants").

**INTRODUCTION**

1.     This case seeks to address the discriminatory treatment of the press, including CNS, with regard to access to newly-filed civil complaints. Defendants restrict remote electronic access

to Virginia-barred attorneys (and their staff), precluding the press and the public from accessing civil complaints remotely and effectively chilling free speech in violation of the First Amendment.

2.     The First Amendment provides the press and public with a presumptive right of access to civil complaints filed with the court.  Access to new civil complaints is essential to accurate and fair news reporting of, and speech about, civil disputes, and thus vital to the public's ability to discuss what is happening in an important branch of government as it is happening. *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532 (E.D. Va. 2020) (holding that the First Amendment provides a contemporaneous right of access to newly filed civil complaints), *aff'd*, 2 F.4th 318, 328 (4th Cir. 2021) ("The press and public thus have an important interest in reasonably contemporaneous access to civil complaints"); *Doe v. Public Citizen,* 749 F.3d 246, 265, 272 (4th Cir. 2014) ("It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings" and "the public and press generally have a contemporaneous right of access to court documents and proceedings when the right applies.").

3.     In the Virginia circuit court system, one segment of the public – Virginia-licensed attorneys (and their authorized agents) – are given remote electronic access to civil, nonconfidential, public court filings via the internet, including documents in cases in which they are not attorneys of record, through a system called Virginia Officer of the Court Remote Access ("OCRA").  Meanwhile, the public and press – including CNS, a news service specializing in news reporting about the courts, and whose reporters cover the Virginia courts on a daily basis – are effectively denied this remote access and, as a result, must bear a greater burden and expense, and delays, to access these same civil, nonconfidential, public court filings, by traveling to courthouses to view them at public access terminals, even though there is no difference between the filings

made available on OCRA and the filings made available at the public terminals – they are the exact same records.

4.    In denying OCRA access to CNS, the clerks of some Virginia circuit courts have relied on Virginia Code § 17.1-293(B), which provides, in relevant part, that "no court clerk shall post on the Internet any document that contains the following information: (i) an actual signature, (ii) a social security number, (iii) a date of birth identified with a particular person, (iv) the maiden name of a person's parent so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child."  The law provides an exception for "members in good standing with the Virginia State bar and their authorized agents."  Va. Code Ann. § 17.1-293(E)(7).

5.    The Prince William Clerk is one clerk that provides Virginia-licensed attorneys – but not the press or the public – with more favorable OCRA subscriber access.  During a deposition in January 2019, the Prince William Clerk stated that she would be willing to provide OCRA subscriber access to CNS, and noted that she uses her "discretion to provide -- to offer to provide [OCRA] to [non-Virginia-licensed attorneys] who need access to the information in the interest of being transparent and providing the highest possible service."  Following several requests, the Prince William Clerk offered CNS OCRA subscriber access in June 2021, but at an annual subscription cost that is six times the amount charged to Virginia-licensed attorneys.  The access offered to CNS also restricted the dissemination and publication of information and filings gathered remotely – information and filings that are nonconfidential and public in nature and that are available at the courthouse.

6.    The First Amendment to the United States Constitution provides the press and public with a presumptive right of access to certain civil, nonconfidential, public court filings.

3

Granting preferential access to these records to one segment of the public, while effectively denying it to others, violates principles of the First Amendment and Equal Protection Clause of the U.S. Constitution unless some legitimate state interest exists for such discrimination. And when a fundamental right is involved, such as the First Amendment right of access, the state interest must be a compelling one and the denial of access must be narrowly tailored to meet those interests.

7.     Virginia Code § 17.1-293(H) further provides that "data accessed by secure remote access" is not permitted "to be sold or posted on any other website or in any way redistributed to any third party" and that such data cannot be "made available to the general public." This language also appears in the Non-Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents ("Non-Attorney Subscriber Agreement") that was created by the Prince William Clerk in response to CNS' request for remote electronic access.

8.     Thus, even if non-discriminatory remote access was provided to CNS, the OCRA prohibition on disseminating nonconfidential public court filings acts as a bar against using those nonconfidential public court filings to provide accurate and fair news reporting of civil disputes and from engaging in an informed discussion about those lawsuits. This violates the Constitution's dual guarantees of freedom of speech and freedom of the press, which ensure that when the press or the public "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information absent a need to further a state interest of the highest order." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979).

9.     CNS thus asks this Court to enjoin Defendants, in their official capacities – as well as their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them or at their direction or under their control – from continuing their policies, practices,

and customs that (i) deny equal treatment of access to OCRA to the press and public and instead provide preferential treatment to Virginia-licensed attorneys for OCRA subscriber access, and (ii) prohibit the dissemination of public documents and information accessed via OCRA.

10.      Further, should this Court determine that Va. Code § 17-1.293 either requires or permits Defendants to restrict such access and such dissemination, CNS requests this Court to enter a declaratory judgment that Va. Code § 17.1-293 is unconstitutional on its face, or, in the alternative, unconstitutional as applied by Defendants' policies, practices, and customs, and to enjoin Defendants from enforcing the challenged statute.

## JURISDICTION AND VENUE

11.      CNS' claims arise under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act, Title 42 U.S.C. §§ 1983, *et seq.*  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 (declaratory relief).

12.      Defendants are subject to personal jurisdiction in this District because they reside and/or conduct business within this District.

13.      Venue is proper in this District under 28 U.S.C. § 1391(b) because the Executive Secretary's primary place of business is within the Richmond Division of this District and because a substantial part of the events or omissions giving rise to CNS' claims occurred in this District.

14.      Divisional venue is proper in the Richmond Division under E.D. Va. Local Civil Rule 3(C) because the Executive Secretary resides in the Richmond Division, and Defendants are all residents of Virginia.  In addition, divisional venue is proper in the Richmond Division because a substantial part of the events or omissions giving rise to CNS' claims occurred in the Richmond Division.

## PARTIES

15.     CNS is a California corporation with its principal place of business located in Pasadena, California.  A widely read legal news service with thousands of subscribers across the nation, CNS specializes in news reporting about civil litigation, from the date of filing through the appellate level, in state and federal courts throughout the United States.  CNS' comprehensive and timely coverage of civil litigation through its print, website, and e-mail publications has made it a go-to source of information about the nation's civil courts.

16.     Defendant Karl R. Hade is the Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia, and is sued in his official capacity.  The Executive Secretary serves as "the administrator of the circuit court system, which includes the operation and maintenance of a case management system." Va. Code § 17.1-502(A).  OES creates, operates, and maintains several programs and systems for the Virginia circuit court clerks, one of which is OCRA.

17.     Acting in his official capacity, the Executive Secretary, as well as those acting at his direction and under his supervision, are directly involved with and/or responsible for acts giving rise to the preferential and discriminatory internet access to civil, nonconfidential, public court filings provided to Virginia-licensed attorneys through OCRA, but which the public and press do not share.

18.     Acting in his official capacity, the Executive Secretary, as well as those acting at his direction and under his supervision, are directly involved with and/or responsible for acts giving rise to the prohibition on disseminating the civil, nonconfidential, public court filings gathered via remote access.

19.    Defendant Jacqueline C. Smith is the Clerk of the Circuit Court for Prince William County, Virginia, and is sued in her official capacity.  The Prince William Clerk is the custodian of and responsible for, among other things, the administration of court records and ensuring that those records are maintained and made available to the public for inspection and examination.

20.    Acting in her official capacity, the Prince William Clerk, as well as those acting at her direction and under her supervision, are directly involved with and/or responsible for acts giving rise to the preferential and discriminatory internet access to civil, nonconfidential, public court filings that are filed in the Circuit Court for Prince William County, Virginia that is provided to Virginia-licensed attorneys through OCRA, but which is not provided to the press and public.

21.    Acting in her official capacity, the Prince William Clerk, as well as those acting at her direction and under her supervision, are directly involved with and/or responsible for acts giving rise to the prohibition on disseminating the civil, nonconfidential, public court filings gathered via remote access.

22.    Defendants' actions reflect Defendants' official policies, practices, and customs. Defendants' actions, as alleged in this Complaint, are under the color of Virginia law and constitute state action within the meaning of the Fourteenth Amendment to the Unites States Constitution and 42 U.S.C. § 1983.

23.    CNS seeks relief against Defendants, as well as against their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them or at their direction or under their control.

## FACTUAL ALLEGATIONS

**A.    CNS' Publications and Subscribers**

24.      CNS is a nationwide news service founded almost 30 years ago out of a belief that great swaths of news about civil litigation went unreported because the traditional news media failed to cover much of the important business of the courts.  CNS employs more than 240 people, most of them editors and reporters, covering approximately 3,000 state and federal trial and appellate courts in all 50 states in the United States.

25.      CNS offers its readers a variety of publications.  Its New Litigation Reports contain original, staff-written summaries of significant new civil complaints.  These reports are sent to subscribers via e-mail each evening.  CNS publishes two New Litigation Reports in Virginia – the *Virginia Report* and the *Southern Virginia State Report*.  These New Litigation Reports do not cover criminal, domestic relations, or probate matters.

26.      In addition, CNS publishes a freely available website, www.courthousenews.com, featuring news reports and commentary, which is read by hundreds of thousands of people each month.  The website functions much like a daily print newspaper, featuring staff-written articles from across the nation that are posted throughout each day, and rotated on and off the page on a 24-hour news cycle.

27.      CNS has been credited as the original source of reporting on various topics by a wide range of publications, including the *ABA Journal*, ABC News, *The Atlantic*, *Austin American Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, *The Christian Science Monitor*, The Daily Beast, *The Dallas Morning News*, Forbes, Fox News, *The Guardian*, The Hill, *Houston Chronicle*, The Huffington Post, *Long Island Press*, *Los Angeles Times*, *Mother Jones*, National Public Radio (NPR); NBC News, *New York Daily News*, *New York Magazine*, *The*

*New York Times*, *The Orange County Register*, Politico, *Rolling Stone*, *Salt Lake City Tribune,* *San Antonio Express-News*, Slate, *The Telegraph* (UK), *The Wall Street Journal*, *The Washington Post*, *The Washington Times*, *Women's Health Policy Report*, United Press International (UPI), *USA Today*, *U.S. News and World Report*, the YouTube news channel, and others.  In addition, U.S., Canadian, and New Zealand radio shows have interviewed CNS reporters.

28.     CNS has more than 2,300 subscribers nationwide.  A substantial set of news and entertainment outlets are CNS subscribers, including but not limited to *The Atlanta Journal Constitution*, *The Boston Globe*, Buzzfeed, *The Dallas Morning News*, *Detroit Free Press*, Fox Entertainment Group, *Houston Chronicle*, *Los Angeles Times*, North Jersey Media Group, *The Salt Lake Tribune*, *San Antonio Express News*, *San Jose Mercury News*, *Tampa Bay Business Journal*, *The Wall Street Journal*, Warner Bros., and many broadcast stations.  The Washington, DC-based Center for Public Integrity is also a CNS subscriber.

29.     Among academic institutions, subscribers to CNS' New Litigation Reports include Boston College Law School, Boston University, Case Western Reserve University, Harvard Law School, Loyola Law School, MIT Sloan School of Management, Southern Illinois University School of Law, UC Hastings College of Law, and UCLA School of Law.

30.     Nearly all of the nation's large and mid-sized law firms also subscribe to one or more of CNS' publications.  Non-law firm business entities, including large publicly-traded companies, government entities, and non-profit organizations, also subscribe to CNS' publications.

31.     To prepare the New Litigation Reports and identify new cases that may warrant a website article, CNS reporters have traditionally visited their assigned courts on a daily or weekly basis to review all the complaints filed that day (or since their last visit) to determine which ones

are newsworthy.  However, as the vast majority of federal courts and an increasing number of state courts are putting court records online via court web sites, CNS also covers courts remotely through the internet.

32.     CNS currently employs three reporters who cover the state and federal trial and appellate courts of Virginia, and who are supervised by CNS' Southeast regional bureau chief. CNS' three Virginia reporters are based in the larger metropolitan areas – Prince William, Norfolk, and Richmond.

33.     CNS previously had a reporter covering the courts in and around Alexandria, Virginia, but those courts are currently being covered by CNS' Prince William reporter on a weekly basis due to staffing constraints.  If CNS had remote electronic access to the Prince William Circuit Court through OCRA and could disseminate information and filings it accessed through OCRA, CNS' current Prince William reporter could cover the Alexandria and Arlington courts on a daily basis.

34.     Of the 120 Virginia circuit courts, CNS is able to cover five (5) live on a daily basis by sending a reporter to the courthouse every day to review the new complaints.  Thirteen (13) other circuit courts are covered intermittently by sending a reporter to the courthouse.  The remaining Virginia circuit courts are covered only with docket information due to their remote location and the expense of hiring numerous additional reporters to cover each of those far-off courts every day.

35.     If CNS had access to OCRA – at a reasonable cost similar to that currently charged to Virginia-barred attorneys – it would be able to, and would, cover on a daily basis the approximately 90 circuit courts that use OCRA by reviewing the new complaints filed in those courts and posted on OCRA.  While records are made available on OCRA after they have been

made available via public access terminals at the courthouse, it is CNS' understanding that the OCRA records lag behind only by a matter of a few minutes.

**B.**   **Relevant Virginia Law**

36.   Virginia law provides that the Virginia circuit court clerks "shall have custody of and shall keep all court records, including books, evidence, records, maps, and papers, deposited in their offices or at such location otherwise designated by the clerk, as well as records stored in electronic format whether the storage media for such electronic records are on premises or elsewhere."  Va. Code § 17.1-242.

37.   Virginia Law also provides that "[t]he Executive Secretary of the Supreme Court shall be the administrator of the circuit court system, which includes the operation and maintenance of a case management system and financial management system and related technology improvements."  Va. Code § 17.1-502(A).

38.   Virginia law permits remote access to nonconfidential court records through each Virginia circuit court clerk.  *See* Va. Code § 17.1-225; *see also* State Officials and Employees-Costs, Fees, Salaries, Allowances, Courts of Record, 1998 Va. Laws Ch. 872 (H.B. 1114).

39.   Pursuant to Virginia law, it is the filer's responsibility to redact confidential information appearing in non-sealed complaints. *See* Va. Code § 8.01-420.8(A) (filing party is responsible for redacting confidential information).

40.   Va. Code § 17.1-293 contains two provisions that place unconstitutional limitations on the right of access to judicial documents.

41.   First, Va. Code § 17.1-293(E)(7) states that a Virginia circuit court clerk can "[p]rovid[e] secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro

hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk." Va. Code § 17.1-293(E)(7). However, the Virginia Code does not provide the same access for the press or public.

42.     Second, Va. Code § 17.1-293(H) provides that:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to a third party, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

43.     These restrictions – on remote access and then dissemination – restrict and chill newsgathering, news reporting, and other speech activity protected by the First and Fourteenth Amendment.

44.     While CNS can access nonconfidential civil complaints at the circuit courts, this is not a viable option for all 120 Virginia circuit courts because the cost and time necessary are prohibitive.

45.     By restricting remote access for newsgathering purposes while permitting it for any Virginia-barred attorney and their staff, and by prohibiting dissemination to the general public, Va. Code § 17.1-293 discriminates against the media through disfavored treatment and imposes restraints on protected speech, in violation of the First and Fourteenth Amendments.

46.     These restrictions infringe CNS' First Amendment rights, and the rights of the public, to gather and disseminate newsworthy information to which a constitutional right of access exists. The burdensome impact of the restrictions also infringes on the First Amendment right of the public to receive information.

C.     <u>**OCRA and Virginia's Preference-Based Access to Online Court Records**</u>

47.     A new civil complaint filed at the Prince William Circuit Court goes through several stages before it is available for viewing online (at either the courthouse via the public access terminals or remotely via OCRA): (1) initial intake; (2) Circuit Court Case Management System (CCMS) data entry; and (3) scanning. Once a complaint is scanned, it can be viewed on the courthouse public access terminals almost immediately and on OCRA shortly thereafter – generally within five (5) minutes.

48.     At the time the civil complaints and other judicial filings are made available on OCRA, they have already been made public via public access terminals at the courthouse.

49.     To get remote access to judicial filings at a Virginia circuit court, a potential user must complete an OCRA Subscriber Agreement. Subscriptions are currently limited to attorneys, their support staff (who are presumably non-attorneys), and officers of the court.

50.     The Attorney Access page for the Prince William Circuit Court states that OCRA "is the Office of the Executive Secretary of the Supreme Court of Virginia's (SCV) Officer of the Court Remote Access (OCRA) system that enables remote viewing of documents in the Virginia Judicial Case Imaging System." The Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents known as Officer of the Court Remote Access (OCRA) ("Attorney Subscriber Agreement") defines OCRA similarly, as "the OES's Officer of the Court Remote Access system…." A copy of the Attorney Subscriber Agreement is attached hereto as **Exhibit 1**.

51.     The Prince William Attorney Access page also states that "OCRA enables online inquiry only access to currently scanned court case documents in the Case Imaging System, except for juvenile, adoption and sealed cases, as well as those parts of a file that are marked confidential,

restricted, sealed, private addendum or victim/witness."  The Attorney Subscriber Agreement includes similar language.  *See* Attorney Subscriber Agreement, Ex. 1 at 2.

52.    Upon information and belief, confidential documents are not available via OCRA. And, documents that contain confidential information are redacted by the filing party, as required by law. The documents available on OCRA are the same documents that have previously been made available on public access terminals.

53.    To log in to the OCRA System, a subscriber visits a centralized website and enters his/her e-mail address, password, and bar number/authorized officer of the court number.  The OCRA login page states: "This system is intended solely for the use of authorized Officer of the Court personnel to retrieve and review court documents they are specifically authorized to view. All other use is expressly prohibited."

54.    Upon information and belief, after logging in, a user then has access to the various circuit courts for which he/she has "subscribed."

55.    Upon information and belief, this login page was created by OES and would need to be edited by OES to allow use by CNS or other member of the media or public, who are not "Officer of the Court personnel."

56.    According to the Attorney Subscriber Agreement, "[t]he servers that store the programs and data are maintained and managed by the OES."  Attorney Subscriber Agreement, Ex. 1 at 2.

57.    The Attorney Subscriber Agreement also releases a number of parties from liability, including the Prince William Clerk's Office and OES.  *See* Attorney Subscriber Agreement, Ex. 1 at 3.

58.     Upon information and belief, the Executive Secretary administers OCRA for over ninety Virginia circuit court clerks.  Through OCRA, the Virginia circuit court clerks, including the Prince William Clerk, and OES provide preferential access to Virginia-licensed attorneys to the detriment of CNS, other members of the press, and the general public.

59.     During a Federal Rule of Civil Procedure 30(b)(6) deposition in *Courthouse News Service v. Schaefer*, Case No. 2:18-cv-391 (E.D. Va. Norfolk Division), an OES designee testified that the restriction of OCRA to Virginia-barred attorneys was an "OES-imposed requirement" and that "[i]t's always been [OES'] stance that the Code does not support providing [OCRA] to anyone other than members of the bar."

60.     After paying a nominal subscriber's fee and registering for OCRA, Virginia attorneys have the ability to view all civil, nonconfidential, public court filings remotely over the internet – on any day of the week, at any time of day, and from any location in the world.  OCRA access also gives Virginia attorneys the ability to download, save, and print out the filings at no additional charge.  In Prince William, the cost for an attorney and one support staff to have access to OCRA is $200 per year.  Access for additional employees costs $75 per individual per year. *See* Attorney Subscriber Agreement, Ex. 1 at 1.

61.     CNS is willing to pay a similar subscriber's fee for OCRA access to the Prince William Circuit Court and other courts throughout the Commonwealth.  However, the Prince William Clerk changed the terms of the subscriber agreement and the cost of access to make it more expensive and more restrictive for non-attorneys.  And, according to the clerks of various Virginia circuit courts and OES, non-Virginia-licensed attorneys cannot register for the same OCRA subscriber access as Virginia-licensed attorneys, and thus are not permitted to have the same remote access to court records as those attorneys enjoy.

62.     None of CNS' reporters covering Virginia or CNS' Southeast Bureau Chief are attorneys, nor are any of CNS' reporters or CNS' Southeast Bureau Chief licensed to practice law in Virginia.

**D.     CNS' Good Faith Attempts to Obtain OCRA Access & to Resolve Short of Litigation**

63.     For many years, CNS has made repeated attempts to obtain OCRA subscriber access and also to resolve this issue with the Executive Secretary, the Prince William Clerk, and various other Virginia circuit court clerks.

64.     In 2016, CNS requested OCRA access from almost fifty Virginia circuit court clerks.  Of the Virginia circuit court clerks who did respond, they either denied OCRA subscriber access outright or offered CNS OCRA subscriber access if the CNS subscriber was a Virginia-licensed attorney, sometimes citing to Va. Code § 17.1-293.

65.     During a deposition in January 2019 in the matter of *Courthouse News Service v. Schaefer*, Case No. 2:18-cv-391 (E.D. Va. Norfolk Division), the Prince William Clerk testified that she has, "on occasion … used [her] discretion to provide -- to offer to provide [OCRA] to others who need access to the information in the interest of being transparent and providing the highest service possible."  To that end, the Prince William Clerk also testified that the offer applied to CNS and she was "still willing to provide it."

66.     Since that time, CNS and its counsel have attempted to work with the Prince William Clerk and her counsel to obtain OCRA subscriber access.  However, the Prince William Clerk denied CNS such access because the CNS applicant did not include a Virginia bar license number and a copy of a Virginia bar card – ostensibly due to the fact that the CNS applicant is not a Virginia-licensed attorney.  A copy of the letter from the Prince William Clerk is attached hereto as **Exhibit 2**.

67.     When CNS, through its counsel, inquired as to the denial of access, the Prince William Clerk responded by email stating that she does not "currently have an OCRA contract for non-attorneys.  I will work on pulling one together now so we can complete same for Mr. Abbott and offer it to any other non-attorney parties who may wish to sign up for access."  A copy of the May 25, 2021 email from the Prince William Clerk is attached hereto as **Exhibit 3**.

68.     Thereafter, the Prince William Clerk provided CNS, through its counsel, the Non-Attorney Subscriber Agreement, which charged an annual subscription fee of $1,200 and imposed a variety of prohibitions on dissemination and publication of the nonconfidential, civil public court filings that are not included in the subscriber agreement for Virginia attorneys.  A copy of the Non-Attorney Subscriber Agreement is attached hereto as **Exhibit 4**.

69.     Some of the differences between the Attorney Subscriber Agreement and the Non-Attorney Subscriber Agreement include:

      a.     While Paragraph 5 of the Attorney Subscriber Agreement includes a "subscription fee [of] $200.00 per year for 1 attorney and 1 employee payable quarterly, semi-annually, or annually," Paragraph 5 of the Non-Attorney Subscriber Agreement provides that the "subscription fee is $1,200.00 per year for 1 non-attorney, payable annually."

      b.     Paragraph 7(j) is a new subparagraph added to the Non-Attorney Subscriber Agreement.  It provides that: "The Subscriber understands and agrees that any data accessed by secure remote access is prohibited from being sold or posted on any other website or in any way redistributed to any third party, and the clerk, in her discretion, may deny secure remote access to ensure compliance with these provisions.  However, the data accessed by secure

remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data."

c.     In addition, while Paragraph 3 of the Attorney Subscriber Agreement provides subscribers "access to an on-line database allowing inquiry-only access to scanned court cases" and cites Va. Code § 17.1-293(E), Paragraph 3 of the Non-Attorney Subscriber Agreement provides "access to an on-line database allowing inquiry access to scanned court cases," citing Va. Code § 17.1-293(F).  Va. Code § 17.1-293(F) provides that court clerks may "provid[e] online access to a case management system that may include *abstracts* of case filings and proceedings…"

70.    Given these and other terms of the Non-Attorney Subscriber Agreement, CNS could not and did not submit an application.

71.    CNS also requested OCRA access from OES.  In March 2021, CNS, through its counsel, wrote to the Executive Secretary and also OES' Director of Judicial Information Technology raising the issues addressed in this Complaint.  By letter, CNS requested a conversation with the Executive Secretary regarding OCRA subscriber access.  A copy of the letter is attached hereto as **Exhibit 5**.

72.    CNS, through its counsel, followed up again in April 2021 via email and noted its willingness to engage in discussions to avoid litigation.  The Executive Secretary, through the Assistant Executive Secretary and Counsel, responded by stating: "Although this Office hosts the

online records viewable through OCRA, after carefully reviewing your request and applicable Virginia statutes, we do not believe we are legally authorized to provide you with the access you request."  After citing Va. Code §17.1-293(E)(7) and stating that access is limited to "*members in good standing with the Virginia State Bar*," OES's response went on to state that the Executive Secretary is "not in a position to provide" CNS with OCRA access because "the contents and records that are viewable [on OCRA] are under the custody and control of the circuit court clerks." A copy of the Executive Secretary's April 22, 2021 E-mail Response is attached hereto as **Exhibit 6**.

73.    In or around January 2019, the Prince William Clerk requested an Opinion from the Attorney General regarding "whether a circuit court clerk may provide members of the press with secure remote access to nonconfidential court records" under Va. Code § 17.1-293.  In response to that inquiry, on June 25, 2021, the Prince William Clerk received an informal opinion and advice from Robert B. McEntee, an Assistant Attorney General for the Commonwealth of Virginia and the Executive Secretary's counsel in this case, representing only his "individual view."  Mr. McEntee's individual view is that "the Code of Virginia grants circuit court clerks the ability to provide secure remote access to nonconfidential court records to members of the general public under § 17.1-225" but that "[b]ecause systems like OCRA … exist in part to facilitate access by officers of the court to protected private information pursuant to § 17.1-293(E)(7), circuit court clerks cannot grant the general public remote access to nonconfidential documents through OCRA."  A copy of the informal opinion is attached hereto as **Exhibit 7**.

74.    Since, according to the Prince William Attorney Access page, "OCRA enables online inquiry only access to currently scanned court case documents in the Case Imaging System, except for juvenile, adoption and sealed cases, as well as those parts of a file that are marked

19

confidential, restricted, sealed, private addendum or victim/witness," and since filers are required to redact private and confidential information prior to filing," the nonconfidential filings available on OCRA should not include the protected private information listed in § 17.1-293(E)(7).

75.     Virginia attorneys and their staff who subscribe to OCRA have access to not only records in their own cases, but also to records in other cases in which they are not attorneys of record, parties, or otherwise involved.

**E.     <u>Harms Caused By Discriminatory Access</u>**

76.     Once a Virginia circuit court clerk makes its documents available for remote or online viewing, it becomes incumbent on the clerk to offer that same access to all members of the public and press.  Such even-handed access to court records is not merely a presumed right or good policy; it is a right conferred by the United States Constitution.  Among the records for which the current discriminatory access exists are not just civil complaints, but also other categories of records for which courts have found a First Amendment right of access to apply, such as summary judgment records.

77.     There is no difference in the content of the civil, nonconfidential, public court filings that CNS and other members of the press must travel to each individual court to see, and the civil records that Virginia-licensed attorneys can see remotely over the internet via OCRA – i.e., they are the exact same records. And yet, while Virginia-licensed attorneys can view these records any time of the day or night, without moving from their office or home chairs, and can print out copies of records without paying per-page copying fees, CNS must go through the time and expense of traveling to each Virginia circuit court clerk's office to review the documents in person.  Even for occasional visits, this is not an insignificant expense or burden, especially if the Virginia circuit court is some distance away.

78.    Indeed, to have anything near the access that a Virginia-licensed attorney has through OCRA, a news organization (such as CNS, which focuses its reporting on court records) would need to send a reporter to all of the Virginia circuit court clerk's offices that use OCRA every day.

79.    In addition, non-attorneys – including CNS, other members of the press, and the general public – must pay a per page charge for any copies that they request, a cost that can add up quickly and that is not incurred by the Virginia-licensed attorneys with OCRA subscriber access.

80.    Moreover, the Prince William Clerk charges non-attorneys $1,200 annually for an OCRA subscription, whereas Virginia-licensed attorneys are charged only $200 annually.

81.    Finally, non-attorneys, while effectively being denied access to OCRA, can only review civil, nonconfidential, public court filings while the Virginia circuit court clerks' offices are open to the public.  Practically speaking, this means that there is an inherent delay in access to nonconfidential, public court filings for non-attorneys, whereas there is no such delay for Virginia-licensed attorneys.

82.    In the case of CNS, a news service specializing in reporting on civil litigation, Defendants' refusal to provide it with the same access to civil court records that Defendants are currently providing to Virginia-licensed attorneys means that, as a practical matter, CNS can only report on a select number of Virginia circuit courts on a daily basis, others on a less periodic basis, and some not at all.

83.    If non-attorneys – including CNS, other members of the press, as well as the general public – were provided the same access to civil, nonconfidential, public court filings that Defendants are currently providing to Virginia-licensed attorneys, the media (including CNS)

would be able to provide more comprehensive news coverage about new civil actions in all or most of Virginia's circuit courts.

84.     In addition, Va. Code § 17-1.293(H) has a severe chilling effect on CNS' protected speech and reporting activities.  CNS requested remote access through OCRA so that its reporters can review new civil complaints, report on them in the New Litigation Reports and/or on the website, and provide interested subscribers with copies of the complaints.  The risk of paying a $1,200 subscription fee and then having the subscription immediately terminated due to CNS providing its subscribers and the general public with a public judicial document, as well as other potential unspecified penalties and/or liabilities, has hindered – and continues to hinder – CNS' ability to contribute to public discourse surrounding civil complaints filed in the Virginia circuit courts.

85.     This chilling effect on CNS' speech and reporting impedes the public's ability to learn about newly-filed civil litigation.

## COUNT ONE
### Violation of U.S. Const. Amend. I and 42 U.S.C. § 1983
### First Amendment – Access Restrictions
### (Against Both Defendants)

86.     CNS incorporates and repeats the allegations of Paragraphs 1 – 85 herein.

87.     The First Amendment to the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment to the U.S. Constitution, protects CNS' right of access to newly-filed civil complaints.

88.     The First Amendment also prohibits states from regulating speech based on the identity of the speaker unless the state can demonstrate a compelling government need for the regulation and that the regulation is narrowly tailored to fulfill that need.   Speaker-based restrictions are presumptively unconstitutional.

89.    Virginia Code § 17.1-293, on its face and as-applied by Defendants through their policies, practices, and customs, deprives CNS, and by extension its subscribers and the public, of their First Amendment right of access.

90.    Defendants' actions under color of state law, including without limitation, their policies, practices, and customs of providing OCRA access to Virginia-licensed attorneys and their staff, including in cases in which they are not attorneys of record, but depriving that same access to others, including CNS, deprives CNS, and by extension its subscribers and the public, of the First Amendment right of equal access to certain civil, nonconfidential, public court filings and other public court records, as required by the First Amendment to the U.S. Constitution.

91.    The policy, practice, and custom of providing remote online access to civil complaints and other public court records to Virginia-licensed attorneys and their staff, including in cases in which they are not attorneys of record, but depriving that same access to others, including CNS, impermissibly discriminates against CNS and other members of the press, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports.

92.    There is no compelling or overriding interest sufficient to justify Defendants' actions resulting in the denial of contemporaneous and equal access to new civil complaints and other public court records under the First Amendment.  Even if an overriding or compelling interest did exist, there are far less restrictive means of protecting any such interest.  As such, Defendants' policies and practices are not narrowly tailored, as required by law.

93.    CNS has no adequate remedy at law to prevent or redress Defendants' unconstitutional actions and will suffer irreparable harm as a result of Defendants' violations of

CNS' First Amendment rights.  CNS is therefore entitled to declaratory and injunctive relief to prevent further deprivation of these rights.

## COUNT TWO
### Violation of U.S. Const. Amend. I and 42 U.S.C. § 1983
### First Amendment – Dissemination Restrictions
### (Against Both Defendants)

94.    CNS incorporates and repeats the allegations of Paragraphs 1 – 93 herein.

95.    The First Amendment to the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment to the U.S. Constitution, protects CNS' right to disseminate newsworthy information. That is especially true where, as here, the newsworthy information CNS wants to disseminate is information about public court records to which there is a First Amendment right of access.

96.    Virginia Code § 17.1-293, on its face and as-applied by Defendants through their policies, practices, and customs, deprives CNS, and by extension its subscribers and the public, of their First Amendment rights.

97.    The First Amendment generally precludes the government from suppressing the dissemination of truthful information about issues of civic importance.  Thus, when a member of the press or the public "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Florida Star v. B.J.F.*, 491 U.S. 524, 533 (1989).

98.    Defendants' actions under color of state law, including without limitation, their policy, practice, and custom of restricting the dissemination of nonconfidential judicial documents obtained via OCRA, and the threatened termination of the Non-Attorney Subscriber Agreement for such dissemination, violates the First Amendment.

99.     The policy, practice, and custom of restricting the dissemination of nonconfidential judicial documents obtained via OCRA and the threatened termination of the Non-Attorney Subscriber Agreement for such dissemination, impermissibly discriminates against CNS and other members of the press, and burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports.

100.    There is no compelling or overriding interest sufficient to justify Defendants' actions.  Even if an overriding or compelling interest did exist, there are far less restrictive means of protecting any such interest.  As such, Defendants' policies and practices are not narrowly tailored, as required by law.

101.    CNS has no adequate remedy at law to prevent or redress Defendants' unconstitutional actions and will suffer irreparable harm as a result of Defendants' violations of CNS' First Amendment rights.  CNS is therefore entitled to declaratory and injunctive relief to prevent further deprivation of these rights.

**COUNT THREE**
**Violation of U.S. Const. Amend. XIV and 42 U.S.C. § 1983**
**Equal Protection**
**(Against Both Defendants)**

102.    CNS incorporates and repeats the allegations of Paragraphs 1 – 101 herein.

103.    Virginia Code § 17.1-293, on its face and as-applied by Defendants through their policies, practices, and customs, deprives CNS, and by extension its subscribers and the public, of their Fourteenth Amendment right to equal protection of the laws.

104.    Defendants' actions under color of state law, including without limitation, their policies, practices, and customs of providing OCRA access to Virginia-licensed attorneys and their staff, including in cases in which they are not attorneys of record, but depriving that same access

25

to others, including CNS, deprives CNS, and by extension its subscribers and the public, of their Fourteenth Amendment right of equal protection of the laws.

105.    The policy, practice, and custom of providing remote online access to civil, nonconfidential, public court filings and other public court records to Virginia-licensed attorneys and their staff, including in cases in which those Virginia-licensed attorneys are not attorneys of record, but depriving that same access to others, including CNS, impermissibly discriminates against CNS and other members of the press, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports.

106.    There is no legitimate, compelling, or other justification for implementing a system of discriminatory access to civil, nonconfidential, public court filings and other public court records, and, even if there were, Defendants' practices and policies are not narrowly tailored, as is required by law.

107.    CNS has no adequate remedy at law to prevent or redress Defendants' unconstitutional actions and will suffer irreparable harm as a result of Defendants' violations of CNS' First and Fourteenth Amendment rights.  CNS is therefore entitled to declaratory and injunctive relief to prevent further deprivation of these rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Courthouse News Service seeks judgment in its favor and against Defendants Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia, and Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia as follows:

1.    Injunctions against Defendants, including their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them, or at their direction or under

their control, prohibiting them from continuing their policies, practices, and customs of denying remote online access to non-Virginia-licensed attorneys;

2.     Injunctions against Defendants, including their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them, or at their direction or under their control, prohibiting them from continuing their policies, practices, and customs of prohibiting the dissemination of public court records gathered via remote electronic access;

3.     To the extent that this Court determines that Va. Code § 17.1-293 restricts such access, CNS seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Va. Code § 17.1-293 unconstitutional on its face because it impermissibly denies remote online access to non-attorneys, including CNS, because it denies non-Virginia-licensed attorneys, including CNS, of equal access and equal protection under the law in violation of the First and Fourteenth Amendments to the U.S. Constitution, and because it impermissibly discriminates against CNS and other members of the press and public, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports;

4.     In the alternative (and also to the extent that this Court determines that Va. Code § 17.1-293 restricts such access), CNS seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Va. Code § 17.1-293 unconstitutional as-applied by Defendants under the Fourteenth Amendment to the U.S. Constitution, for the reason that Defendants' policies, practices, and customs deprive non-attorneys, including CNS, of equal protection under the law in that those policies, practices, and customs impermissibly discriminate against CNS and other members of the press, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports;

5.    To the extent that this Court determines that Va. Code § 17.1-293 restricts the dissemination of civil, nonconfidential, public court records gathered via remote electronic access, CNS seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Va. Code § 17.1-293 unconstitutional on its face because it impermissibly burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports.

6.    In the alternative (and also to the extent that this Court determines that Va. Code § 17.1-293 restricts dissemination), CNS seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Va. Code § 17.1-293 unconstitutional as-applied by Defendants under the Fourteenth Amendment to the U.S. Constitution, for the reason that her policies, practices, and customs impermissibly burden the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports;

7.    Injunctions against Defendants, including their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them, or at their direction or under their control, prohibiting them from enforcing the challenged statute;

8.    For an award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

9.    For all other relief the Court deems just and proper.


[[SIGNATURE BLOCK APPEARS ON FOLLOWING PAGE]]

Dated: September 14, 2021

Respectfully Submitted,

/s/ Adam L. Shaw
Adam L. Shaw (Va. Bar No. 89559)
Heather S. Goldman (admitted *pro hac vice*)
**BRYAN CAVE LEIGHTON PAISNER LLP**
1155 F Street, NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Fax: (202) 508-6200
Email: adam.shaw@bclplaw.com
   heather.goldman@bclplaw.com

*Attorneys for Plaintiff*
*Courthouse News Service*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of September, 2021, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing to all counsel of record.

*/s/ Adam L. Shaw*
Adam L. Shaw