**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br>*Plaintiff*,<br>v.<br>JACQUELINE C. SMITH, *et al*.,<br>*Defendants.* | ) | Civil Action No. 3:21-cv-00460-HEH |

**COURTHOUSE NEWS SERVICE'S MEMORANDUM OF LAW**
**<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**


**BRYAN CAVE LEIGHTON PAISNER LLP**
Jonathan E. Ginsberg (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**
Dabney J. Carr, IV (VSB No. 28679)
P.O. Box 1122
Richmond, Virginia
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr.@troutman.com

*Counsel for Plaintiff*
*Courthouse News Service*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ........ 1

**STATEMENT OF UNDISPUTED MATERIAL FACTS** ........ 3

A. About CNS ........ 3

B. About the Prince William Clerk, Virginia Circuit Courts, and Executive Secretary ........ 6

C. About OCRA Access ........ 7

D. Civil Filings at the Prince William Court and the Clerk's Redaction Practices ........ 10

E. The Prince William Clerk's Redaction Practices ........ 11

F. CNS' Requests for OCRA Access ........ 13

**RELEVANT VIRGINIA STATUTES AND LEGISLATIVE HISTORY** ........ 14

**ARGUMENT** ........ 16

**CNS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW** ........ 16

A. The Clerk Has Violated CNS' First Amendment Rights ........ 18

1. There Is a First Amendment Right of Access to Newly Filed Civil Complaints and Other Civil Court Records ........ 18

2. The Non-Attorney Access and Dissemination Restrictions Do Not Pass Constitutional Scrutiny ........ 19

a. The Virginia Code Does Not Require the Clerk to Implement the Non-Attorney and Dissemination Access Restrictions, and Even if it Did, the Requirements of the First Amendment Trump the Code ........ 21

b. The Access Restrictions are Not Supported By a Compelling or Significant Government Interest Nor Are They Narrowly Tailored ........ 22

B. CNS is Entitled to a Declaratory Judgment and Permanent Injunction ........ 29

**CONCLUSION** ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associated Press v. Dist. Ct.*,
705 F.2d 1143 (9th Cir. 1983) ....................20

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)....................20

*Bernstein v. Bernstein Litowitz Berger & Grossman LLP*,
814 F.3d 132 (2d Cir. 2016)....................18, 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................17

*Centennial Life Ins. Co. v. Poston*,
88 F.3d 255 (4th Cir. 1996) ....................29

*Centro Tepeyac v. Montgomery County*,
722 F.3d 184 (4th Cir. 2013) ....................29

*Courthouse News Serv. v. Cozine*,
2022 WL 1000775 (D. Or. Apr. 4, 2022) ....................18

*Courthouse News Serv. v. Forman*,
2022 WL 2105910 (N. D. Fla. June 10, 2022) ....................18

*Courthouse News Serv. v. Forman*,
2022 WL 1405907 (N.D. Fla. May 4, 2022) ....................27, 28

*Courthouse News Serv. v. Gabel*,
2021 WL 5416650 (D. Vt. Nov. 19, 2021)....................19

*Courthouse News Serv. v. N.M. Admin. Office of the Courts*,
566 F. Supp. 3d 1121 (D.N.M. 2021)....................19

*Courthouse News Serv. v. Omundson*,
2022 WL 1125357 (D. Idaho Apr. 14, 2022) ....................19

*Courthouse News Serv. v. Planet*,
947 F.3d 581 (9th Cir. 2020) .................... *passim*

*Courthouse News Serv. v. Quinlan*,
32 F.4th 15 (1st Cir. 2022)....................18

*Courthouse News Serv. v. Schaefer*,
440 F. Supp. 3d 532 (E.D. Va. 2020), *aff'd*, 2 F.4th 318 ............................................. *passim*

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975)........................................................................................20, 30

*Doe v. Public Citizen*,
749 F.3d 246 (4th Cir. 2014) .......................................................................... *passim*

*Elrod v. Burns*,
427 U.S. 347 (1976)..............................................................................................29

*Globe Newspaper Co. v. Pokaski*,
868 F.2d 497 (1st Cir. 1989)..................................................................... 19-20

*In re Charlotte Observer*,
921 F.2d 47 (4th Cir. 1990) ..................................................................................23

*In re Wash. Post Co.*,
807 F.2d 383 (4th Cir. 1986) ................................................................................19

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir. 2011) ...........................................................................29, 30

*Leigh v. Salazar*,
677 F.3d 892 (9th Cir. 2012) ................................................................................20

*Lux v. Judd*,
842 F. Supp. 2d 895 (E.D. Va. 2012) ...................................................................30

*McCullen v. Coakley*,
573 U.S. 464 (2014)..............................................................................................20

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
612 F.3d 301 (4th Cir. 2010) ................................................................................18

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
354 F.3d 249 (4th Cir. 2003) ................................................................................29

*Penn-Am Ins. Co. v. Coffety*,
368 F.3d 409 (4th Cir. 2004) ................................................................................29

*Press-Enterprise Co. v. Superior Court of California for Riverside Cnty.*,
478 U.S. 1 (1986)............................................................................................ *passim*

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) ................................................................................18

*Richmond Newspapers, Inc., v. Virginia*,
448 U.S. 555 (1980)....................30

*Rushford v. New Yorker Mag., Inc.*,
846 F.2d 249 (4th Cir. 1988) ....................17, 19

*Soderberg v. Carrion*,
999 F.3d 962 (4th Cir. 2021) ....................20

*Stone v. Univ. of Maryland Medical System Corp.*,
855 F.2d 178 (4th Cir. 1988) ....................19

*Va. Dep't. of State Police v. Washington Post*,
386 F.3d 567 (4th Cir. 2004) ....................17, 19, 23, 24

**Statutes**

Va. Code § 8.01-420.8 ....................11, 16, 24

Va. Code § 8.01-217(G).................... 13, 25-26

Va. Code §§ 16.1-307, 63.2-1246, 16.1-305; 16.1-305.01 ....................25

Va. Code § 17.1-225 ....................14, 22

Va. Code § 17.1-242 ....................14

Va. Code § 17.1-293 .................... *passim*

Va. Code § 17.1-295 ....................27

Va. Code § 20-124 ....................26

Va. Code § 20-146.20 ....................25

**Other Authorities**

ITRM Standard SEC503-02.2....................29

Senate Bill No. 980 ....................16

**PRELIMINARY STATEMENT**

Plaintiff Courthouse News Service ("CNS") is entitled to summary judgment because the policies and practices of Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County (the "Clerk" or "Prince William Clerk"), as well as those of Defendant-Intervenor the Commonwealth of Virginia (the "Commonwealth") (collectively, "Defendants"), that (i) restrict remote access to Virginia-barred attorneys, while precluding such access to the general public and press (the "Non-Attorney Access Restriction") and (ii) prohibit the dissemination of non-confidential civil filings accessed remotely (the "Dissemination Restriction") violate the First Amendment.

The Clerk provides remote online access to subscribers via a permissions-based system known as the Officer of the Court Remote Access system ("OCRA") to the same non-confidential civil court records that are available on public access terminals at the Prince William County Circuit Court (the "Prince William Court"). But unlike all federal district courts, including this Court, and a growing number of state courts across the country – *including the Alexandria Circuit Court in Virginia* – that provide the press and public with remote access to new civil filings via secure court websites – enabling journalists to cover more courts in the era of digital news coverage where there is a 24/7 news cycle – the Prince William Clerk offers OCRA only to Virginia-barred attorneys and their staff.

The effect is that the practical ability of the press to report on new filings on a daily basis is impaired. It is simply not possible for a news service, such as CNS, to send reporters on a daily basis, if at all, to the 120 courts throughout the Virginia circuit court system, 105 of which utilize OCRA and cover an area of over 30,000 square miles. This impediment to access undermines the benefit of public scrutiny and effectively results in suppression, all while one subclass of the public can review new filings remotely on a daily basis 24/7/365.

The Fourth Circuit has made clear that the First Amendment provides the press and public with a contemporaneous right of access to civil court filings, and such access must be "as expeditiously as possible" based on the facts "[i]n the context of the case." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021). Same-day access is required "insofar as practicable," *Schaefer*, 440 F. Supp. 3d 532, 562 (E.D. Va. 2020), and in the context of a court, like the Prince William Court, where remote access is available, and thus practicable, restricting such access to Virginia-barred attorneys interferes with CNS' First Amendment right of access.

Because the First Amendment right of access attaches to civil court filings, Defendants bear the burden of justifying *any* access restrictions pursuant to the framework established by the Supreme Court in *Press-Enterprise Co. v. Superior Court of California for Riverside Cnty.*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"). In other words, they must demonstrate that the challenged access restrictions, which blackout the press and public in favor of Virginia attorneys, are justified by a compelling or significant interest based on findings that withholding remote access and prohibiting the dissemination of filings accessed remotely is essential to preserve higher values and is narrowly tailored to serve that interest. Defendants cannot do so.

While Defendants rely on Va. Code § 17.1-293, which prohibits a clerk from posting on the Internet social security and financial account numbers, dates of birth, maiden and minor names, and signatures, to justify her restriction of access to *all* civil filings – regardless of whether they contain personal identifiers – the plain language of the statute does not require the Non-Attorney Access and Dissemination Restrictions. At least one Virginia circuit court clerk agrees, *i.e.*, the Alexandria clerk, who provides remote access to subscribing members of the press and public, regardless of whether they are an attorney. And even if the Virginia Code did mandate the challenged access restrictions, the First Amendment trumps the Code.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

CNS sets forth the following statement of undisputed material facts ("SUF").

**A. About CNS**

1. CNS is a nationwide news service that specializes in reporting on civil litigation, from the initial complaint to subsequent filings, hearings, and rulings, through the appellate level, in state and federal courts across all 50 states, including Virginia. Joint Stipulations of Fact, dated May 4, 2022, Doc. 55 ("JSF"), ¶ 1.

2. CNS now has more than 2,750 subscribers nationwide, including law firms and libraries, academic institutions, publicly traded companies, government entities, non-profit organizations, news and entertainment media outlets, and watchdog groups. *Id.* ¶ 2; *see also* Declaration of William Girdner, dated July 11, 2022 ("Girdner Decl."), ¶¶ 18-20.

3. A wide range of news and media outlets rely on CNS to learn about new civil filings, and CNS has been credited as the original source of reporting by newspapers, legal publications, magazines, television, radio, and online media. *Id.*, ¶¶ 21-22; JSF ¶ 3.

4. CNS offers a variety of publications. *Id.* ¶¶ 4-7. One category of publications is CNS' New Litigation Reports, which contain original, staff-written summaries of significant and newsworthy new civil complaints. *Id.* ¶ 4. New Litigation Reports focus on general jurisdiction civil complaints against business institutions, public entities, prominent individuals, or other civil actions that might be of interest to CNS' subscribers. *Id.*; Girdner Decl., ¶ 15.

5. CNS publishes two New Litigation Reports in Virginia: the *Virginia Report*, which covers new litigation filed in 31 Virginia circuit courts, including the Prince William Court, and the *Southern Virginia State Report*, which covers new litigation filed in 89 Virginia circuit courts. JSF ¶ 5. Both reports are sent to subscribers via email each weekday evening. *Id.*

6. CNS also publishes a publicly-available website (www.courthousenews.com) featuring news reports and commentary, which is read by hundreds of thousands of readers each month. *Id.* ¶ 7. The website functions much like a print daily newspaper, featuring staff-written articles about the news of the day from throughout the nation that are posted and rotate on and off the page on a 24-hour news cycle. *Id.* Many of the stories on the website focus on ongoing court cases and rulings in state and federal courts, including those in Virginia. *Id.*

7. CNS' publications do not cover criminal, domestic relations, or juvenile matters, nor do they include name changes, probate filings, or most residential foreclosures. *Id.* ¶ 8. And CNS' reporters observe ethical proscriptions precluding inclusion of confidential information and personal identifiers in any of CNS' publications. Girdner Decl. ¶ 43.

8. To prepare New Litigation Reports and identify civil filings that warrant a website article, CNS reporters have traditionally visited their assigned courts on a daily or weekly basis to review complaints and other civil court documents filed that day, or since their last visit, to determine which ones are newsworthy. JSF ¶ 9. However, as the vast majority of federal courts and many state courts are putting court records online via court websites, CNS also covers courts remotely through the Internet, without the need to require reporters to travel to those courts. *Id.*

9. State courts that provide remote online access to all non-confidential civil filings and other court records, through a permission-based system that require user credentials, either on a statewide basis or through individual courts within the state, include California, Louisiana, Massachusetts, Nebraska, Oklahoma, Tennessee, and Washington – in which several of the courts are predominantly paper-filing courts (like the Prince William Court) – as well as courts within Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Minnesota, Mississippi, Montana, Nevada, New

Jersey, New Mexico, New York, North and South Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, and Utah. *Id.* ¶ 10; Girdner Decl. ¶¶ 26-27.

10. All federal courts in the nation, including the U.S. district courts in Virginia, give the press and public remote online access to civil court records via PACER. JSF ¶ 11.

11. CNS currently employs approximately 240 people, most of them editors and reporters, who report on the day's civil filings filed at their assigned courthouse(s). *Id.* ¶ 12. In Virginia, CNS currently employs two reporters who cover the state and federal courts across the state and who are based in the larger metropolitan areas – Prince William County, Norfolk, and Richmond. Declaration of Ryan Abbott, dated July 11, 2022 ("Abbott Decl."), ¶ 4.

12. Of the 120 Virginia circuit courts, CNS currently sends reporters to five on a daily basis, *i.e.*, Prince William, Fairfax, Norfolk, Richmond City, and Virginia Beach. JSF ¶ 14.

13. CNS currently covers one Virginia circuit court, *i.e.*, Alexandria, remotely on a daily basis by accessing new civil filings through the Internet via the Alexandria Justice Information System ("AJIS"). *Id.* ¶ 15; Abbott Decl. ¶¶ 12-18. CNS previously covered the Alexandria Circuit Court by sending a reporter to the court on a weekly basis. *Id.* ¶ 12; JSF ¶ 15.

14. The filings on AJIS are available to any subscribing member of the press or public, and those filings are the same records available at the courthouse. Abbott Decl., ¶¶ 16-17.

15. CNS currently covers twelve other Virginia circuit courts by sending one of the three Virginia-based reporters to the court on a less than daily basis. JSF ¶ 16. CNS covers the remaining 102 Virginia circuit courts only with docket information, *i.e.*, party names, case type, court name, due to their remote locations and the cost-prohibitive expense of hiring numerous additional reporters to cover each of those far off courts in person, which cover an area of over 30,000 square miles. *Id.* ¶ 17; Girdner Decl. ¶¶ 29, 32.

**B. <u>About the Prince William Clerk, Virginia Circuit Courts, and Executive Secretary</u>**

16. The Prince William Clerk is an independently elected constitutional officer and serves as the custodian of all court records in the Prince William Court, including records stored in electronic format whether in the clerk's office or elsewhere, and she is responsible for making those records available to the public for inspection and examination. JSF ¶¶ 20-21.

17. The Prince William Clerk is also responsible for developing and implementing the policies and procedures for operating the Prince William Court Clerk's Office, in conformance with applicable law, including those relating to access to non-confidential civil filings and other court records that are filed in the Prince William Court. *Id.* ¶ 22.

18. The Prince William Clerk, like other Virginia circuit court clerks, provides the public and press, including CNS, with access to non-confidential electronic civil court records, including new filings and court rulings, through its public access terminals located in the Civil Division of the Clerk's office at the physical courthouse during normal business hours, *i.e.*, Monday through Friday, 8:30 a.m. to 5:00 p.m. *Id.* ¶¶ 24-26.

19. Since 2012, the Prince William Clerk has also provided subscribers, whom the Clerk approves and authorizes, with remote online access to electronic images of all non-confidential civil court records filed in the Prince William Court, including new filings and court rulings, through OCRA. *Id.* ¶ 27. However, the Prince William Clerk does not offer remote online access to civil court records to any members of the press or public unless they are a Virginia-barred attorney or the staff member of a Virginia licensed attorney. *Id.* ¶ 28.

20. OCRA is provided by Office of the Executive Secretary of the Supreme Court of Virginia ("OES") to the Prince William Clerk and any other interested circuit court clerks. *Id.* ¶ 27. Currently, in addition to the Prince William Clerk, clerks for 104 other Virginia circuit

courts provide subscribers, whom those clerks likewise approve and authorize, with remote online access to electronic images of non-confidential civil court records filed in their respective courts through OCRA. *Id.*

21. The case management system used by the Clerk, as well as all but two Virginia circuit court clerks, is known as the Circuit Court Case Management System ("CCMS"). *Id.* ¶ 30. A Case Imaging System ("CIS") enables the Clerk, as well as other Virginia circuit court clerks, to create and store electronic images of case documents that the clerk may, if he or she so chooses, make available for viewing by members of the public and press on public access terminals at the courthouse. *Id.* ¶¶ 31, 35. The Prince William Clerk makes electronic images of case documents available for viewing by the public and press in this manner. *Id.*, ¶ 31.

**C. <u>About OCRA Access</u>**

22. OCRA, which was created, and is now supported and maintained by OES, enables circuit clerks to make non-confidential CIS case images available for secure online viewing by their subscribers. *Id.* ¶ 35. The records viewable through OCRA are stored on local servers controlled by the respective local circuit court clerks. *Id.* ¶ 36.

23. To log in to OCRA, a subscriber visits a centralized permission-based website (https://cisweb.vacourts.gov/Ocra) – which OES provides and maintains for participating circuit clerks – and enters his/her e-mail address, password, and bar number or assigned authorized subscriber number. *Id.* ¶¶ 35, 40. The OCRA login page states: "This system is intended solely for the use of authorized Officer of the Court personnel to retrieve and review court documents they are specifically authorized to view. All other use is expressly prohibited." *Id.* ¶ 40. Each participating clerk ultimately determines who is authorized to access the clerk's records via OCRA, pursuant to and in compliance with applicable law. *Id.*

24. If a circuit court clerk, like the Prince William Clerk, determines that a subscriber is authorized to have OCRA access, then that subscriber will be provided a username and temporary password by the circuit court clerk to access OCRA, and when the subscriber logs in, he/she will be prompted to change their password after their first login. *Id.* ¶ 41. OES does not evaluate or screen subscribers once they are authorized by a clerk. *Id.* In fact, OES takes no steps to authorize access to a circuit court's OCRA system; all steps are taken by individual court clerks, such as the Prince William Clerk, or their employees. Karl Hade's Responses to CNS' First Interrogatories, No. 2, attached as Exhibit A.

25. OES would not object, and has no authority to do so, if the Prince William Clerk provided CNS with access to civil filings via OCRA. *Id.* No. 3. Indeed, it is not necessary for OES to provide permission or authorization in order for the Prince William Clerk, or any other Virginia clerk, to provide OCRA access to CNS. *Id.* No. 1.[1]

26. An OCRA subscriber is responsible for paying any subscriber fee charged by a circuit court clerk and for the proper use of the secure remote access system pursuant to a subscriber agreement and any applicable law. JSF ¶ 37.

27. To subscribe to OCRA at the Prince William Court, in addition to entering into a subscription agreement with the court, a subscriber must pay an annual fee of $200.00 per year, which covers one attorney and one employee of that attorney; any additional employee is $75 per individual per year. *Id.* ¶ 43; *see also* Exhibit B, Attorney Subscriber Agreement For Remote Access to Prince William Court Documents ("Attorney Subscriber Agreement"), ¶ 5. CNS is

---

[1] Based on Mr. Hade's interrogatory responses, among other reasons, on May 31, 2022, CNS agreed to dismiss this action as against Mr. Hade without prejudice. Doc. 60, 64. Thereafter, on the same date, the Commonwealth filed a Notice of Intervention. Doc. 61.

willing to enter into an agreement with each circuit court clerk, including the Prince William Clerk, and to pay a similar subscriber's fee for OCRA access. JSF ¶ 43.

28. There is a sliding scale for annual maintenance charges for clerks who have five (5) or more private (non-governmental) subscribers: the annual maintenance charge is $500 for clerks with 5-14 private subscribers; $1,500 for clerks with 15-34 private subscribers; $3,500 for clerks with 35-54 private subscribers; $5,500 for clerks with 55-94 private subscribers; and $9,500 for clerks with 95 – 400 private subscribers. *Id.* ¶ 38.

29. The Prince William Clerk currently has 274 paying private, *i.e.*, attorney, OCRA subscribers, meaning the Clerk collects at least $54,800 in annual subscriber fees, despite only paying an annual maintenance fee of $9,500. Exhibit C, Defendant Smith's Answers to Plaintiff's Second Set of Interrogatories ("Smith Second Resp."), No. 12.

30. After paying a subscriber's fee and registering for OCRA, Virginia attorneys and their staff have the ability to view non-confidential civil filings that the Clerk has made available through OCRA remotely – on any day of the week, at any time of day, and from any location in the world. JSF ¶ 44. To access the same court records without OCRA or an alternative means of remote access, CNS and other press and public must travel to each courthouse that uses OCRA, including the Prince William Court, during business hours. *Id.*

31. OCRA subscribers have access to civil filings and records in their own cases, as well as filings and records in other cases in which they are not attorneys of record, parties, or otherwise involved, provided those records are scanned into CIS. *Id.* ¶ 45.

32. In 2018, the General Assembly passed a budget appropriations bill that required OES to convene a workgroup to evaluate issues related to, among other things, a system in which digital images of non-confidential civil records in circuit courts may be viewed by subscribers.

JSF ¶ 52. The workgroup consisted of OES staff and circuit court clerks representing the Virginia Court Clerks Association ("VCCA"); their findings and recommendations to the General Assembly (the "2018 Work Group Report") are attached as Exhibit D.

33. One option presented in the 2018 Work Group Report to implement a statewide platform for subscribers, including non-attorneys, to view non-confidential civil court records was to adopt OCRA statewide. Ex. D at 12-13. In that regard, the report stated: "If [OCRA is] made available to the public (which the VCCA does not feel is appropriate), steps would need to be taken to prevent unauthorized access to sensitive information such as social security numbers, dates of birth and financial account numbers," such as requiring the filing party to include such information on a separate addendum, "which would be only be made available to the parties, their attorneys, and such other persons deemed necessary by the court." *Id.* at 13. OES notes made in connection with the 2018 Work Group Report reflect its view that no authority may exist for clerks' concerns that non-attorney OCRA users could scrape data. *See* Exhibit E at 5.

34. In 2019, the General Assembly rejected an attempt to amend the Virginia Code to expressly require the clerks of the circuit courts to provide secure remote access to all non-confidential civil court records to non-attorneys. *See infra* at 15-16.

**D. Civil Filings at the Prince William Court and the Clerk's Redaction Practices**

35. A new non-confidential civil filing filed at the Prince William Court, and other Virginia circuit courts, goes through several stages before it is available for viewing online at either the courthouse via public access terminals or remotely via OCRA: (1) initial intake, (2) data entry into CCMS, and (3) scanning into CIS; once a new filing is scanned into CIS, it can be viewed by the press and public via public access terminals at courthouses that provide public

terminals, like the Prince William Court, almost immediately and on OCRA, by subscribers authorized by the circuit clerk shortly thereafter, usually within five minutes. JSF ¶¶ 46-47.

36. For courts that provide public access terminals at the courthouse, like the Prince William Court, every civil court record that is available remotely on OCRA has already been made available to the public and press via public access terminals at the courthouse in which the record was filed. *Id.* ¶ 48. There is no difference in the content of the court records that CNS and other members of the press and public must travel to each individual court to see, and the court records that subscribers can see remotely via OCRA – they are the same records. *Id.* ¶ 49.

37. The Prince William Clerk "is unable to provide" the total number of non-confidential civil court records that were filed in the Prince William Court in each of the last five years, but in March 2018, there were 392 new civil complaints filed; in March 2019, there were 379 new civil complaints filed; in March 2020, there were 319 new civil complaints filed; in March 2021, there were 461 new civil complaints filed; and in March 2022, there were 457 new civil complaints filed. Exhibit F, Defendant Smith Supplemental Responses to Plaintiff's First Interrogatories and Requests for Production ("Smith Supp. Resp."), No. 7.

38. The Clerk is "unable to provide" the number of filings in each of the last five years that contain the personal identifiers identified in Va. Code § 17.1-293(B). *Id.* No. 8.

## E. The Prince William Clerk's Redaction Practices

39. Pursuant to Va. Code § 8.01-420.8, those filing civil court records in Virginia circuit courts, including the Prince William Court, are required to redact all but the last four digits of social security numbers or other identification numbers appearing on a driver's license, credit card, debit card, bank account, or other billing or payment system. JSF ¶ 51.

40. The Prince William Clerk and her staff review new civil filings for any unredacted social security numbers or other identification numbers appearing on a driver's license, credit card, debit card, bank account, or other billing or payment system and, if discovered, redact such information before scanning the filing into CIS. *Id.*

41. The Prince William Clerk and her staff also seek to redact dates of birth, maiden names, minor names, and signatures "if a civil filing is posted on the Prince William County Circuit Court's website," which occurs in "exceptional cases that are of public interest or for which the Clerk's office anticipates repeated requests for information." Smith Second Resp., Ex. C, No. 10; Smith Supp. Resp., Ex. E, Nos. 2-6.

42. During a deposition in January 2019 in the *Schaefer* matter, the Prince William Clerk testified that prior to scanning into CIS, new filings are "reviewed for confidential information and to see if it's a sealed case. If it's a sealed case, it is sealed in the computer system. If there's confidential information, it's either redacted or sealed [before] the document is scanned [by court staff]." Exhibit G at 87:12-89:2. The Prince William Clerk further testified that as part of the review for confidential information, in addition to social security numbers, minor names are redacted by court staff if they appear unredacted in a filing. *Id.* at 34:16-36:18.

43. Many circuit court cases that concern minors (*i.e.*, adoptions and proceedings on appeal from juvenile and domestic relations cases, including child support, abuse, and neglect cases) are confidential by statute and thus not available on OCRA. *See* Exhibit H (titled "Confidentiality Considerations," produced by the Clerk) at 2, 5, 6, 13; *see also* https://www.pwcva.gov/department/circuit-court/attorney-access. In addition, minor names may be sealed where the health, safety, or liberty of the child is in jeopardy. Ex. G at 5. And in a

case seeking a minor name change, sealing may be requested where the "[p]ublic recording of the name change would pose a serious threat to the health or safety of the applicant." *Id.* at 18.

44. Maiden names are likewise often sealed from public view. The Clerk's current redaction practices, attached as Exhibit I, indicate that maiden names "are required information on name change petitions/applications," but if the applicant believes "that in the event [the] change of name should become a public record, a serious threat to the health or safety of the applicant of [their] immediate family would exist…the court may order the record sealed and direct the clerk not to spread and index any orders entered in the cause." Va. Code § 8.01-217(G); *see also* Ex. G at 18.

**F. CNS' Requests for OCRA Access**

45. In 2016, CNS requested OCRA access from 46 Virginia circuit court clerks that utilized OCRA at that time. JSF ¶ 53. Of the Virginia circuit court clerks who did respond, they either denied OCRA subscriber access outright or offered CNS OCRA subscriber access if the CNS subscriber was a Virginia-barred attorney. *Id.*

46. In May 2021, CNS, through its Southeast Bureau Chief, Ryan Abbott, wrote to the Prince William Clerk to request OCRA access. *Id.* ¶ 54; Abbott Decl., Ex. 4. In response, the Prince William Clerk sent a letter to Mr. Abbott, dated May 13, 2021, denying CNS access to OCRA because Mr. Abbott did not include a Virginia bar license number and a copy of a Virginia bar card with his application. *Id.*, Ex. 5; JSF ¶ 54. Neither Mr. Abbott nor any of CNS' reporters covering Virginia are attorneys or licensed to practice law in Virginia. *Id.* ¶ 55.

47. On May 25, 2021, CNS, through its counsel, wrote to the Prince William Clerk via email to inquire as to the denial of access, and later that day, the Clerk responded by email stating, in part "[W]e don't currently have an OCRA contract for non-attorneys. I will work on

pulling one together now so we can complete same for Mr. Abbott and offer it to any other non-attorney parties who may wish to sign up for access." Abbott Decl. ¶ 25, Ex. 6.

48. Thereafter, the Clerk provided CNS, though its counsel, a Non-Attorney Subscriber Agreement, offering to provide OCRA access to CNS at an annual subscription fee of $1,200 for one non-attorney. *Id.* Ex. 7; Non-Attorney Subscriber Agreement, attached hereto as Exhibit J, ¶ 5. That agreement also imposed prohibitions on dissemination and publication of non-confidential civil filings that are not included in the Attorney Subscriber Agreement. *Id.* ¶¶ 3, 5, 7(j). CNS did not submit the Non-Attorney Subscriber Agreement. Abbott Decl., ¶ 26.

49. The Prince William Clerk denies that she has now, or had at any time, discretion to provide CNS access to OCRA. JSF ¶ 57.

## **RELEVANT VIRGINIA STATUTES AND LEGISLATIVE HISTORY**

Section 17.1-225 of the Virginia code permits circuit court clerks to provide remote online access to non-confidential court records:

> The clerk of the circuit court of any county or city may provide remote access, including Internet access, to all nonconfidential court records on an automated case management or other system maintained by his office and described in § 17.1-242. The clerk shall be responsible for inssuring that proper security measures are implemented and maintained to prevent remote access users from obtaining any data that are confidential under this Code and to prevent the modification or destruction of any records by remote access users. For purposes of this section, remote access users are those individuals who are not employees of the clerk's office.

In 2007, Virginia codified various requirements and restrictions for the posting and availability of certain personal information through the Internet. *See* Va. Code § 17.1-293. That section contains two provisions that purport to place limitations on the right of access to judicial documents. First, Section 17.1-293(B) provides that:

> Beginning January 1, 2004, no court clerk shall post on the Internet any document that contains the following information: (i) an actual signature, (ii) a social security number, (iii) a date of birth identified with a particular person, (iv) the maiden name

> of a person's parent so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child.

However, Section 17.1-293(E)(5) and (7) state that Section 17.1-293 "shall not apply to:"

> 5. Providing secure remote access to any person, his counsel, or staff which counsel directly supervises to documents filed in matters to which such person is a party;
>
> 7. Providing secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk.

Va. Code § 17.1-293(E)(5); (E)(7). Second, Section 17.1-293(H) provides that:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to a third party, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

In 2018, Senator Mark D. Obenshain introduced Senate Bill No. 980 (the "Bill"), which although rejected, would have required Virginia circuit court clerks to provide secure remote access to all non-confidential civil court records to non-attorneys. *See* Exhibit K. The Bill proposed the addition of (i) Section 17.1-293(E)(8), clarifying that the language in Section 17.1-293(B) that prevents court clerks from posting on the internet certain information shall not apply to "[p]roviding secure remote access to nonconfidential court records on and after July 1, 2019, subject to any fees charged by the clerk and the Office of the Executive Secretary as authorized by § 17.1-293.1,"[2] and (ii) Section 8.01-271.02, which would have prohibited the inclusion of

---

[2] Proposed Section 17.1-293.1 stated, in relevant part: Secure remote access to nonconfidential civil case documents and records. A. In any civil case filed on or after July 1, 2019, clerks of the circuit courts of the Commonwealth shall maintain all nonconfidential documents and

social security or any financial account numbers in a civil filing beginning July 1, 2019.

Since July 1, 2014, Virginia Code § 8.01-420.8(A) places the burden of redacting confidential information in an otherwise non-confidential court record on the filing party:

> Whenever a party files, or causes to be filed, with the court a motion, pleading, subpoena, exhibit, or other document containing a social security number or other identification number appearing on a driver's license…, or on a credit card, debit card, bank account, or other electronic billing and payment system, the party shall make reasonable efforts to redact all but the last four digits of the identification number.

## **ARGUMENT**

## **CNS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW**

The question in this case – whether Defendants' policies and practices of (i) restricting remote access for non-confidential civil filings to Virginia-barred attorneys, while precluding such access to the general public and press, and (ii) prohibiting the dissemination of non-confidential civil filings accessed remotely, violate the First Amendment right of access – is answered by applying the two-step analysis articulated in *Press-Enterprise II*. The analysis first asks whether a particular document or proceeding has historically been open to the press and public, *i.e.*, the "experience and logic" test, and then, after finding a right of access, considers whether a defendant has met their burden of justifying *any* access restrictions by application of the requisite level of constitutional scrutiny. *Id.* at 8-10; *Doe v. Public Citizen*, 749 F.3d 246, 266 (4th Cir. 2014); *see also Schaefer*, 440 F. Supp. 3d at 559*; CNS v. Planet*, 947 F.3d 581, 595 (9th Cir. 2020) ("*Planet III*") ("[o]nce…a presumption of access arises under *Press-Enterprise II*" it "may be restricted only if 'closure is essential to preserve higher values and is narrowly tailored to serve those interests'") (quoting *Press-Enterprise II*, 478 U.S. at 13-14).

---

records in electronic form and make such documents and records available through secure remote access….

As this Court recognized, "[i]t is well-settled that the press and public have a right of access to most, if not all, civil court records." Memorandum Opinion dated Jan. 14, 2022 [Doc. 48] ("Mem. Op.") at 9 (citing *Schaefer*, 2 F.4th at 328 (finding right of access to civil complaints); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) (right of access to summary judgment documents)); *see also Doe*, 749 F.3d at 268-69 (right of access to judicial opinions and civil docket sheets). Thus, Defendants bear the burden of justifying the Non-Attorney Access and Dissemination Restrictions by presenting evidence justifying the practices. *See, e.g., Va. Dep't. of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004) ("The burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position") (citing *Press-Enterprise II*, 478 U.S. at 15). Since Defendants bear the burden of proof, CNS does not need to produce any evidence or establish the absence of a genuine issue of material fact; rather, summary judgment is mandated if there is an absence of evidence to support the defense. *See, e.g. Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Schaefer*, 2 F.4th at 329 ("argument unsupported by the evidence will not suffice to carry the government's burden").

Defendants' practices challenged herein, including their reliance on Va. Code §§ 17.1-293(E)(7) and 17.1-293(H), are therefore unconstitutional unless they can demonstrate that the Clerk's conduct is justified by an "overriding interest based on findings" that withholding remote access and prohibiting the dissemination of filings accessed remotely is "essential to preserve higher values and is narrowly tailored to serve that interest." *Press Enterprise II*, 478 U.S. at 9; *see also Doe*, 749 F.3d at 266. And even under "time, place, and manner" scrutiny, which was applied in *Schaefer*, 2 F.4th at 328, Defendants must demonstrate that the challenged conduct is

"narrowly tailored to serve a significant government interest." *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015). Defendants cannot meet that burden.

## A. <u>The Clerk Has Violated CNS' First Amendment Rights</u>

### 1. There Is a First Amendment Right of Access to Newly Filed Civil Complaints and Other Civil Court Records

Applying the "experience" and "logic" test set forth in *Press Enterprise II*, the Fourth Circuit in *Schaefer* conclusively determined that a First Amendment right of access attaches to civil complaints. *Id.* at 328. As this Court recognized in *Schaefer*, "each federal court to reach this question ha[s] found that the First Amendment applies." 440 F. Supp. 3d at 555; *see also CNS v. Quinlan*, 32 F.4th 15, 20, n.8 (1st Cir. 2022); *Planet III*, 947 F.3d at 591 (9th Cir. 2020); *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 141 (2d Cir. 2016).

And in *Doe*, the Fourth Circuit explained: "the public and press generally have a contemporaneous right of access to court documents and proceedings *when the right applies*." 749 F.3d at 272 (emphasis added).[3] This is because "public access promotes not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary." *Id.* at 266. "An informed citizenry is at the heart of this democracy, and narrowing the arteries of information…will only serve to impair our country's coronary health." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 612 F.3d 301, 304 (4th Cir. 2010).[4]

---

[3] The First Amendment right of access attaches on receipt, *i.e.*, when a record is filed. *See, e.g.*, *Planet III*, 947 F.3d at 585; *CNS v. Forman*, 2022 WL 2105910, at *6 (N. D. Fla. June 10, 2022); *CNS v. Omundson*, 2022 WL 1125357, at *12 (D. Idaho Apr. 14, 2022); *CNS v. Cozine*, 2022 WL 1000775, at *2 (D. Or. Apr. 4, 2022); *CNS v. Gabel*, 2021 WL 5416650, at *13 (D. Vt. Nov. 19, 2021); *CNS v. N.M. Admin. Office of the Courts*, 566 F. Supp. 3d 1121, 1171 (D.N.M. 2021).

[4] Since the Fourth Circuit has determined that there is a First Amendment right of access to civil court records, this Court need not apply the experience and logic test. *See* Mem. Op. at 9, n.8. Even so, experience and logic supports a right of access. *Schaefer*, 2 F.4th at 326-27.

In *Schaefer*, the court emphasized that "reasonably contemporaneous access" is required "as expeditiously as possible" based on "the context of th[e] case." 2 F.4th at 328. As such, the court affirmed a declaratory judgment holding that because the public enjoys a right of access "contemporaneous with the filing of the complaint," same-day access is required "insofar as practicable." 440 F. Supp. 3d at 562. In the context of a court, like the Prince William Court, where remote access is available, and thus practicable, restricting such access to Virginia-barred attorneys interferes with CNS' right to contemporaneous access "as expeditiously as possible."

**2. The Non-Attorney Access and Dissemination Restrictions Do Not Pass Constitutional Scrutiny**

To satisfy constitutional scrutiny, the Clerk must show that withholding remote access for non-attorneys and prohibiting the dissemination of court records accessed remotely, "[are] 'necessitated by a compelling government interest' and the restriction of access is 'narrowly tailored to serve that interest.'" *Doe*, 749 F.3d at 266 (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)); *accord Va. Dept. of State Police*, 386 F.3d at 575; *Stone v. Univ. of Maryland Medical System Corp.*, 855 F.2d 178, 180 (4th Cir. 1988); *Rushford*, 846 F.2d at 253.

The decision to overcome the presumption of access – and the right to disseminate information accessed – shall "not be made lightly," *Stone*, 855 F.2d at 182, and "may be abrogated only in unusual circumstances." *Doe*, 749 F.3d at 266 (quoting *Stone*). The proponent of withholding access, like Defendants here, bear the burden of proof to make this showing with "specific reasons in support of its position." *See Va. Dep't of State Police*, 386 F.3d at 575. Conclusory assertions are insufficient to justify the deprivation of public access. *Id.* (quoting *Press Enterprise II*, 478 U.S. at 15). Indeed, it is the defendant who "has the burden to demonstrate why more access is not better than less," *Globe Newspaper v. Pokaski*, 868 F.2d

497, 505 (1st Cir. 1989), and "a court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

In its Memorandum Opinion, this Court explained that "strict scrutiny ordinarily applies to an alleged violation of the First Amendment" but concluded that the Non-Attorney Access Restriction "resembles a time, place, and manner restriction and relaxed scrutiny applies." *Id.* at 10. However, the level of scrutiny is governed not by what the Clerk's practices resemble but by whether the Non-Attorney Access Restriction, when coupled with the Dissemination Restriction, "is a total restraint on the public's first amendment right of access even though the restraint is limited in time." *Associated Press v. Dist. Ct.*, 705 F.2d 1143, 1147, 1149 (9th Cir. 1983) (emphasizing that it is "irrelevant that some…documents might only be under seal for, at a minimum, 48 hours"). Indeed, the Supreme Court has explained that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). That principle carries its greatest weight when the information to be published is derived from a public source, such as court records. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496 (1975) ("Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it"). For that reason, the Fourth Circuit has held that efforts to restrict the dissemination of "truthful information" in "official court records" must be narrowly tailored to "further a state interest of the *highest order*." *See Soderberg v. Carrion*, 999 F.3d 962, 969 (4th Cir. 2021).

Even under intermediate "time, place, and manner" scrutiny, Defendants bear the burden of proving the Clerk's conduct is "narrowly tailored and necessary" to serve a "significant government interest." Mem. Op. at 10 (quoting *Schaefer*, 2 F.4th at 328; *Planet III*, 947 F.3d at 585; and *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)). In other words, Defendants must

establish that "no reasonable alternatives exist to 'adequately protect' that government interest." *Planet III*, 947 F.3d at 603 (emphasizing that the appropriate level of intermediate review is "rigorous" scrutiny) (quoting *Press Enterprise II*, 478 U.S. at 14). They cannot do so.

As this Court explained in *Schaefer*, no matter what level of scrutiny, "both standards of review require Defendants to come forward with evidence, not mere argument, to show that the [restrictions] are narrowly tailored to some higher governmental interest." 440 F.Supp.3d at 560. Thus, access may not be restricted *unless justified by factual evidence*. *Doe*, 749 F.3d at 266.

**a. The Virginia Code Does Not Require the Clerk to Implement the Non-Attorney and Dissemination Access Restrictions, and Even if it Did, the Requirements of the First Amendment Trump the Code**

To justify the Non-Attorney Access and Dissemination Restrictions, Defendants rely on Va. Code § 17.1-293, but nothing in that statute mandates that clerks withhold remote access for non-attorneys, nor does the First Amendment permit the Clerk to do so. Instead, Section 17.1-293(B) merely prohibits court clerks from posting generally "on the Internet" (as opposed to a secured permission-based subscriber system) certain personal identifiers. Section 17.1-293(E) qualifies that prohibition by stating, in relevant part, that it "shall not apply to…[p]roviding secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar…" Va. Code § 17.1-293(E)(7).[5] Defendants contend that this carve-out requires the Clerk to restrict remote access via OCRA to attorneys, and that the Clerk is otherwise prohibited from providing remote access to records, *even if they do not include any of the personal identifiers identified in Section 17.1-293(B).*

Not only do the requirements of the First Amendment trump this practice even if it was

---

[5] Section 17.1-293(E)(5) also permits "secured remote access to any person, his counsel, or staff which counsel directly supervises to documents filed in matters to which such person is a party."

compelled by Section 17.1-293, it is also foreclosed by Va. Code § 17.1-225, which expressly *permits* the access sought in this case. *See supra* at 14. Section 17.1-225 does not limit remote access to Virginia-barred attorneys, nor is it limited to systems other than OCRA. *Id.* And Section 17.1-225 already has safeguards in place to address Defendants' concern in this case, *i.e.*, that the Clerk implement "proper security measures…to prevent remote access users from obtaining any data that are confidential." *Id.* As discussed below in Point A.2.b, OCRA is a permission-based system, and thus mechanisms such as subscriber agreements are already in place for the Clerk to police misuse of OCRA. *See also* SUF ¶¶ 26-27.

Nonetheless, the Clerk restricts remote access to all civil filings to attorneys only, regardless of whether they contain personal identifiers. Defendants primarily assert that the restrictions are necessary to protect against the dissemination of private information. Doc. 27 at 9; Doc. 66 at 14-17. In essence, Defendants contend that the Clerk must restrict remote access to *all* non-confidential civil filings to attorneys because *some* of those filings *might* contain sensitive information. The Clerk, however, did not substantiate this concern in discovery.

**b. The Access Restrictions are Not Supported By a Compelling or Significant Government Interest Nor Are They Narrowly Tailored**

In its Memorandum Opinion, this Court stated, at the motion to dismiss stage, that CNS' "allegations [that OCRA contains identical court records already available to the public at physical courthouses and that users of OCRA must sign subscription agreements] could lead to the reasonable inference that the non-attorney access restriction is not narrowly tailored to preserve a significant governmental interest and thus, could violate the First Amendment." Mem. Op. at 11. Discovery has confirmed that conclusion.

Defendants appear to assert that the Clerk cannot adequately protect privacy if non-attorneys have remote access via OCRA, or any other system. Privacy interests are important,

but any supposed harm that is curtailed by the Clerk's practice of restricting remote access to non-attorneys does not withstand scrutiny under *Press Enterprise II* – or any applicable scrutiny test – and does not override CNS' First Amendment right of access.

In discovery, CNS asked the Clerk to provide factual data to substantiate her position that the Non-Attorney Access and Dissemination Restrictions are necessary to protect sensitive information, asking for the number of filings in each of the last five years that contained the information identified in Va. Code § 17.1-293(B), but the Clerk was "unable to provide the information sought," stating that "the information sought is not tracked by the Office of the Clerk of Court or any group." SUF ¶¶ 37-38. For this reason alone, the Clerk has not met her burden.

Significantly, OCRA contains the same non-confidential court records that are available to the public and press via public access terminals at the Prince William courthouse. SUF ¶ 36. There is no difference in the content of the court records that CNS and other members of the press and public must travel to each individual court to see, on the one hand, and the court records that Virginia-barred attorneys can see remotely via OCRA, on the other hand – they are the same records. *Id.* Thus, the non-confidential documents available on OCRA, even to the extent that they *may* contain certain sensitive information, are available to anyone at the courthouse. "Once announced to the world, the information [has] lost its secret characteristic." *In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990) (vacating injunction prohibiting reporters from disclosing information revealed in open courtroom); *see also Bernstein*, 814 F.3d at 141 ("easily conclud[ing]" that the First Amendment right of access applies to civil complaints "*even when they contain arguably sensitive information*") (emphasis added).

The Fourth Circuit's analysis in *Va. Dep't of State Police, supra*, is instruction. I affirming a determination that the state police failed to present a significant interest sufficient to

keep certain criminal documents sealed in a civil rights lawsuit, the court explained:

> We note initially our complete agreement with the general principle that a compelling governmental interest exists in protecting the integrity of an ongoing law enforcement investigation. However, not every release of information contained in an ongoing criminal investigation file will necessarily affect the integrity of the investigation. Therefore, it is not enough simply to assert this general principle without providing specific underlying reasons for the district court to understand how the integrity of the investigation reasonably could be affected by the release of such information. … Although we need not attempt to catalogue the various reasons which may be considered in deciding whether an asserted interest is compelling, we note that one consideration is…whether the granting of access to the contents of an ongoing police investigation file will disclose facts that are otherwise unknown to the public.

386 F.3d at 579.

Here, as in *Va. Dept. of State Police*, Defendants only asserts a general concern about protecting private information without any specifics, and any information that the Clerk seeks to protect *is already public*. "There is insufficient evidence to show that the practices and customs that result[ ] in the [restricted] access [a]re narrowly tailored to serve a substantial or compelling government interest." *Schaefer*, 440 F. Supp. 3d at 551, *aff'd*, 2 F.4th 318.

Moreover, because the filing party is required to redact much of the information Defendants are concerned about, *i.e.*, social security numbers and financial account numbers, *see* Va. Code § 8.01-420.8(A), a less restrictive alternative is already in place with respect to this particular information. And the Clerk and her staff review new civil filings for any unredacted social security numbers and other identification numbers, such as those appearing on a bank account or other billing or payment system and, if discovered, redact such information before scanning the filing into CIS and making it available via OCRA. SUF ¶ 40. There thus cannot be any dispute that the Non-Attorney Access and Dissemination Restrictions are not narrowly tailored or necessary to protect the potential disclosure of social security numbers or financial account numbers. *See, e.g.*, *Schaefer*, 440 F.Supp.3d at 560 (rejecting clerks' argument that

"their interest in the orderly administration of their office and protecting confidential information outweigh the public's First Amendment right to contemporaneous access" where "filer is responsible for redacting confidential information" and Prince William Clerk was "ensuring that confidential information is protected"), *aff'd* 2 F. 4th at 328 (agreeing that clerks violated First Amendment because withholding complaints until after docketing was not "narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice") (quoting *Planet III*, 947 F.3d at 595).[6]

A less restrictive alternative is also already in place with respect to minor and maiden names. Many circuit court cases that concern minors are confidential by statute and thus not available on OCRA. *See* SUF ¶ 43; Va. Code §§ 16.1-307, 63.2-1246, 16.1-305; 16.1-305.01. In addition, for child custody proceedings, if the "health, safety, or liberty of a…child would be jeopardized by disclosure of identifying information, the information shall be sealed and may not be disclosed to the…public…" Va. Code § 20-146.20. And in a case seeking an order for change of a minor name, sealing may be requested where the "[p]ublic recording of the name change would pose a serious threat to the health or safety of the applicant." SUF ¶ 43.

Maiden names are likewise often sealed. If the applicant believes "that in the event [the] change of name should become a public record, a serious threat to the health or safety of the applicant of [their] immediate family would exist…the court may order the record sealed and direct the clerk not to spread and index any orders entered in the cause." Va. Code § 8.01-

[6] Notably, social security and financial account numbers are the only identifiers in Va. Code 17.1-293(B) that are deemed confidential by the Virginia Code. Thus, the legislature has already determined that dates of birth, maiden names, minor names, and signatures are not sensitive enough to warrant mandatory redaction. Accordingly, Defendants' concern regarding these data points does not rise to the level of being a "substantial" or "compelling" interest.

217(G). To the extent a maiden name appears in a divorce proceeding, that too may be sealed by agreement or upon motion by either party. Va. Code § 20-124. Notably, CNS does not cover domestic relations or name change filings, nor do they cover juvenile matters. SUF ¶ 7.

These less restrictive safeguards work. And because the Clerk is already reviewing each new civil filing to redact social security numbers, driver license numbers, and other identification numbers, there is no reason she cannot also redact any of the other information she is concerned about as a less restrictive alternative. In fact, in *Schaefer*, the Clerk testified that her staff did redact minor names at that time, SUF ¶ 42, and the Clerk acknowledges that she and her staff "do redact [dates of birth, maiden names, minor names, financial account numbers, and signatures] if a civil filing is posted on the Prince William County Circuit Court's website." SUF ¶ 41. And the 2018 Work Group Report contemplates that less restrictive alternatives exist. Ex. E at 5 (detailing steps that could be taken to prevent unauthorized access to sensitive information).

Moreover, OCRA records are not available to any anonymous internet user. Instead, users must apply to, and be approved and authorized by, the Clerk, and must sign a subscriber agreement in front of a notary with the applicant's name, address, phone number, and email address in order to obtain a user ID and password that permits OCRA access, and must pay a fee, *i.e.*, $200 per year per user. SUF ¶¶ 24, 26-27; Ex. B. An OCRA user is also responsible for the proper use of OCRA pursuant to the terms of the subscriber agreement, which, among other things, require the subscriber to acknowledge responsibility "for ensuring that the use of OCRA is conducted in a proper and legal manner." *Id.* ¶ 26; Ex. B at ¶ 7.g.[7]

[7] The Virginia Information Technologies Agency ("VITA") has also developed and promulgated a Security Standard for Restricted Remote Access to Documents on Court-Controlled Websites, like OCRA, known as ITRM Standard SEC503-02.2. That Standard, which refers to Section 17.1-293, among other Code provisions, does not mention the need to restrict remote access to attorneys. Instead, ITRM Standard SEC503-02.2 simply explains that remote access shall be

In addition to privacy concerns, Defendants also appear to contend that the cost of expanding OCRA access to non-attorneys should excuse the Clerk's unconstitutional conduct. Not so. As a preliminary matter, "[i]f budget implications of any amount…justified the suppression of constitutional rights, the last two centuries of constitutional jurisprudence would be eviscerated." *CNS v. Forman*, 2022 WL 1405907, at *15 (N.D. Fla. May 4, 2022). Moreover, the primary "evidence" provided in discovery to substantiate the Clerk's apparent concern was a declaration from Paul Ferguson, the Clerk of the Arlington County Circuit Court, who is not a defendant in or involved in this case. *See* Exhibit L. According to Mr. Ferguson, the Arlington County Clerk of Court posts court records online not via OCRA, but through a system that is similarly restricted to attorneys only. *Id.* ¶ 7. But unlike the Prince William Clerk, the Arlington County Clerk does not make non-confidential court records accessible to the public at the courthouse in unredacted form. *Id.* ¶ 6. Instead, the Arlington Clerk first sends new filings to a third-party vendor "that is tasked with the job of redacting original signatures, social security numbers, Credit Cards, Bank Accounts, Minor Children Names and Ages, Maiden Names, Judges Signatures, and Tax IDs" before making them available on public terminals in the Clerk's office, and Mr. Ferguson states that the cost to do so is approximately $35,000 per year. *Id.* ¶ 10.[8] He then "estimates," without any explanation, that "it would cost approximately $150,000

restricted to "pre-registered subscribers," who must comply with the terms of a sworn subscription agreement. *See also* Va. Code § 17.1-295 (defining subscriber as "any person who has entered into a subscriber agreement with the clerk of the circuit court authorizing the subscriber to have … secure remote access to court records maintained by the clerk or the clerk's designated application service providers"). Moreover, ITRM Standard SEC503-02.2 also states that a clerk shall maintain a record of all remote access permitted to court-controlled documents, and that commercial software is available for servers that do not have built-in monitoring and surveillance capability. *Id.* Mechanisms are thus available to prevent misuse.

[8] The Clerk collects at least $54,800 in annual OCRA subscriber fees. SUF ¶ 29.

to provide access to redacted documents for records posted on [his court's] remote access system." *Id.* ¶ 11.[9] Putting aside the conclusory nature of this statement, Mr. Ferguson does not estimate how much it would cost for Ms. Smith to redact filings at the Prince William Court that are available on OCRA, nor did Ms. Smith provide this information in discovery. Thus, Mr. Ferguson's declaration is of little help to the Clerk in meeting her constitutional burden. *See Forman*, 2022 WL 1405907, at *15 (rejecting cost as sufficient justification for failure to implement a public review queue, accessible remotely, where defendant "did not provide an amount but simply pointed to [another court] where it cost $20,500 to install a public queue").[10]

The cost concerns, as well as those about confidential information or personal identifiers becoming publicly available on a remote basis, are not a risk unique to the Prince William Court or any other Virginia circuit court. They are shared by all courts around the country, yet all federal district courts, including those in Virginia, give the press and public remote online access to civil court records via PACER. Courts in at least 37 other states do as well through their own technology systems, and many of those courts, like the Prince William Court, provide remote online access even though they are predominantly paper-filing courts. SUF ¶ 9.

Indeed, at least one other Virginia circuit court, *i.e.*, Alexandria – notwithstanding the language in Section 17.1-293 of the Virginia Code, provides subscribing members of the press and public, including non-attorneys, with remote online access to all non-confidential civil records filed in that court, including new filings and court rulings. SUF ¶¶ 13-14.

---

[9] It is not clear why there would be an additional cost to provide remote access to the same documents that have already been redacted. In any event, Mr. Ferguson's declaration should be disregarded because it was produced on the last day of discovery, he was not identified as a witness until that day, and CNS did not have an opportunity to depose Mr. Ferguson.

[10] Indeed, the Ferguson declaration demonstrates that a less restrictive alternative exists, *i.e.*, redaction.

**B. <u>CNS is Entitled to a Declaratory Judgment and Permanent Injunction</u>**

CNS is entitled to a judgment declaring the Non-Attorney Access and Dissemination Restrictions unconstitutional and a permanent injunction, as against the Clerk, prohibiting the continued enforcement of those restrictions. "[A] declaratory judgment…is appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and…when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (internal quotations omitted); *Penn-Am Ins. Co. v. Coffety*, 368 F.3d 409, 412 (4th Cir. 2004). That is the case with respect to the constitutional question at the heart of this case.

Also, CNS will continue to be deprived of its First Amendment rights absent injunctive relief because CNS has shown that (i) it has suffered an irreparable injury; (ii) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (iii) the balance of equities tips in its favor; and (iv) the public interest would not be disserved by such an injunction. *See Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011).

***Irreparable Injury.*** "[I]rreparable harm…is inseparably linked to [the] claim of a violation of First Amendment rights." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 254 (4th Cir. 2003). This is because access restrictions that violate the First Amendment necessarily constitute irreparable harm. "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Legend Night Club*, 637 F.3d at 302 (quoting *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). As such, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 190 (4th Cir. 2013).

***Balance of Equities; Public Interest.*** "[I]t is always in the public interest to protect First Amendment liberties." *Legend Night Club*, 637 F.3d at 303; *see also Centro Tepeyac*, 722 F.3d at 191. That is why this district has previously held that "[t]here can be no irreparable harm" to a governmental entity "when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect the First Amendment." *Lux v. Judd*, 842 F. Supp. 2d 895, 905 (E.D. Va. 2012). The same holds true here.

In contrast to the irreparable harm CNS will face without injunctive relief, there is no evidence that the Clerk would suffer any inconvenience or hardship as a result of an injunction. This is particularly true in light of the practices of other jurisdictions providing remote online access to non-confidential civil filings. This in turn allows journalists to report on court records in the same news cycle as their filing, when they are most likely to come to the attention of the public. This is precisely what the First Amendment right of access seeks to encourage.

"[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of the government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations … a public benefit is performed by the reporting of the true contents of [public court records] by the media." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975); *accord Richmond Newspapers, Inc.*, *v. Virginia*, 448 U.S. 555, 572-73 (1980) (explaining that the media "function[s] as surrogates for the public").

## CONCLUSION

Providing a system of remote access to court records to just one segment of the public is contrary to basic principles of government transparency protected by the First Amendment. As such, Defendants' restriction of remote access to attorneys only, and their preclusion of the publication of information contained in records already made public, cannot be justified under any constitutional standard. CNS is entitled to summary judgment.

Dated: July 11, 2022

Respectfully submitted,

*/s/*

Dabney J. Carr, IV (VSB No. 28679)
**TROUTMAN PEPER**
**HAMILTON SANDERS LLP**
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

Jonathan E. Ginsberg (admitted *pro hac vice)*
**BRYAN CAVE**
**LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

*Counsel for Plaintiff Courthouse News Service*