**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, *Plaintiff,* v. JAQUELINE C. SMITH, *et al*., *Defendants.* | ) | Civil Action No. 3:21-cv-00460-HEH |

DECLARATION OF WILLIAM GIRDNER IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT

I, William Girdner, declare and state as follows:

1. I am the founder and editor of Courthouse News Service ("CNS"), a nationwide news service and the plaintiff in the above-captioned action. I make this declaration in support of CNS' motion for summary judgment as against Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia ("Prince William Clerk") and the Intervenor-Defendant the Commonwealth of Virginia (the "Commonwealth") (collectively, "Defendants"). I have personal knowledge of the following facts, except where otherwise stated.

2. CNS commenced this case to address two access restrictions that blackout the press and public in favor of Virginia-barred attorneys and their staff in violation of the First Amendment. The first access restriction precludes the press and public from remotely accessing new civil filings in the Circuit Court for Prince William County ("Prince William Court"), even though the Prince William Clerk does provide remote access to a special class of the Commonwealth's citizens – Virginia-barred attorneys and their staff – through the Officer of the

Court Remote Access system ("OCRA"). The second access restriction prohibits the dissemination to the public of information accessed remotely.

3. OCRA is a permissions-based system of access. In other words, anyone seeking access must apply and receive a user name and password. The user's activity can then be monitored. The federal courts PACER system is a permissions-based access system, requiring registration and the use of a user name and password. This declaration, once filed, will be available via the Internet from where I work in Pasadena, California, through the PACER system, after I enter our PACER user name and password, and agree to pay a modest fee.

4. Almost all the state court systems that mandate e-filing also provide online access through a permissions-based system. New York is the principal exception in that it does not require registration for statewide public access to new court filings, public access that has been in place since 2017 without incident.

5. Within CNS, we refer to a system that grants access only to members of the bar as an "attorney preference" system. Other than Virginia, only two states in the nation maintain an attorney preference system. One is Missouri where the chair of the court automation committee announced in May of this year that the state would open its online system to public access. Illinois is the other state that follows a similar practice. *See* https://www.courts.mo.gov/page.jsp?id=89450. New Mexico was another state that used to operate an attorney preference system, but online access opened to press and public in 2017, based on a request from Courthouse News. That leaves Illinois and Virginia as the only states in the nation that maintain and defend an attorney preference system.

6. Online remote access is the only practical means for covering, and reporting on, new civil filings in the Prince William Court, and throughout the Commonwealth, because sending a reporter to visit each of the 120 circuit courts across the state on a daily basis, if at all,

is not practicable for any news entity. I looked on Google Maps to measure the commute time from the eastern-most OCRA court in Eastville on the Delmarva Peninsula in the Atlantic Ocean to the western-most OCRA court in Jonesville in the Appalachian Mountains. It would take a reporter eight hours and seventeen minutes to drive between the two courthouses and review their records. Starting at one courthouse when it opened, the reporter could not get to the other before it closed. A member of the bar, however, covers that distance in the blink of a virtual eye without budging from the office chair.

7. The undeniable effect of Defendants' access restrictions is that the practical ability of the press to report on new civil lawsuits and subsequent filings in a timely fashion is impaired. This means that the ability of the general public to learn about and comment on events in an important institution is impeded or eliminated altogether, all while one subclass of the public can view new filings remotely on a daily basis, wreaking havoc on the traditional press corps.

8. Based on my many years as a journalist covering courts throughout this country and my personal experience overseeing CNS, I have developed a comprehensive understanding of how various courts' case management systems operate and how courts provide remote access to new civil filings and the court record as a whole.

9. I have also observed that contemporaneous access to new civil filings and other court records is essential to robust and accurate news reporting about the courts of our nation, a critical branch of government and one of the foundation stones of our democratic republic. Readers are interested in the course of legal events and in the latest news. They are constantly seeking fresh information, particularly in an era of digital news coverage, where there is a 24/7 news cycle. That is why traditionally and now, news outlets report today's events today.

10. In order to accurately report on those events, and to let the public know that a legal case or significant record has been filed, it is fundamental to have practical contemporaneous access to newly filed civil complaints and subsequent civil filings as the court record is developed. Remote access is the best way to achieve contemporaneous access. But that is not possible in the Prince William Court, where the press and public are pushed behind one segment of the public – Virginia-licensed attorneys – who are in fact given remote electronic access to new civil filings, including in cases in which they are not attorneys of record, via OCRA. I believe the First Amendment, the number one right in the Bill of Rights, does not allow the government to impose such an onerous and obvious restriction on access to public records, when the government operates a common, permissions-based system of access that provides access to public court records only to one subset of the public, local lawyers.

**CNS Publications and Subscribers**

11. CNS is a nationwide legal news service focusing on new civil litigation with a network of reporters based across the nation. We provide reports on appellate rulings, legislation, and new civil cases from federal and state courts around the country, as well as coverage of Congressional hearings and Supreme Court arguments.

12. I began CNS in 1990 out of a belief that news about civil litigation went unreported because the traditional news media failed to cover much of the important business of the courts. CNS is similar to other news services, such as the Associated Press, except that CNS specializes in reporting about civil lawsuits, from the inception of new cases and on to appellate rulings.

13. CNS' coverage of rulings, trials, and new civil complaints initially focused on the United States District Court for the Central District of California where journalists trooped down to the clerk's office every afternoon and gathered a stack of new complaints from the intake clerk

to look over for news stories. By 2001, CNS' regional coverage in California included the major metropolitan state and federal courts in Los Angeles, Orange County, California, and San Francisco. Soon after, CNS was also covering state and federal courts in Houston, New York, and Chicago. CNS continued expanding its coverage of trial courts over the years, first in major metropolitan areas and then gradually extending into less populous areas. Today, CNS employs approximately 240 people, most of them editors and reporters, covering state and federal trial and appellate courts across all 50 states. *See also* Joint Stipulations of Facts, dated May 4, 2022, Dkt. No. 55 ("JSF"), ¶ 12.

14. The result of CNS' nation-wide coverage by its reporters is a variety of publications offered to subscribers, reporting on all stages of civil litigation, from the initial complaint or petition to subsequent filings, hearings, and rulings, through final appeal in federal and state courts around the nation, including the U.S. Supreme Court. *See also* JSF ¶¶ 4-7.

15. One category of publications is CNS' New Litigation Reports, which contain original, staff-written summaries of significant and newsworthy new civil complaints. These reports are sent to subscribers via e-mail each evening. The New Litigation Reports focus on general jurisdiction complaints against business and government entities, as well as any other civil action that might be of interest to CNS' subscribers. The reports do not cover criminal, domestic relations, or probate matters, nor do they include name changes, probate filings, or most residential foreclosures. *See also id.* ¶¶ 4-5, 8. Nor does CNS seek to report on any filings that are statutorily confidential or accompanied by a motion to seal.

16. To prepare the New Litigation Reports and identify new filings that may warrant a broader article on CNS' website – which functions much like a print daily newspaper, featuring staff-written articles about the news of the day that are posted and rotate on and off the page on a 24-hour news cycle – CNS reporters have traditionally visited their assigned courts, so that they

can review the filings to determine which ones are newsworthy. *See also id.* ¶¶ 7, 9. CNS reporters often visit courts daily, usually at the end of the day, to review the day's filings, but sometimes less frequently, especially in remote areas, where CNS is forced to base its reports on any docket information (*i.e.*, party names, case type, and court name) made available online.

17. As the federal courts and an increasing number of state courts are making court records, including new civil filings, available online, CNS also covers courts remotely through the Internet. To report on the onset of new litigation and subsequent developments in a case, a reporter must have access to newly filed civil complaints and subsequent filings on a contemporaneous basis.

18. CNS now has more than 2,750 subscribers nationwide. All but a very few of the nation's large and mid-sized law firms subscribe to one or more of CNS' publications, and make them available to attorneys and others at the firm. CNS subscribers also include law schools, law libraries, government offices, judges, news organizations, public entities, Fortune 500 Companies, and entertainment and watchdog groups nationwide. *See also* JSF ¶ 2.

19. A substantial number of news and entertainment outlets are CNS subscribers, including but not limited to, *The Atlanta Journal Constitution*, *The Boston Globe*, Buzzfeed, *The Dallas Morning News*, *Detroit Free Press*, Fox Entertainment Group, *Los Angeles Times*, North Jersey Media Group, *The Salt Lake Tribune*, *San Antonio Express News*, *San Jose Mercury News*, *Tampa Bay Business Journal*, *The Wall Street Journal*, Warner Bros., and many broadcast stations. The Washington-based Center for Public Integrity also subscribes.

20. Among academic institutions, subscribers to CNS' New Litigation Reports include Boston College Law School, Boston University, Case Western Reserve University, MIT Sloan School of Management, Southern Illinois University School of Law, UC Hastings College of Law, and UCLA School of Law, among many others.

21. CNS' news media subscribers rely on CNS to provide them with timely information about civil litigation, our specialty, so they can provide information about those cases to their readers and viewers. I have found that as resources for mainstream media have diminished, media outlets are increasingly relying on CNS for prompt information about court filings. CNS has been credited as the original source of reporting by a range of publications, including: *ABA Journal*, ABC News, *The Atlantic*, *Austin American Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, *The Christian Science Monitor*, *The Daily Beast*, *The Dallas Morning News*, *Forbes*, Fox News, *The Guardian*, *The Hill*, *Houston Chronicle*, *The Huffington Post*, *Long Island Press*, *Los Angeles Times*, *The Mercury News, Mother Jones*, National Public Radio (NPR); NBC News, *New York Daily News*, *New York Magazine*, *The New York Times*, *The Orange County Register, Politico*, *Rolling Stone*, *Salt Lake City Tribune*, *San Antonio Express-News*, Slate, *The Telegraph* (UK), *The Wall Street Journal*, *The Washington Post*, *The Washington Times*, Women's Health Policy Report, United Press International (UPI), *USA Today*, *U.S. News and World Report,* and the YouTube news channel. In addition, American, Canadian, and New Zealand radio shows have interviewed CNS reporters.

22. In Virginia, CNS has been credited as the original source of reporting by WTKR News 3 (wtkr.com) and *The Virginia-Pilot* (PilotOnline.com). And, *The Washington Post* has credited CNS as the original source of reporting in articles it published on its website concerning new complaints filed in Fairfax County and in the United States District Court for the Eastern District of Virginia (Alexandria Division).

**The Tradition of Access to New Complaints and Other Civil Filings**

23. It has been a long-standing tradition for the press to review new civil complaints in courts across the country on the day of filing. This practice ensures that interested members of

the public learn about new cases in a contemporaneous manner, while the news is still fresh. As CNS expanded, I regularly visited federal and state trial courts to start our reporting on those courts. Each court, state and federal – whether in Los Angeles, Orange County, San Francisco, or San Jose – provided journalists with access to the new paper complaints filed that day. The complaints were usually stacked in a bin, made of either wood, wire mesh, or cardboard. The same was true as our coverage expanded to the Midwest and East Coast, in Chicago, New York, and Washington D.C. The pattern also held true through the South, in Dallas and Houston; in the Southeast in Miami; and in the Southwest in Phoenix and Albuquerque. Those courts provided the press with access to the new complaints on the day of filing, with clerks allowing reporters to regularly check the stack of newly filed civil complaints. The reporters were looking for news, and the review of the new complaints that had just come across the counter was a standard and daily task for a reporter on the court beat.

24. In addition to seeing the new cases at the counter, as was the case in clerks' offices throughout Virginia, including at the Prince William Court, journalists covering a courthouse traditionally had access to the records room, where they could review new civil complaints and subsequent filings, including motions and rulings, and check and research the record. As electronic technology and the Internet began to dominate the area of communication and record-keeping, the records room moved online in court after court. The common and nearly universal practice when courts were first starting to move things online was to first scan paper documents and electronically store the scans, often discarding the paper records. This was, and still is, the case in the Prince William Court, among other courts in Virginia. The next step courts have taken is to require that the filers provide scans or electronic versions of their documents as part of electronic filing, with those records also being stored electronically.

25. Virginia's technological transition is stuck between these two phases. The overwhelming number of new civil filings are still filed in paper form but they are scanned by court staff and stored in electronic form. In individual courts, such as the Prince William Court and others, the records room is electronic and journalists and members of the public seeking to review records are directed to an electronic terminal in the clerks' office where they look at scans of paper records. *See also* JSF ¶ 24-26.

26. The overwhelming number of states and courts that have engaged in the technological transition have given access to their records online, via the Internet, through a court website. Even Ventura County Superior Court in California, a fully paper court and the focus of ten years of litigation over access, scans its paper records and puts them online through the court's website, for review by the press and public.

27. Where courts provide the press with access to filings on a remote online basis, CNS covers most of them remotely. The list of states providing online access to the press is long. It includes, either on a statewide basis or through individual courts within the state: California, Louisiana, Massachusetts, Nebraska, Oklahoma, Tennessee, and Washington – in which several of the courts are predominantly paper-filing courts – as well as courts within Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Minnesota, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, North and South Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, and Utah. *See also* JSF ¶ 10.

28. In addition, all federal courts in the nation, including this Court, give journalists and the public online access to public court records via PACER. *Id.* ¶ 11.

29. What all these state and federal courts permit, while carrying on the tradition of access in today's technological age, is a review of new civil actions and subsequent filings in

courts urban and rural. They provide this access to journalists and often to the public as well. Virginia, by contrast, allows this access only to a special class of its citizens, those with a law degree and Virginia bar number, while excluding the press and public. The access allowed to attorneys cannot, in practical terms, be matched by the press or public. No press organization can afford to send a reporter on a daily basis to each circuit court that uses OCRA, which covers most of the Virginia circuit courts, *i.e.*, 105 out of 120, in an area of over 30,600 square miles with 6 million residents. *See also* JSF ¶ 27; Dkt No. 33-2 (map of counties covered by OCRA). No private news organization can cover that area on a daily basis. Such a task would require a small army of reporters and is, in practical terms, impossible.

**Access to Civil Filings in the Prince William Court and Other Virginia Circuit Courts**

30. Of the 120 Virginia circuit courts, CNS is only able to send reporters to five of them on a daily basis, including the Prince William Court. *See also* JSF ¶ 14. Twelve other circuit courts are covered intermittently by sending one of the Virginia-based reporters to the court on a less than daily basis. *See also id.* ¶ 16.

31. As explained in more detail in the accompanying declaration of Ryan Abbott, CNS' Southeast and Mid-Atlantic Bureau Chief ("Abbott Decl."), CNS currently covers one Virginia circuit court, *i.e.*, the Alexandria Circuit Court, remotely on a daily basis by accessing new civil filings through the Internet via the Alexandria Justice Information System. That system, unlike OCRA in the Prince William Court, and other Virginia circuit courts, is not restricted to attorneys only.

32. Due to the remote location of many of the remaining 102 courts and the cost-prohibitive expense of hiring numerous additional reporters to cover each of those far off courts in person, it is not possible to visit these courts at all, and most certainly not on a daily basis. *See also* JSF ¶ 17. I am thus resigned to having those remaining courts covered with docket

information only. This is less than ideal because, without access to the actual complaints and other filings, CNS cannot fully inform its subscribers and the public regarding who has been hauled into the courts and why. This, in turn, suppresses the ability of lawyers, professors, law students, news reporters, and readers of our New Litigation Reports, website, and other publications to know about and freely discuss a new or ongoing legal contest pending in a public court of law. The practical effect of the exclusion is a press blackout for public records in the smaller, far-flung counties in the OCRA system.

33. Having access to OCRA would assist my reporters in covering the courts in a timely manner. If CNS had access to OCRA on a statewide basis, I would have the three Virginia reporters cover the 105 circuit courts that use OCRA on a daily basis by having them review the complaints filed in those courts and posted on OCRA. Our reporters could also follow and report on newsworthy cases in remote regions of Virginia as they progress through their courts.

34. For example, the CNS reporter covering the Prince William Court, Joan Hennessey, could instead cover that court via OCRA to allow her to visit other courts daily that do not offer OCRA or any other online access. Currently, Ms. Hennessey visits the Prince William Clerk's office on a daily basis to review all newly filed civil complaints and other filings made available since her visit the previous day. She then reports on newsworthy complaints by preparing original summaries for inclusion in CNS' *Virginia Report*. In addition to covering the Prince William Court, she also covers the Alexandria Circuit Court remotely on a daily basis, while covering the Fairfax Circuit Court (which does not utilize OCRA) in person on a daily basis, and the circuit courts in Arlington, Fauquier, and Loudoun in person on a weekly basis.

If Ms. Hennessey had access to OCRA, particularly on a statewide basis, she could visit the Fairfax court in person on a daily basis, while also covering the Prince William Court and others on a daily basis via OCRA, ensuring the timely delivery of news in each of these courts.

**Requests for OCRA Access**

35. In 2016, I instructed Ryan Abbott to request OCRA access from circuit courts that used OCRA. Mr. Abbott requested such access from almost fifty Virginia circuit court clerks. Of those clerks who responded, they either denied OCRA subscriber access outright or offered subscriber access on the condition that the person subscribing was a Virginia-barred attorney. *See* Abbott Decl., ¶ 23.

36. During her deposition in the *Courthouse News Serv. v. Schaefer* litigation, in which Judge Henry Coke Morgan, Jr. issued a declaratory judgment finding the press and public enjoy a First Amendment right of access to newly filed civil complaints "contemporaneous with the filing of the complaint," *id.*, 440 F. Supp. 3d 532 (E.D. Va. 2020), the Prince William Clerk testified that she was willing to provide OCRA access to CNS. *See* Dkt No. 33-4 at 6-7. Hearing that offer, I instructed Mr. Abbott and CNS' outside counsel at Bryan Cave Leighton Paisner to follow-up and request such access from the Prince William Clerk.

37. Upon my instruction, Mr. Abbott filled out an OCRA Subscriber Agreement and sent it to the Prince William Clerk. *See* Abbott Decl., Ex. 4.

38. I again instructed Mr. Abbott and CNS' outside counsel to follow-up regarding access to OCRA. In response, the Prince William Clerk created an OCRA Subscriber Agreement for non-attorneys. This Non-Attorney Subscriber Agreement increased the cost of OCRA from $200 per year to $1,200 per year, and imposed a variety of prohibitions on dissemination and publication of filings gathered via OCRA. It is my understanding that the prohibition on dissemination may be based on language in the Virginia Code, and it is my belief

that a restriction on the dissemination of a public court filing, which this is, violates the First Amendment and is unconstitutional.

39. While I would be willing to have CNS pay $200 per year for access to Prince William Court filings via OCRA, because the Prince William Clerk increased the subscription cost sixfold and restricted public dissemination of any reporting based on that access, I instructed Mr. Abbott and CNS' outside counsel to not complete the Non-Attorney Subscriber agreement.

40. It is my understanding that the Prince William Clerk denies that she has no, or had at any time, discretion to provide CNS access to OCRA.

**CNS is Not Seeking Access to Confidential Documents**

41. It is also my understanding that the documents available on OCRA are not confidential. By the time the documents are available on OCRA, they have already gone through the three stages of processing – (1) intake; (2) data entry; and (3) scanning – and are also already available for public viewing at the courthouse.

42. To the extent that Defendants argue that limiting remote access to Virginia-barred attorneys and their staff protects private and confidential information, as pointed out by Judge Morgan during the *Schaefer* trial, the duty to keep personal identifiers out of filings is the filer's responsibility based on Virginia statues and court rules.

43. And, to the extent that Defendants argue that Virginia-barred attorneys can have access because they are governed by a Code of Ethics, I note that CNS reporters abide by ethical proscriptions precluding inclusion of such data in original news stories. The CNS manual makes clear that if confidential information is inadvertently released, CNS is not to disclose such information, and in training, reporters are instructed that the rule applies to personal identifiers. Reporters are members of a profession, just as lawyers are, with attendant professional standards. More importantly, OCRA is a permissions-based system, which requires registration,

a user name and password, and provides the ability to monitor use, if need be, whether users are lawyers, reporters or anyone else.

**Importance of Remote Access**

44. New civil filings are a traditional source of news, and can involve matters of great public interest, from constitutional challenges to environmental complaints to opioid class actions, many of which were filed in rural counties in the Appalachian region. The only way for reporters to provide the public with consistent and reliable information about those filings is to have access to the court record. In practical terms, OCRA, the Clerk, and the Commonwealth have placed a barrier in front of access to the public record in a great swath of the state, a barrier that is high and wide. The result of that barrier, in practice, is that the public record has been blacked out. No news organization can hire the dozens of reporters necessary to travel on a daily basis to the 105 courts in the OCRA system. No news organization can come close to matching the ease with which local attorneys can see the public record in the Commonwealth's courts. As a result, the news contained in the new public filing in a critical institution of democratic government is limited to one professional class and cannot be conveyed to the public. At the same time, that government-imposed barrier can be brought down with remarkable ease. Reporters can be allowed to register and obtain a user name and password so they can enter the great public records room that is OCRA, and report on the public business of the Commonwealth's courts to the people of Virginia and the nation.

45. Restricting remote access to new filings effectively suppresses reporting on court matters, and turns them into secret tribunals where only those directly involved – and members of the bar – know of the events taking place and the documents filed in association with those events.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Pasadena, California on this 11th day of July 2022.

William Girdner