**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. 3:21-cv-00460-HEH |
| v. | ) | |
| | ) | |
| JACQUELINE C. SMITH, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**COURTHOUSE NEWS SERVICE'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**BRYAN CAVE LEIGHTON PAISNER LLP**
Jonathan E. Ginsberg (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**
Dabney J. Carr, IV (VSB No. 28679)
P.O. Box 1122
Richmond, Virginia
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr.@troutman.com

*Counsel for Plaintiff*
*Courthouse News Service*

## TABLE OF CONTENTS

**Page**


**PRELIMINARY STATEMENT ........................................................................................ 1**

**COUNTERSTATEMENT OF UNDISPUTED FACTS........................................................ 2**

A. Response to Commonwealth's Facts Section ........................................................ 2

B. Response to the Clerk's Statement of Undisputed Facts ......................................... 7

C. CNS' Statement of Undisputed Facts in Opposition to Defendants' Motions ........ 10

**ARGUMENT.................................................................................................................. 10**

A. Defendants Concede There Is a First Amendment Right of Access to Civil Court Records ......................................................................................................... 11

B. Defendants Fail to Carry Their Burden of Showing that Their Policies and Practices, and Reliance on the Virginia Code, Survive Constitutional Scrutiny .................................. 12

1. Defendants Fail to Demonstrate that the Virginia Code Compels the Challenged Restrictions, and Even if it Did, the Requirements of the First Amendment Trump the Code ........................................................................................ 14

2. Defendants Fail to Demonstrate That the Challenged Restrictions are Supported By a Compelling or Significant Government Interest ................................................ 16

3. Defendants Fail to Demonstrate that the Challenged Restrictions are Narrowly Tailored ......................................................................................................... 18

**CONCLUSION ............................................................................................................. 30**

# TABLE OF AUTHORITIES

**Cases** **Page**

*Associated Press v. Dist. Ct.*,
705 F.2d 1143 (9th Cir. 1983) ....................13

*Barber v. Conradi*,
51 F. Supp. 2d 1257 (N.D. Ala. 1999)....................20

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)....................13

*Bernstein v. Bernstein Litowitz Berger & Grossman LLP*,
814 F.3d 132 (2d Cir. 2016)....................11, 19

*Bowman v. Johnson*,
2011 WL 1167320 (E.D. Va. Mar. 24, 2011)....................3

*In re Charlotte Observer*,
921 F.2d 47 (4th Cir. 1990) ....................19

*Courthouse News v. Forman*,
2022 WL 2105910 (N.D. Fla. June 10, 2022) ....................28, 29

*Courthouse News v. Gabel*,
2021 WL 5416650 (D. Vt. Nov. 19, 2021)....................25

*Courthouse News v. Planet*,
947 F.3d 581 (9th Cir. 2020) .................... *passim*

*Courthouse News v. Quinlan*,
32 F.4th 15 (1st Cir. 2022)....................11

*Courthouse News v. Schaefer*,
2 F.4th 318 (4th Cir. 2021) .................... *passim*

*Courthouse News v. Tingling*,
2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) ....................26

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
447 U.S. 530 (1980)....................14

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975)....................13

*Doe v. Public Citizen*,
749 F.3d 246 (4th Cir. 2014) ....................10, 11

*Educ. Media Co. at Virginia Tech v. Insley*,
731 F.3d 291 (4th Cir. 2013) ....................................................................................15

*Francisco v. Verizon S., Inc.*,
756 F. Supp. 2d 705 (E.D. Va. 2010), *aff'd* 442 F. App'x 752 (4th Cir. 2011)........................3

*Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
721 F.3d 264 (4th Cir. 2013) ....................................................................................15

*Holmes v. Gen. Dynamics Mission Systems, Inc.*,
835 Fed. App'x 688 (4th Cir. 2020) ..............................................................................4

*Hoyle v. Freightliner, LLC*,
650 F.3d 321 (4th Cir. 2011) ......................................................................................4

*McCullen v. Coakley*,
573 U.S. 464 (2014)..........................................................................................13, 14, 24

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
612 F.3d 301 (4th Cir. 2010) ....................................................................................11

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) ................................................................................20, 21

*Press-Enterprise Co. v. Superior Court of California for Riverside Cnty.*,
478 U.S. 1 (1986)........................................................................................... *passim*

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) ....................................................................................13

*Richmond Med. Ctr. for Women v. Herring*,
570 F.3d 165 (4th Cir. 2009) (en banc) ......................................................................15

*Robinson v. Fenner*,
2021 WL 771753 (E.D. Va. Feb. 26, 2021)...................................................................9

*Rushford v. New Yorker Mag., Inc.*,
846 F.2d 249 (4th Cir. 1988) ....................................................................................10

*Seattle Times Co. v. Rhinehart*,
467 U.S. 20 (1984)....................................................................................................20

*Soderberg v. Carrion*,
999 F.3d 962 (4th Cir. 2021) ....................................................................................14

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011)..................................................................................................20

*Stone v. Univ. of Maryland Medical System Corp.*,
855 F.2d 178 (4th Cir. 1988) .......... 10-11

*SwimWays Corp. v. Zuru, Inc.*,
2014 WL 3615981 (E.D. Va. July 18, 2014) .......... 3

*Turner Broad. Sys. v. F.C.C.*,
512 U.S. 662 (1994) .......... 13

*U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*,
489 U.S. 749 (1989) .......... 19, 21

*U.S. v. Bissonnette*,
2021 WL 1438309 (E.D. Va. Mar. 24, 2021) .......... 3

*U.S. v. Taylor*,
2011 WL 13195944 (E.D. Va. Mar. 3, 2011) .......... 3

*Va. Dept. of State Police v. Washington Post*,
386 F.3d 567 (4th Cir. 2004) .......... 10, 11, 13, 19

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .......... 14

**Statutes and Rules**

Fed. R. Civ. P. 37(c)(1) .......... 4

Local Rule 56(B) .......... *passim*

Va. Code 17.1-293 .......... *passim*

Va. Code § 8.01-217(G) .......... 22

Va. Code § 8.01-314 .......... 23

Va. Code § 8.01-420.8(A) .......... 21, 22

Va. Code § 17.1-225 .......... 8, 16

Va. Code § 17.1-294(B) .......... 21

**Other Authorities**

David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30
Berkeley Tech. L.J. 1807 (2015) .......... 18

David S. Ardia, *Privacy and Court Records: Online Access and the Loss of Practical Obscurity*,
2017 U. Ill. L. Rev. 1385 (2017) .......... 24

Fred H. Cate, *Government Data Mining: The Need for a Legal Framework,* 43 Harv. C.R.-C.L. L. rev. 435 (2008)..........................................................................25

Oversight and Investigations Majority Staff, *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes* (Dec. 18, 2013)............................25

**PRELIMINARY STATEMENT**

Defendants' motions for summary judgment ignore that in order to survive constitutional scrutiny they must demonstrate, with record evidence, that the Non-Attorney Access and Dissemination Restrictions, which blackout the press and public in favor of Virginia-barred attorneys and their staff, are justified by a compelling or significant interest and that withholding remote access and prohibiting the dissemination of information accessed remotely is narrowly tailored to serve those interests. Defendants do not do so. This alone warrants denial of their motions, as well as summary judgment in favor of CNS.[1]

Instead of pointing to factual evidence, Defendants set forth a parade of horribles as to what *might* happen if non-attorneys are provided with remote access to civil filings via OCRA – a permissions-based system that requires the Clerk to vet and approve subscribing users – even though they admit that the same non-confidential records are already available on public access terminals at the Prince William Court (and other Virginia circuit courts). There is no difference in the content of the court records that CNS and other members of the press and public must travel to each individual court to see, on the one hand, and the court records that Virginia-barred attorneys can see remotely via OCRA, on the other hand.

Despite this reality, Defendants seek to justify the challenged restrictions based on generalized concerns of privacy, but they fail to square their concerns with the fact that less restrictive alternatives, such as requiring filer redaction, as well as subscriber agreements, already exist. And they ignore that all federal district courts and courts in at least 38 states –

[1] For brevity and the convenience of both the Court and the parties, CNS submits this single memorandum of law in opposition to each motion for summary judgment, as the factual and legal issues are inextricably linked. All capitalized terms not defined herein shall have the meanings assigned to them in CNS' memorandum of law in support of its summary judgment motion, Dkt. No. 71 ("CNS Br.").

including the Alexandria Circuit Court – provide the press and public with remote access to new civil filings via secure court websites. Defendants' motions, which lack evidentiary foundation, offer no basis for concluding that the Clerk, and other Virginia circuit courts that offer OCRA, cannot provide the same remote access that other courts already do.

Defendants rely on a tortured reading of Va. Code § 17.1-293 as part of their effort to justify the restriction of access to *all* civil filings – regardless of whether they actually contain personal identifiers – but the plain language of the statute does not mandate that non-attorneys should be precluded from accessing or disseminating information accessed remotely. And consistent with *Press-Enterprise Co. v. Superior Court of California for Riverside Cnty.*, 478 U.S. 1 (1986) ("*Press-Enterprise II*") and its progeny, even if the Virginia Code did mandate the challenged restrictions, the First Amendment trumps the code.

## COUNTERSTATEMENT OF UNDISPUTED FACTS

### A. Response to Commonwealth's Facts Section

As a threshold matter, the Commonwealth's "facts" section violates Local Rule 56(B). Contrary to the requirements of that Rule, the Commonwealth does not "list[ ] all material facts" nor does it, for the most part, "cit[e] the parts of the record relied on to support" the alleged facts. Instead, the Commonwealth provides a narrative, in paragraph form – relying mainly on law review articles, blog posts, and other secondary sources – in an effort to "demonstrate that OCRA would be particularly vulnerable to malicious and exploitative data mining if it were available to the public at large." Commonwealth's Memorandum of Law in Support of its Motion for Summary Judgment, Dkt. No. 67 ("Comm. Br.), at 3. Not only does the narrative form make it near impossible for CNS to meaningfully respond to the Commonwealth's alleged "facts," but perhaps more significantly, the Commonwealth's reliance on unauthenticated

secondary sources, many of which constitute hearsay, are inadmissible on a motion for summary judgment. *See, e.g.*, *U.S. v. Taylor*, 2011 WL 13195944, at *3-4 (E.D. Va. Mar. 3, 2011) ("the Fourth Circuit has 'consistently held that newspaper articles are inadmissible hearsay to the extent they are introduced 'to prove the factual matters asserted therein'") (internal citations omitted); *Francisco v. Verizon S., Inc.*, 756 F. Supp. 2d 705, 713 (E.D. Va. 2010), *aff'd* 442 F. App'x 752 (4th Cir. 2011) ("[h]earsay evidence, inadmissible at trial, is likewise insufficient to support a motion for summary judgment" and "unsworn, unauthenticated documents cannot be considered on a motion for summary judgment") (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)). Accordingly, the Commonwealth's motion should be denied for failing to comply with Local Rule 56(B), *U.S. v. Bissonnette*, 2021 WL 1438309, at *7 (E.D. Va. Mar. 24, 2021); *Bowman v. Johnson*, 2011 WL 1167320, at *3 (E.D. Va. Mar. 24, 2011), or at the very least, the Court should disregard all statements contained in the Commonwealth's fact section that are not supported by a record cite. *SwimWays Corp. v. Zuru, Inc.*, 2014 WL 3615981, at *9 (E.D. Va. July 18, 2014).

Notwithstanding the above, CNS responds to the Commonwealth's "Facts" as follows:

With respect to the first paragraph, Comm. Br. at 3, it is undisputed that the parties' Joint Stipulations of Fact, Dkt. No. 55 ("JSF"), provide the relevant facts in this case. The remainder of that paragraph is not supported by any record cites, but to the extent it requires a response, CNS disputes that "OCRA would be particularly vulnerable to malicious and exploitative data mining if it were available to the public at large," in light of redaction practices and subscriber agreements that are already in place, *see* CNS. Br., Statement of Undisputed Material Facts ("SUF") ¶¶ 24, 26-27, 39-44; and considering that the practices of all federal district courts and

courts in at least 38 other states that provide remote access to civil filings to the press and public without issue. JSF ¶¶ 10-11; Girdner Decl. [attached to Dkt. No. 71] ¶¶ 26-27.

With respect to the second paragraph, Comm. Br. at 3-4, the statements within that are based on unsworn, unauthenticated secondary sources constitute inadmissible hearsay with no evidentiary weight. CNS also notes that the Commonwealth's citations to statutory provisions and case law do not satisfy Local Rule 56(B).

With respect to the third paragraph, Comm. Br. at 4-5, the statements within are based on unsworn, unauthenticated secondary sources. They constitute inadmissible hearsay with no evidentiary weight.

With respect to the fourth paragraph, *id.* at 5-6, the Declaration of Joby Knuth ("Knuth Declaration") is not entitled to any evidentiary weight, as that declaration is submitted by a witness who was not disclosed until after the close of discovery, *see* Exhibit A hereto, and contains statements of expert opinion which were not disclosed as required under the Court's Pretrial Schedule A [Dkt. No. 28-1]. *See* Fed. R. Civ. P. 37(c)(1) ("[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion…"); *Holmes v. Gen. Dynamics Mission Systems, Inc.*, 835 Fed. App'x 688, 691 (4th Cir. 2020) (affirming district court's decision to strike from the summary judgment record a declaration from a witness disclosed after the close of discovery); *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 330 (4th Cir. 2011) (same). Nonetheless, to avoid any doubt, CNS disputes that any supposed data mining in Virginia's publicly available court databases, other than OCRA, are relevant to the constitutional inquiry at

issue.[2] CNS also notes that the Commonwealth's citation to the Virginia Code does not satisfy Local Rule 56(B), but CNS does not dispute that OES "must comply with Virginia's laws…."

With respect to the fifth paragraph, Comm. Br. at 6-7, CNS does not dispute those portions that cite to the parties' joint stipulation of facts, Dkt. No. 55. Moreover, as explained above, the statements based on the Knuth Declaration are not entitled to any evidentiary weight. Nonetheless, to avoid any doubt, CNS does not dispute the existence of the applications described in this paragraph but denies that those applications are material to this matter.

With respect to the sixth paragraph, Comm. Br. at 7, the statements within are based on the Knuth Declaration, which is not entitled to any evidentiary weight.[3] Nonetheless, to avoid any doubt, CNS disputes that supposed "data harvesting tactics" with respect to General OCIS and Circuit OCIS – neither of which is a permissions-based system – support the Non-Attorney Access or Dissemination Restrictions or are material to this matter. *See infra* at 27.

With respect to the seventh paragraph, Comm. Br. at 7-8, the statements within are based on the Knuth Declaration, which is not entitled to any evidentiary weight. Nonetheless, to avoid any doubt, CNS does not dispute the Commonwealth's description of the Virginia Date of Birth Confirmation ("VDBC") system, but it does dispute that "one can glean PII by coding an

---

[2] CNS, however, does not believe that any issues of fact raised by either of Defendants' motions are material to the determination of the parties' respective summary judgment motions.

[3] The statements in this paragraph should also be disregarded because they involve events that took place in 2010, ten years before Mr. Knuth was employed at OES. In 2010, Mr. Knuth was employed by an independent contractor serving the Supreme Court of Virginia, *see* Knuth Decl. ¶ 1, and his declaration provides no foundation establishing that he has personal knowledge of any alleged data mining of Virginia's General District Court Online Case Information System ("General OCIS") or Circuit Court Online Case Information System ("Circuit OCIS") in 2010.

algorithm with partial PII and determine by process of elimination," which is based on speculation not factual evidence.[4]

With respect to the eighth paragraph, Comm. Br. at 8, the statements within are based on the Knuth Declaration, which is not entitled to any evidentiary weight and constitutes an undisclosed expert opinion. Nonetheless, to avoid any doubt, CNS disputes that VDBC requires a registrant agreement similar to OCRA's subscriber agreement; VDBC does not require a paid subscription service, like OCRA. JSF ¶ 43, Ex. B.[5] Thus, VDBC's registrant agreement has no bearing on the issues herein. Moreover, the statement concerning "bots" searching VDBC to "guess" social security numbers is not substantiated by the Knuth Declaration, which also does not present any evidence to establish that any data purportedly mined from VDBC has been used for nefarious purposes.

With respect to the ninth paragraph, Comm. Br. at 9, CNS does not dispute the portions that rely on the parties' joint stipulation of facts, Dkt. No. 55. CNS disputes the statements in the second sentence that "the Code of Virginia permits clerks to post PII online if it is posted to OCRA." To the contrary, Va. Code § 17.1-293(E)(7) permits remote access only to "nonconfidential court records." As to the statements that are based on the Knuth Declaration, those are not entitled to any evidentiary weight and constitute undisclosed expert opinions. For the avoidance of doubt, CNS disputes that "OCRA is particularly vulnerable to data mining," as that statement is based on pure speculation not evidence. As to the statements that are based on

---

[4] In addition, paragraph 12 of the Knuth Declaration, which is cited as support for this statement, does not state anything about gleaning PII by coding an algorithm with partial PII. Even if it did, such statements would be admissible only as expert opinion, and Mr. Knuth has not been disclosed as an expert in this matter.

[5] All references to exhibits, unless otherwise noted as attached hereto, are to those attached to CNS' memorandum of law in support of its motion for summary judgment. Dkt. No. 71.

the Declaration of Michael Riggs, CNS does not dispute that an OCRA subscriber "has access to the entirety of the records made available through the OCRA application," but emphasizes that those records are already disclosed to the public at the physical courthouse. JSF ¶¶ 48-49. Finally, CNS disputes the last sentence, which is attorney argument, not fact, and affirmatively states that "OCRA's current limitations" are not narrowly tailored. *See infra* at 18-30.

**B. <u>Response to the Clerk's Statement of Undisputed Facts</u>**

Although the Clerk "lists all material facts" as required by Local Rule 56(B), she does so in bullet point form rather than numbered paragraphs. Accordingly, CNS responds as follows:

The first through fourth bullet points, Clerk's Memorandum of Law in Support of Motion for Summary Judgment, Dkt. No. 75 ("Clerk Br.), at 2, are undisputed.

The fifth bullet point, Clerk Br. at 2, is undisputed, except that 105 (not 90) of the 120 Virginia circuit courts currently provide subscribers with remote access via OCRA. JSF ¶ 27.

The sixth bullet point, Clerk Br. at 2, is undisputed.

The seventh bullet point, Clerk Br. at 3, is undisputed, except that CNS clarifies that "officers of the court" is limited to Virginia-barred attorneys and their staff. JSF ¶¶ 28, 53.

The eighth bullet point, Clerk Br. at 3, is undisputed.

The ninth bullet point, Clerk Br. at 3, contains a statement of law, not fact, which does not require a response. Nonetheless, to avoid any doubt, CNS disputes that the cited statutory language permits the Non-Attorney Access Restriction. *See infra* at 14-16.

The tenth bullet point, Clerk Br. at 3, is undisputed.

The eleventh bullet point, Clerk Br. at 3, cherry-picks language from the cited opinion letter. CNS does not dispute that the quoted language appears in the cited letter, but affirmatively states that the letter was an informal opinion from Robert B. McEntee, an Assistant

Attorney General representing the Commonwealth in this case, representing only his "individual view," which also explained that "the Code of Virginia grants circuit court clerks the ability to provide secure remote access to nonconfidential court records to members of the general public under § 17.1-225." *See* Exhibit B, hereto, at 1, 3.

The twelfth bullet point, Clerk Br. at 3, is undisputed.

The thirteenth bullet point, Clerk Br. at 4, is a statement of law and is disputed. By virtue of the Non-Attorney Access Restriction, the Dissemination Restriction is limited to Virginia-barred attorneys and their staff since they are the only individuals to whom the Clerk offers remote access to civil court records. JSF ¶ 28. Moreover, the Non-Attorney Subscriber Agreement that the Clerk provided to CNS in June 2021 imposed prohibitions on dissemination and publication of non-confidential civil filings that are not included in the Attorney Subscriber Agreement. Ex. J, ¶ 5.

With respect to the fourteenth bullet point, Clerk. Br. at 4, CNS disputes that it "does not assert that it has been denied access to non-confidential civil filings" because the effect of the Non-Attorney Access Restriction is the denial of the ability of the press and public to access new civil filings in a timely fashion, if at all, in violation of the First Amendment. Girdner Decl., ¶¶ 6-7, 10, 32, 44-45; *see also infra* at 23-24. The fact that CNS "can access non-confidential civil complaints at the circuit court[houses]" is undisputed, but due to the remote location of 102 Virginia circuit courts and the cost-prohibitive expense of hiring numerous additional reporters to cover each of those far off courts in person, it is not viable to visit these courts at all, and most certainly not on a daily basis. JSF ¶ 17; Girdner Decl. ¶¶ 29, 32.

The fifteenth and sixteenth bullet points, Clerk Br. at 4, are undisputed.

The seventeenth bullet point, Clerk Br. at 4, is disputed because the Clerk does review new civil filings for any unredacted identification numbers appearing on a credit card, debit card, bank account, or other billing or payment system and, if discovered, redact such information. JSF § 51. The Clerk and her staff also seek to redact dates of birth, maiden names, minor names, and signatures "if a civil filing is posted on the Prince William County Circuit Court's website," which occurs in "exceptional cases that are of public interest or for which the Clerk's office anticipates repeated requests for information." Ex. C, No. 10; Ex. E, Nos. 2-6.

The eighteenth through twenty-third bullet points, Clerk Br. 4-5, to the extent they pertain solely to the practices of the Arlington County Clerk, are undisputed for purposes of the parties' summary judgment motions. However, the Declaration of Paul Ferguson ("Ferguson Declaration"), submitted by a party who is not a defendant in or involved in this case, should be disregarded because Mr. Ferguson was not identified as a witness until the evening of the last day of discovery, *see* Exhibit C, hereto, and CNS did not have an opportunity to depose him.

The twenty-fourth and twenty-fifth bullet points, Clerk Br. 5, are speculative and lack foundation, and are thus disputed. *See, e.g., Robinson v. Fenner*, 2021 WL 771753, at *2 (E.D. Va. Feb. 26, 2021) ("[t]he absence of an 'affirmative showing of personal knowledge of specific facts' prevents the consideration of such facts in conducting a summary judgment analysis") (citation omitted). For the avoidance of doubt, CNS disputes that the practices of Clerk Ferguson are probative of the practices of Clerk Smith.

The twenty-sixth bullet point, Clerk Br. 5, is undisputed for the purpose of the parties' summary judgment motions.

The twenty-seventh bullet point, Clerk Br. 6-7, is speculative and lacks foundation, and is thus disputed.

**C. <u>CNS' Statement of Undisputed Facts in Opposition to Defendants' Motions</u>**

CNS hereby incorporates by reference the statement of undisputed material facts set forth in CNS' memorandum of law in support of its summary judgment motion.

## <u>ARGUMENT</u>

### DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT <u>BECAUSE THEY FAIL TO MEET THEIR CONSTITUIONAL BURDEN</u>

In *Press-Enterprise II*, the Supreme Court established a two-step framework for claims challenging access restrictions in violation of the First Amendment. 478 U.S. at 8-10. The first step of the analysis asks whether there is a First Amendment right of access to the documents at issue, *id.* at 8-9, and as this Court recognized, "[i]t is well-settled that the press and public have a right of access to most, if not all, civil court records." Mem. Op. at 9 (citing *CNS v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). Once that right of access is established, as here, the second step of the analysis is an examination of the interests offered to justify the challenged restrictions by applying the requisite level of constitutional scrutiny. *Press-Enterprise II*, 478 U.S. at 10; *Doe v. Public Citizen*, 749 F.3d 246, 266 (4th Cir. 2014); *see also Schaefer*, 440 F. Supp. 3d 532, 559 (E.D. Va. 2020).

In other words, Defendants must demonstrate that the Non-Attorney Access and Dissemination Restrictions are "'necessitated by a compelling government interest'" and that the restrictions of access are '"narrowly tailored to serve that interest.'" *Doe*, 749 F.3d at 266 (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)); *see also CNS v. Planet*, 947 F.3d 581, 594-95 (9th Cir. 2020) ("*Planet III*") ("[o]nce…a presumption of access arises under *Press-Enterprise II*" it "may be restricted only if 'closure is essential to preserve higher values and is narrowly tailored to serve those interests'") (quoting *Press-Enterprise II*, 478 U.S. at 13-14), *accord Va. Dept. of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004); *Stone v.*

*Univ. of Maryland Medical System Corp.*, 855 F.2d 178, 180 (4th Cir. 1988); *Rushford*, 846 F.2d at 253.

Defendants bear the burden of justifying the challenged restrictions by presenting factual evidence, not mere conjecture, in support of their position. *See, e.g.*, *Va. Dep't. of State Police*, 386 F.3d at 575 (citing *Press-Enterprise II*, 478 U.S. at 15). Unable to do so, Defendants essentially ask this Court to rubber stamp the challenged restrictions based on general concerns of privacy and the orderly administration of justice. But they do not provide the requisite evidentiary showing.

**A. Defendants Concede There Is a First <u>Amendment Right of Access to Civil Court Records</u>**

Defendants do not dispute that "the press and public enjoy a qualified right of access to nonconfidential civil court records, which helps ensure the transparency of the courts." Comm. Br. at 2; Smith Br., *generally*; *see also CNS v. Quinlan*, 32 F.4th 15, 20, n.8 (1st Cir. 2022); *Planet III*, 947 F.3d at 59; *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 141 (2d Cir. 2016). As CNS explained in its summary judgment motion, "the public and press generally have a contemporaneous right of access to court documents and proceedings *when the right applies*." *Doe*, 749 F.3d at 272 (emphasis added); *see also* CNS Br. at 18, n.3 (collecting cases finding that First Amendment right of access attaches when a court record is filed). This is because "public access promotes not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary." *Id.* at 266. "An informed citizenry is at the heart of this democracy, and narrowing the arteries of information…will only serve to impair our country's coronary health." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 612 F.3d 301, 304 (4th Cir. 2010).

In *Schaefer*, the court emphasized that "reasonably contemporaneous access" is required "as expeditiously as possible" based on "the context of th[e] case." 2 F.4th at 328. In doing so, the Fourth Circuit affirmed the district court's holding that because the public enjoys a right of access "contemporaneous with the filing of the complaint," same-day access is required "insofar as practicable." 440 F. Supp. 3d at 562.[6] In the context of a court, like the Prince William Court, where remote access is available, and thus practicable, restricting such access to Virginia-barred attorneys interferes with CNS' right to contemporaneous access "as expeditiously as possible."

Notwithstanding the foregoing legal principles, the Commonwealth contends that the First Amendment does not mandate *remote* access. Comm. Br. at 2. This Court should reject that illusory argument, as it has already observed:

> [CNS] is not alleging that the public has a fundamental right to remotely access civil records guaranteed by the First Amendment. Instead, [CNS] argues that *if* Defendants provide Virginia attorneys remote access to civil court records, *then* the First Amendment also requires them to provide the public with remote access. In effect, [CNS] argues that Defendants are limiting an already established fundamental right, the right to access civil court records, in an unconstitutional manner by giving one group, Virginia lawyers, remote access while denying it to others.

Mem. Op. at 9 (emphasis within). CNS is not seeking a *per se* right of remote access. Instead, CNS simply asserts that where, as here, a First Amendment right of access applies, Defendants must meet their burden of justifying any access restrictions.

### B. Defendants Fail to Carry Their Burden of Showing that Their Policies and Practices, and Reliance on the Virginia Code, Survive Constitutional Scrutiny

Critically, "[t]he burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position."

---

[6] Judge Henry Coke Morgan Jr. of this Court specifically found, after applying *Press Enterprise II*, that the clerks' policies that withheld access to new civil complaints until they were "fully indexed and docketed" violated the First Amendment because the clerks "failed to prove that their practices and customs that lead to the substantial delays. . .were narrowly tailored." *Schaefer*, 440 F. Supp. 3d at 532, 560. The Fourth Circuit agreed. 2 F.4th at 328.

*Va. Dep't of State Police*, 386 F.3d at 575. "General concerns stated in conclusory fashion," and unsupported speculation, are insufficient to justify the deprivation of public access. *Id.* at 573; *see also id.* at 575 (quoting *Press-Enterprise II*, 478 U.S. at 15).

Relying on this Court's Memorandum Opinion, Defendants contend that the challenged restrictions "resemble" time, place, and manner ("TPM") restrictions and thus advocate for "relaxed scrutiny." Comm. Br. at 11; Clerk Br. at 11. Defendants are mistaken; nonetheless, as was also the case in *Schaefer*, no matter what level of scrutiny, "both standards of review require Defendants to come forward with evidence, not mere argument, to show that the [restrictions] are narrowly tailored to some higher governmental interest." *Id.*, 440 F.Supp.3d at 560; *see also Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015); Mem. Op. at 10 (quoting *Schaefer*, 2 F.4th at 328; *Planet III*, 947 F.3d at 585; and *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)).

Even under TPM scrutiny, "[t]hat the Government's asserted interests are important in the abstract" is not enough. *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 662, 664 (1994). Defendants must show that "the recited harms are real, not merely conjectural….," *id.* at 664, and that "no reasonable alternatives exist to 'adequately protect' that government interest." *Planet III*, 947 F.3d at 603 (quoting *Press Enterprise II*, 478 U.S. at 14). They have not done so.

Moreover, the level of scrutiny itself is governed not by what the challenged practices resemble but by whether they are "a total restraint on the public's first amendment right of access even though the restraint is limited in time." *Associated Press v. Dist. Ct.*, 705 F.2d 1143, 1147 (9th Cir. 1983). Indeed, "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation omitted). "Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it." *Cox Broadcasting Corp. v. Cohn*,

420 U.S. 469, 496 (1975). Thus, efforts to restrict the dissemination of "truthful information" in "official court records" must be narrowly tailored to "further a state interest of the *highest order*." *See Soderberg v. Carrion*, 999 F.3d 962, 969 (4th Cir. 2021) (emphasis added).

While the Ninth Circuit in *Planet III* observed that access restrictions to civil complaints "resemble" TPM restrictions, that court still applied what it called the "rigorous" standard from *Press-Enterprise II*. 947 F.3d at 595-96, 603.[7] Even so, Defendants concede TPM restrictions must be content-neutral, *see* Comm. Br. at 11-12; Smith Br. at 12-13, but the challenged restrictions are anything but. They are expressly supported by concerns *over content*, *i.e.*, that civil filings might contain certain personal identifiers. Restricting access and dissemination based on content Defendants believe would otherwise result in exploitation of litigants' personal information clearly is content-based. *McCullen*, 573 U.S. at 480 (a restriction is content-neutral only if "justified without reference to the content of the regulated speech"). And contrary to the Commonwealth's assertion that the Non-Attorney Access Restriction is content-neutral because it does not "discriminate among classes of the public seeking access records," Comm. Br. at 11, the Non-Attorney Access Restriction does exactly that, providing remote access only to a special class of the Commonwealth's citizens – Virginia-barred attorneys and their staff.

**1. Defendants Fail to Demonstrate that the Virginia Code Compels the Challenged Restrictions, and Even if it Did, the Requirements of the First Amendment Trump the Code**

Defendants rely on Va. Code § 17.1-293, but nothing in that statute mandates that clerks withhold remote access for non-attorneys, nor does the First Amendment permit them to do so.

[7] Unlike *Planet III*, case law regarding reasonable TPM restrictions pertain to restrictions on the exercise of free speech rights in traditional public forums like performance venues, schools, and city streets. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 536 (1980).

Indeed, when an access restriction is a broadly applicable statute, it is not necessary to determine whether the statute is unconstitutional on its face or as-applied. *See, e.g., Press-Enterprise II*, 478 U.S. at 8-13 (challenge to a section of the California Penal Code restricting access to preliminary hearings). Rather, what matters is whether Defendants have justified the access restrictions under constitutional scrutiny. *See supra* at 10-13. Thus, to the extent Va. Code § 17.1-293 purports to require Defendants to restrict remote access to civil filings to Virginia-barred attorneys (and their staff), the requirements of the First Amendment trump the Code.[8]

Defendants contend that two provisions of Va. Code § 17.1-293, when considered together, mandate the Non-Attorney Access Restriction. The first, Section 17.1-293(B), merely prohibits court clerks from posting generally "on the Internet" – as opposed to a secured permission-based subscriber system – certain personal identifiers. The second, Section 17.1-293(E)(7), qualifies that prohibition by stating, in relevant part, that it "shall not apply to…[p]roviding secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar…" Contrary to Defendants' assertion, Section 17.1-293(E)(7) does not permit the Clerk to post confidential

---

[8] To the extent this Court deems it necessary to rule on the constitutionality of Va. Code § 17.1-293, the record supports a finding that the statute is unconstitutional on its face and as applied to CNS. A plaintiff sustains its burdens on a facial challenge by demonstrating either (i) "no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep;" or (2) "that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (en banc) (quotations and citations omitted); *see also Educ. Media Co. at Virginia Tech v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013). Defendants cannot claim that the current preferential access is consistent with any tradition of access in the Virginia circuit courts. Traditionally, everyone – including attorneys – were provided exactly the same type of access to non-confidential public court records. An as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]" *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc). Here, Defendants' practices and policies are unconstitutional as applied to CNS. Defendants, through their actions, are exposing CNS to a burden and expense not suffered by Virginia-licensed attorneys.

information or private information on OCRA or any other remote access system. Rather, it simply permits the Clerk to provide attorneys with remote access to *non-confidential* records notwithstanding the prohibition in Section 17.1-293(B). And the Clerk concedes there is nothing confidential about a signature, date of birth, maiden name, or minor name. Clerk Br. at 9.

Nonetheless, Defendants contend that Section 17.1-293(E)(7) requires the Clerk to restrict remote access via OCRA to attorneys, and that the Clerk is otherwise prohibited from providing the public or press with remote access to non-confidential records, *even if they do not include any of the personal identifiers identified in Section 17.1-293(B)*. Not only do the requirements of the First Amendment trump this practice, but it is also foreclosed by Va. Code § 17.1-225, which expressly *permits* clerks to provide remote access to the non-confidential court records sought in this case, *i.e.*, the same access permitted by Section 17.1-293(E)(7). Section 17.1-225 does not limit remote access to Virginia-barred attorneys, nor is it limited to systems other than OCRA. *Id.*

**2. Defendants Fail to Demonstrate That the Challenged Restrictions are Supported By a Compelling or Significant Government Interest**

In an effort to avoid constitutional scrutiny, Defendants rely primarily on fear mongering, claiming, among other things, that the challenged restrictions are necessary to promote the fair and orderly administration of justice by protecting against the *potential* misuse of private information that *might* appear in a non-confidential civil filing. For her part, the Clerk contends, without any factual support, that the challenged restrictions "target[ ] information that is highly sought after by third parties to engage in identify theft, data mining, and other crimes, as well as information regarding minor children" because "[a]ny information posted online is at risk of being misused for nefarious purposes." Clerk Br. at 13, 15; *see also id.* at 20. The Clerk, however, does not attempt to set forth any evidence that this risk is a reality in her court or any

others. The Commonwealth likewise relies on generalized privacy concerns – not factual evidence – to argue that "[l]imiting online access to court records – many of which contain private and personally identifiable information – to a narrow class of qualified court officers promotes critical privacy and security interests by sharply reducing the amount of private, sensitive information let out into the world, limiting the potential for widespread information harvesting, resale, and dissemination." Comm. Br. at 2.

Defendants' concerns about private information *possibly* being "let out into the world," *id.*, for anyone to access "with an Internet connection," Clerk Br. at 20, is premised on the false notion that OCRA, without the Non-Attorney Access Restriction, would be available to any anonymous internet user like other free, public websites. OCRA, however, is a permissions-based system, which provides the ability to monitor use, if need be; it requires that a user (i) apply to, and be approved and authorized by, the Clerk; (ii) sign a subscriber agreement in front of a notary with the applicant's name, address, phone number, and email address in order to obtain a user ID and password that permits OCRA access; and (iii) pay an annual subscription fee, *i.e.*, $200 per year per user. SUF ¶¶ 24, 26-27; Ex. B. To be clear, CNS does not dispute that privacy interests are important, but any supposed harm that is curtailed by Defendants' policy and practice of restricting remote access to non-attorneys, as well as the dissemination of information accessed remotely – regardless of whether a filing contains any personal identifiers – does not override CNS' First Amendment right of access.

CNS demonstrated in its summary judgment motion that the Clerk is "unable to provide" factual data to support Defendants' position that the challenged restrictions are even necessary to protect private information. SUF ¶ 38. In discovery, CNS asked the Clerk to identify the number of filings in each of the last five years that contained the information described in Va.

Code § 17.1-293(B); in response, the Clerk could only state that "the information sought is not tracked by the Office of the Clerk of Court or any group." Ex. F, No. 8; CNS Br. at 23. Having failed to demonstrate the frequency that personal identifiers appear in civil filings at the Prince William Court, Defendants cannot establish, with specific evidence, that the challenged restrictions further their stated interests. Summary judgment for Defendants must be denied on that basis alone.[9]

**3. Defendants Fail to Demonstrate that the Challenged Restrictions are Narrowly Tailored**

Even if Defendants were able to substantiate their privacy concerns, the challenged restrictions are not narrowly tailored to preserve a compelling or significant interest.

**a. Defendants' Ignore That the Same Records They Shield From Remote Access for Non-Attorneys, And For Which They Prohibit Dissemination, Are Already Disclosed to the Public at the Courthouse**

There is no dispute that the non-confidential documents court records available on OCRA, even to the extent that they *may* contain certain sensitive information, are the same non-confidential court records that are available to the public and press via public access terminals at the Prince William courthouse. Clerk Br. at 4; SUF ¶ 36. "Once announced to the world, the

[9] Instead of providing any data with respect to the Prince William Court, the Commonwealth cites to "a 2015 empirical study in North Carolina" that purportedly "showed a high frequency of sensitive information included in state court filings" in the North Carolina Supreme Court (the "2015 North Carolina Report"). Comm. Br. at 21-22. Not only is that "study" inadmissible hearsay and irrelevant to the First Amendment right of access to civil filings at the Prince William Court, but it, in reality, concluded that "[m]ost of the documents contained relatively few incidences of sensitive information" and that "criminal cases have disproportionately more sensitive information than civil [ ] cases." David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech. L.J. 1807, 1807-08 (2015). Moreover, the "study" observes that because "court records vary significantly in the types of sensitive information they contain," "when scholars and policymakers discuss privacy and court records, *they must be cautious of generalizing*," *id.* at 1892 (emphasis added) – the exact approach Defendants advocate for here.

information [has] lost its secret characteristic." *In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990) (vacating injunction prohibiting reporters from disclosing information revealed in open courtroom); *see also Va. Dep't of State Police*, 386 F.3d at 579 (one consideration "which may be considered in deciding whether an asserted interest is compelling….is whether the granting of access….will disclose facts that are otherwise unknown to the public"); *Bernstein*, 814 F.3d at 141 ("easily conclud[ing]" that the First Amendment right of access applies to civil complaints "*even when they contain arguably sensitive information*") (emphasis added).

To avoid this reality, Defendants misguidedly rely on *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989), *see* Comm. Br. at 15; Clerk Br. at 14-15, in which the Supreme Court held that FBI criminal rap sheets (created by collecting biographical data and criminal history from various state and local public records *across the country*) were not subject to disclosure "*within the meaning of the Freedom of Information Act*," 489 U.S. 751 (emphasis added), based on a specific statutory exception within FOIA for "records or information compiled for law enforcement purposes…the production of [which]…could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* at 755-56 (quoting 5 U.S.C. § 522(b)(7)(C)). In that specific context, which did not concern the First Amendment, the Supreme Court observed that "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." 489 U.S. at 764. The Court, however, was not describing a remote access system, like OCRA, that provides access to the very same records (not a summary) available at a single courthouse (not several).[10]

[10] The Commonwealth also suggests that "information contained in court files stored at courthouses is 'practically obscure' due to the logistical barriers to amassing large amounts of

The Commonwealth's reliance on *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984) and *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011), *see* Comm. Br. at 13, 17, is similarly misguided. In *Seattle Times*, the Supreme Court held that a protective order, limiting the disclosure of *otherwise non-public information* obtained in discovery, did not offend the First Amendment. 467 U.S. at 37. That is not the issue here. As to *Sorrell*, the Commonwealth leans on the dissent as part of its effort to establish that the challenged restrictions further Defendants' "interest in preventing widespread disclosure of [ ] private information of litigations," Comm. Br. at 14, but *Sorrell* ultimately held that a Vermont law that restricted pharmacies and health insurers from disclosing and selling prescriber-identifying information to pharmaceutical marketers and data miners violated the First Amendment, despite privacy concerns, "given the information's widespread availability." *Id.* at 573.[11]

The Fourth Circuit took a similar approach in *Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010), in which the court recognized a difference between records available at courthouses and those available through secure remote access, but ultimately concluded that prohibiting the posting of already public records online is not "narrowly tailored to protecting individual

---

private information" and thus "private and sensitive information can appear in public records without creating a risk of actual widespread public disclosure or harm." Comm. Br. at 2. The article cited for this premise, however, urges *against* online access restrictions because such practices violate the First Amendment; thus, courts should offer less restrictive alternatives to remote access blackouts, like redaction. *See infra* at 24-25. And as William Girdner, CNS' founder and editor, explains in his accompanying declaration in opposition to Defendants' motions, the banner of "practical obscurity" is a nonsensical philosophy that incorrectly posits paper records are hard to find in practice so access to electronic records should be restricted, notwithstanding the requirements of the First Amendment. *Id.* ¶¶ 6-7.

[11] *Barber v. Conradi*, 51 F. Supp. 2d 1257 (N.D. Ala. 1999), cited by the Clerk, *see* Clerk Br. at 17, is also inapposite. In that case, the documents at issue were *not* available on public access terminals or any online system; thus, the limitation imposed was narrowly tailored to avoid a labor intensive effort that would require court clerks, unlike here, to pull thousands of files each week. *Id.* at 1267-68.

privacy." *Id.* at 286. That case involved a secure, permissions-based remote access system (like OCRA but not restricted to attorneys only) through which Virginia circuit court clerks provided online access to the same unredacted land records available at the courthouse. *Id.* at 266. Plaintiff, a privacy advocate, brought a First Amendment challenge to Virginia's Personal Information Privacy Act, which prohibited the intentional communication of another's social security number to the general public, after the Attorney General sought to prosecute her for displaying on her website copies of Virginia land records containing unredacted SSNs that she obtained by logging on to the secure remote access land records system. In concluding that the statute violated the First Amendment as applied to plaintiff, the Fourth Circuit in *Ostergren* discussed the Supreme Court's distinction in *Reporters Committee*, *supra*, between public records available at courthouse's nationwide and a single computerized summary of that information but held that "Virginia could curtail SSNs' public disclosure much more narrowly by directing clerks not to make land records available through secure remote access until after SSNs have been redacted." *Id.* at 286 The same is true here.[12]

**b. Less Restrictive, Effective Alternatives Such as Redaction and <u>Subscriber Agreements Achieve Defendants' Stated Interests</u>**

Defendants largely ignore that because the filing party is required to redact much of the information they are concerned about, *i.e.*, social security numbers and financial account numbers, *see* Va. Code § 8.01-420.8(A), a less restrictive alternative is already in place with respect to this particular information.[13] Indeed, the Clerk and her staff review new civil filings to

---

[12] Notably, the *Ostergren* court did not suggest that circuit court clerks restrict remote access to land records in their entirety. In response to that decision, the General Assembly amended the Virginia Code to require that "[b]eginning July 1, 2012, any land record made available to subscribers via secure remote access may contain only the last four digits of the social security number of any party." Va. Code § 17.1-294(B).

[13] The Clerk appears to concede that SSNs and financial account numbers are the only personal

ensure that any social security numbers and other identification numbers, such as those appearing on a bank account or other billing or payment system, are redacted before making records available via OCRA. SUF ¶ 40. Thus, like in *Schaefer*, because the "filer is responsible for redacting confidential information" and the Clerk takes steps to "ensur[e] that confidential information is protected," *id.* 440 F.Supp.3d at 560, the challenged restrictions are not "narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." 2 F. 4th at 328 (quoting *Planet III*, 947 F.3d at 595).[14]

CNS' summary judgment motion also explains that less restrictive alternatives are in place with respect to minor and maiden names. *See* CNS Br. at 25-26; SUF ¶ 43. Many circuit court cases that concern minors are confidential by statute and thus not available on OCRA, and for those that are, minor names may be redacted or sealed where disclosure of the name would pose a health or safety threat. *Id.* The same is true for maiden names. Va. Code § 8.01-217(G).

Instead of confronting this evidence, or presenting much of their own, Defendants assert that lawyers for some reason need personal identifiers contained in court records to perform their jobs. Comm. Br. at 15; Smith Br. at 17, 20. This argument ignores that OCRA subscribers have access to filings not only in their own cases, but also in other cases in which they are not

---

identifiers that the General Assembly has deemed confidential. *See* Clerk Br. at 8-9. But she oddly argues that Va. Code § 8.01-420.8(A) "does not contain an absolute requirement that the filing party redact the information, but rather that the party simply make 'reasonable efforts'" to do so. *Id.* at 8. This is a distinction without meaning, and one that is contrary to the parties' stipulated facts. SUF ¶ 39, citing Dkt. No. 55 ¶ 51.

[14] Defendants cite to *Schaefer* and *Planet III* throughout their briefs to show that those courts acknowledged government concerns about privacy and the fair and orderly administration of justice," Comm. Br. at 3, 13, 18, 24, 26; Clerk Br. at 12, 16-17, but conveniently fail to point out that those courts both found that the clerks' policies that withheld access to new civil complaints violated the First Amendment because they were *not* narrowly tailored and necessary to preserve those interests. *Schaefer*, 2 F. 4th at 328; *Planet III*, 947 F.3d at 595.

attorneys of record. SUF ¶ 31; *see also* Va. Code § 17.1-293(E)(7).[15] Defendants do not explain why attorneys would need access to personal identifiers that may appear in court filings in cases in which they are not involved. They do not. Moreover, Defendants overlook that Virginia attorneys are served with all pleadings in every case in which they represent a party. *See* Va. Code § 8.01-314. OCRA access simply provides them with access to an additional copy of such pleadings on a 24/7/365 basis.[16]

Defendants also contend that, for attorneys, "[t]ime spent traveling to and from courthouses is time that [is] better spent performing any number of advocacy-related activities," Comm. Br. at 16, "without [having to] stand[ ] in line at the courthouse and causing expensive and time-consuming delays," Clerk Br. at 18, but the same reasoning holds true for journalists. As Mr. Girdner illustrated in connection with CNS' summary judgment motion:

> Online remote access is the only practical means for covering, and reporting on, new civil filings in the Prince William Court, and throughout the Commonwealth, because sending a reporter to visit each of the 120 circuit courts across the state on a daily basis, if at all, is not practicable for any news entity…. In order to accurately report on those events, and to let the public know that a legal case or significant record has been filed, it is fundamental to have practical contemporaneous access to newly filed civil complaints and subsequent civil filings as the court record is developed. Remote access is the best way to achieve contemporaneous access.

Girdner Decl. ¶¶ 6-7, 10.

For these reasons, the challenged restrictions do not "leave open ample alternative channels for communication of the information," as would be required to survive TPM scrutiny.

---

[15] Va. Code § 17.1-293(E)(5) separately permits "secured remote access to any person, his counsel, or staff which counsel directly supervises to documents filed in matters to which such person is a party."

[16] Contrary to the Commonwealth's assertion, the rules of professional conduct cited at pages 16-17 of their brief do not expressly prohibit lawyers from disclosing information obtained through OCRA or other court records.

*McCullen*, 573 U.S. at 477. The access allowed to attorneys cannot, in practical terms, be matched by the press or public. No press organization can afford to send a reporter on a daily basis to each of the 105 Virginia circuit courts that use OCRA. SUF ¶ 15. Contemporaneous access, "as expeditiously as possible," *Schaefer*, 2 F. 4th at 328, is simply not viable.[17]

The Commonwealth's next gambit is to contend that redaction practices fail to protect against disclosure of personal identifiers, Comm. Br. at 20-23, while the Clerk does not meaningfully address redaction at all. The Commonwealth relies largely on a series of law review articles and blog posts to argue that notwithstanding redaction practices, OCRA, if accessible to non-attorneys, would "expos[e] vulnerable litigants to harmful data mining and exploitations" which "can also be used for criminal and quasi-criminal purposes." *Id.* at 3-4. Not only do those secondary sources constitute hearsay, *see supra* at 2-3, but they also do not support Defendants' position. As one of those articles explains, "[c]ourts can significantly reduce the amount of privacy-harming information in their records by shifting the responsibility for protecting private information to lawyers and litigants, who should not be permitted to include highly sensitive information in court files if it is not relevant to the case." David S. Ardia, *Privacy and Court Records: Online Access and the Loss of Practical Obscurity*, 2017 U. Ill. L. Rev. 1385, 1389 (2017); *see also id.* at 1445-47. That approach is preferred where "a

---

[17] The Clerk's suggestion that CNS, and other members of the press and public, should not receive the remote access that is currently available to Virginia-barred attorneys because a citizen does not "need to comb through online court records to learn the maiden name of another citizen, or to know the names and ages of their children, or to have a copy of their signature," Clerk Br. at 20, misses the point. The record does not demonstrate that CNS, or any Virginia citizens, seek to do this. Rather, as Mr. Girdner explained, CNS seeks remote access to all civil filings for the purpose of informing the public about the day's events in the Prince William Court and other Virginia circuit courts. Girdner Decl. ¶¶ 6-7, 10. And in connection with its reporting, CNS, like attorneys, abides by ethical proscriptions precluding inclusion of personal identifiers in original news stories. *Id.* ¶ 43.

court does provide online access to some or all of its court records" because "it cannot impose restrictions on who may access those records or how the information can be used unless those restrictions comply with the First Amendment." *Id.* at 1442; *see also id.* at 1453 (explaining that restricting online access to protect privacy, "while superficially appealing, is contrary to established First Amendment doctrines that mandate a presumption of public access and require case-specific analysis before public access can be restricted"). "The fact is, without online access to court records, the benefits of public access will be reduced. Curtailing remote access to court records, for example, would reduce the frequency and quality of media reporting about the courts…And it would diminish the accountability of the court system as a whole." *Id.* at 1449.

Other secondary sources cited by the Commonwealth likewise do not help Defendants, nor do they even mention that court filings accessed remotely are mined for nefarious purposes. *See* Fred H. Cate, *Government Data Mining: The Need for a Legal Framework*, 43 Harv. C.R.-C.L. L. rev. 435 (2008) (discussing *government* data aggregating activities on websites that belong to companies like LexisNexis and credit bureaus); Office of Oversight and Investigations Majority Staff, *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes* (Dec. 18, 2013) ("focus[ing] specifically on the collection and sale of consumer information for the purpose of marketing" not "criminal ends").[18]

---

[18] As explained *supra* in note 9, the Commonwealth's citation to the 2015 North Carolina Report to support its contention that redaction is not effective is misplaced. So too is the Commonwealth's reliance on a "Letter from Carl Malamud to The Honorable Lee H. Rosenthal" and a blog post from "computer scientist Timothy Lee." Comm. Br. at 20-21. The Malamud letter identifies 1,669 out of 2,706,431 filings in 32 district courts that contained social security numbers or other private information; the Lee blog post identifies 194 out of 1.8 million filings available on PACER where parties tried, but for technical reasons, did not successfully redact private information. In other words, only ***0.062%*** and ***0.011%*** of the filings discussed in those secondary sources, respectively, contained arguably confidential or sensitive information, both a "minute fraction" that fall well short of justifying the challenged restrictions. *See CNS v. Gabel*, 2021 WL 5416650, at *15-16 (D. Vt. Nov. 19, 2021) (withholding access to newly filed complaints was "not 'essential to preserve higher values" because "[a]s for protecting privacy

The Commonwealth points to the 2018 Work Group Report to argue that "opening OCRA to the public would require litigants or clerks to redact all filings, and litigants would have to provide separate filings, both redacted and unredacted" and that this would somehow be a "drastic alteration." Comm. Br. at 20. Not so. Litigants are already redacting filings. *See supra* at 21-22. In any event, the Work Group Report demonstrates that less restrictive alternatives to an access blackout exist. Ex. E at 5 (requiring additional redactions by the filing party or a separate addendum could protect sensitive information if OCRA is available to the public). And because the Clerk is already reviewing each new civil filing to redact social security numbers and other identification numbers, there is no reason she cannot also redact any other information Defendants are concerned about.[19]

While an OCRA user must apply to, and be approved and authorized by, the Clerk, and must sign a subscriber agreement and pay a fee in order to access OCRA, SUF ¶¶ 23-24, 26-27, the Commonwealth claims, without evidentiary support, that subscriber agreements are often ignored and circumvented and thus not effective at policing misuse. Comm. Br. at 23-24.[20] Much of their argument, however, hinges on the false notion that only Virginia-barred attorneys can be "pre-vetted" since they "are asked for their Virginia State Bar number" and therefore can

---

interests," only 2 out of 4,156 complaints, *i.e.*, 0.048%, "contained confidential information;" thus, "placing the onus on filers has been overwhelmingly effective"); *CNS v. Tingling*, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) (withholding access to newly filed complaints "to prevent a narrow category of errant pleadings" was not "essential to preserve higher values or [ ] narrowly tailored to serve that interest"). A similar outcome is warranted here.

[19] The General Assembly, however, has already determined that dates of birth, maiden names, minor names, and signatures are not sensitive enough to warrant mandatory redaction. *See* Va. Code 17.1-293(B).

[20] Like with redaction, the Clerk fails to address that the use of OCRA subscription agreements adequately addresses her stated interest.

be "easily identifiable." Comm. Br. at 14, 24. The Clerk's subscriber agreements, however, including the Non-Attorney Subscriber Agreement that she sent to CNS in June 2021, *see* Ex. J at 6, asks the applicant to identify their employer, address, phone, and email address, all of which allow the Clerk to "easily identify" the subscriber. Indeed, an OCRA user is responsible for the proper use of OCRA pursuant to the terms of the subscriber agreement, which, among other things, require the subscriber to acknowledge responsibility "for ensuring that the use of OCRA is conducted in a proper and legal manner." SUF ¶ 26; Ex. B at ¶ 7.g.

The Commonwealth points to the Knuth Declaration to claim this is not sufficient because Virginia's General OCIS and Circuit OCIS systems – neither of which is a permissions-based system – have purportedly "been subject to data harvesting tactics," relying simply on the fact that OES has determined that "instead of searching [these databases] for a few cases or names within a single session, [ ] bots [ ] enter searches for every single possible case number within the database, sequentially…far faster than what a human is capable of entering." Comm. Br. at 6-7, Knuth Decl. ¶¶ 8-10.[21] The Commonwealth, however, does not explain why these supposed search activities justify the challenged restrictions.

The Commonwealth also contends that the VDBC system – which by design, unlike OCRA, allows registrants to search using an individual's date of birth and last four digits of their SSN – "has been, and continues to be, subjected to data harvesting tactics by bots" despite its registrant agreement. Comm. Br. at 7-8, Knuth Decl. ¶¶ 11-14. But unlike OCRA, VDBC is not a paid subscription service. Even so, like General OCIS and Circuit OCIS, the Knuth Declaration does not present any evidence to establish that VDBC has been mined *for nefarious*

[21] As explained *supra*, the Knuth Declaration is submitted by a witness who was not disclosed until after the close of discovery. Accordingly, the Court should disregard that declaration in its entirety.

*purposes*. Indeed, despite such supposed data mining, the Commonwealth, through OES, continues to operate these systems, regardless of these supposed harms. And perhaps most significantly, even accepting Knuth's remarks as true, it is purely speculative to posit that OCRA, if accessible to non-attorneys via a subscriber agreement vetted and monitored by the Clerk, would be mined to malicious ends.

In light of the many available less restrictive alternatives, Defendants are left to argue that, without the Non-Attorney Access and Dissemination Restrictions, the Clerk (and any other Virginia circuit court clerk that offers OCRA to non-attorneys) would be forced to expend an *unspecified* amount of money to redact filings and police misuse of OCRA. Comm. Br. at 20, 23; Clerk Br. at 5, 18. But Section 17.1-293(E)(7) only permits remote access to *nonconfidential* court records. Further, "[i]f budget implications of any amount…justified the suppression of constitutional rights, the last two centuries of constitutional jurisprudence would be eviscerated." *CNS v. Forman*, 2022 WL 2105910, at *15 (N.D. Fla. June 10, 2022).

Defendants attempt to support their supposed cost concern by relying on a declaration from Paul Ferguson, the Clerk of the Arlington County Circuit Court, who is not a defendant in or involved in this case. *See* Exhibit L. As more fully explained in CNS' summary judgment motion, and as summarized here, Mr. Ferguson's declaration lacks foundation and, in any event, is not probative of the challenged restrictions that are before the Court. *See* CNS Br. at 27-28. Unlike the Prince William Clerk, the Arlington Clerk does not make non-confidential court records accessible to the public at the courthouse in unredacted form. Ex. L ¶ 6. Instead, the Arlington Clerk states that his court pays a third-party vendor approximately $35,000 per year to "redact[ ] original signatures, social security numbers, Credit Cards, Bank Accounts, Minor Children Names and Ages, Maiden Names, Judges Signatures, and Tax IDs" before making

court records available on public terminals in the Clerk's office. *Id.* ¶ 10. He then "estimates," without any explanation, that "it would cost approximately $150,000 to provide access to redacted documents for records posted on [his court's] remote access system." *Id.* ¶ 11.[22] Mr. Ferguson does not estimate how much it would cost for Ms. Smith to redact filings at the Prince William Court that are available on OCRA, nor does Ms. Smith provide this information herself. Thus, Mr. Ferguson's declaration is of no help to Defendants in meeting their constitutional burden. *See, e.g., Forman*, 2022 WL 2105910, at *15 (rejecting cost as sufficient justification where defendant "did not provide an amount but simply pointed to [the cost in another court]").

**c. Defendants Ignore That The Practices of Other Courts, Including the Alexandria Circuit Court, Demonstrate that the Access Restrictions Are Not Narrowly Tailored to Serve Any Compelling or Significant Interest**

Defendants' concerns regarding fair and orderly administration of justice and protecting privacy are not unique. They are shared by all courts nationwide, state and federal, yet all federal district courts, as well as courts in at least 37 other states, give the press and public remote online access to civil court records. SUF ¶¶ 9-10.[23] At least one other Virginia circuit court, *i.e.*, Alexandria – notwithstanding the language in Section 17.1-293 of the Virginia Code – provides subscribing members of the press and public, including non-attorneys, with remote online access to all non-confidential civil records filed in that court. SUF ¶¶ 13-14. Indeed, as David Ardia law review article cited by the Commonwealth explains:

> In practical terms, the recognition that the First Amendment precludes the courts from discriminating between members of the public with regard to access to court records would not mark a dramatic shift in the current practice of most courts. The federal courts, for example, do not exclude any individuals or entities from

---

[22] Mr. Ferguson fails to explain, for example, why he cannot simply post the redacted documents already available on public terminals on his court's remote access system (which is not OCRA).

[23] The Commonwealth's assertion that "very few states provide online access to court records to all members of the public," Comm. Br. at 18, is simply not true.

> accessing publicly available court records, and PACER is available to anyone who registers for an account.

2017 U. Ill. L. Rev. at 1413.

Unable to escape this truth, the Commonwealth misleadingly asserts that "Virginia's approach of refraining from posting non-confidential court records online for public consumption is consistent with the practices of all other states in the Fourth Circuit, except for South Carolina, in which some, but not all, jurisdictions within the state post court records online." Comm. Br. at 18. This argument misses the mark. What matters is that the Clerk, and other Virginia circuit court clerks that offer OCRA, provide remote access to attorneys while restricting it for all other members of the public. No other state in the Fourth Circuit, or for that matter, nationwide (except one), maintains and defends an attorney preference system. *See* Girdner Decl. ¶ 5.

The Prince William Court, and other Virginia circuit courts, are not distinct from the overwhelming majority of states and all federal district courts that provide the public and press with remote access to civil filings. They too can provide remote access, and without restricting the dissemination of information accessed remotely, consistent with the First Amendment, while also protecting Defendants' stated interests. It is not an either/or proposition.

## **CONCLUSION**

Restricting remote access to attorneys only and prohibiting the publication of information accessed remotely, suppresses reporting on court matters, and darkens the halls of government where only those directly involved are privy to the day's events. Defendants say these blackout policies are justified by privacy interests, but they fail to support their position with any record evidence, as they must to survive constitutional scrutiny. Summary judgment is warranted for CNS, not Defendants.

Dated: August 1, 2022

Respectfully submitted,

*/s/ Dabney J. Carr*

Dabney J. Carr, IV (VSB No. 28679)
**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

Jonathan E. Ginsberg (admitted *pro hac vice)*
**BRYAN CAVE**
**LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

*Counsel for Plaintiff Courthouse News Service*