# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

COURTHOUSE NEWS SERVICE,      )
                               )
           *Plaintiff,*        )      Civil Action No. 3:21-cv-00460-HEH
     v.                      )
                               )
JACQUELINE C. SMITH, *et al.*,      )
                               )
           *Defendants.*      )
                               )

## COURTHOUSE NEWS SERVICE'S REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**BRYAN CAVE LEIGHTON PAISNER LLP**
Jonathan E. Ginsberg (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**
Dabney J. Carr, IV (VSB No. 28679)
P.O. Box 1122
Richmond, Virginia
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

*Counsel for Plaintiff*
*Courthouse News Service*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 2

CNS IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO
GENUINE DISPUTE OF MATERIAL FACT AND DEFENDANTS HAVE FAILED
TO MEET THEIR CONSTITUTIONAL BURDEN ........................................................ 2

A.  Defendants are Restricting CNS' First Amendment Right to Access Civil
Court Records ......................................................................................................... 2

B.  Defendants Fail to Carry Their Burden of Showing That the Non-Attorney
Access and Dissemination Restrictions, and Reliance on the Virginia Code,
Survive Constitutional Scrutiny ............................................................................. 6

1.  Defendants Have Not Demonstrated that the Virginia Code Compels the
Challenged Restrictions ................................................................................... 7

2.  Privacy Interests, Shared By All Courts, Many of Which Provide Remote
Access to Court Filings, Do Not Trump the First Amendment ....................... 9

3.  Defendants Do Not Dispute That the Record is Devoid of Any Evidence to
Demonstrate the Frequency By Which Personal Identifiers Appear in Prince
William Court Filings .................................................................................... 11

4.  Defendants Do Not Dispute That the Same Records They Shield From
Remote Access By Non-Attorneys, And For Which They Prohibit
Dissemination, Are Already Disclosed to the Public at the Courthouse ........ 13

5.  Defendants Offer No Evidence to Contest That Redaction Practices and
Subscriber Agreements are Less Restrictive, Effective Alternatives That
Achieve Defendants' Stated Interests ............................................................ 16

CONCLUSION ......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bernstein v. Bernstein Litowitz Berger & Grossman LLP*,
  814 F.3d 132 (2d Cir. 2016)....................................................................11

*Courthouse News v. Forman*,
  2022 WL 2105910 (N.D. Fla. June 10, 2022) .........................................13

*Courthouse News v. N.M. Admin Office of the Courts*,
  566 F.Supp.3d 1121 (D.N.M. 2021) .........................................................6

*Courthouse News v. Planet*,
  947 F.3d 581 (9th Cir. 2020) .................................................................5, 6

*Courthouse News v. Schaefer*,
  440 F. Supp. 3d 532  (E.D. Va. 2020), *aff'd*, 2 F.4th at 328.....................5

*Courthouse News v. Schaefer*,
  2 F.4th 318 (4th Cir. 2021) ............................................................ *passim*

*Courthouse News Serv. v. Gabel*,
  2021 WL 5416650 (D. Vt. Nov. 19, 2021)...........................................11, 19

*Doe v. Public Citizen*,
  749 F.3d 246 (4th Cir. 2014) ...............................................................2, 3, 4

*Francisco v. Verizon S., Inc.*,
  756 F. Supp. 2d 705 (E.D. Va. 2010) ........................................................9

*McCullen v. Coakley*,
  573 U.S. 464 (2014)...............................................................................2, 7

*Northwestern Memorial Hosp. v. Ashcroft*,
  362 F.3d 923 (7th Cir. 2004) ..................................................................18

*Ostergren v. Cuccinelli*,
  615 F.3d 263 (4th Cir. 2010) ..................................................................14

*Press Enterprise Co. v. Superior Court of California for Riverside Cnty.*,
  478 U.S. 1 (1986)................................................................................4, 6

*Reynolds v. Middleton*,
  779 F.3d 222 (4th Cir. 2015) ............................................................2, 4, 7

*Rushford v. New Yorker Mag., Inc.*,
    846 F.2d 249 (4th Cir. 1988) .............................................................3, 6

*Shaffer v. Defense Intelligence Agency*,
    102 F.Supp.3d 1 (D.D.C. 1983) .................................................................14

*Stone v. Univ. of Maryland Medical System Corp.*,
    855 F.2d 178 (4th Cir. 1988) .........................................................................6

*U.S. Dep't of Def. v. Fed. Labor Relations Auth.*,
    510 U.S. 487 (1994).....................................................................................14

*U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*,
    489 U.S. 749 (1989).............................................................................13, 14

*U.S. v. Taylor*,
    2011 WL 13195944 (E.D. Va. Mar. 3, 2011) ...............................................9

*Va. Dep't of State Police v. Washington Post*,
    386 F.3d 567 (4th Cir. 2004) ................................................................2, 4, 6

*Whalen v. Roe*,
    429 U.S. 589 (1977).....................................................................................14

**Statutes**

Cal. Code § 1798.100, *et seq.* (California Consumer Privacy Act) ..............11

Co. Code § 6-1-1301, *et seq.* (Colorado Privacy Act) .................................11

Va. Code § 8.01-217(G)................................................................................18

Va. Code § 8.01-420.8(A)..............................................................................17

Va. Code § 17.1-225 ...............................................................................7, 8, 9

Va. Code § 17.1-293 ...............................................................................7, 8, 9

Va. Code § 59.1-442 ......................................................................................11

**Other Authorities**

Am. H. B. No. 567, 134th Gen. Assemb., Reg. Sess. (Oh. 2021-2022),
    available at https://ohiohouse.gov/legislation/134/hb567.......................10

David S. Ardia & Anne Klinefelter,
    *Privacy and Court Records: An Empirical Study*
    30 Berkley Tech. L.J. 1807 (2015) ............................................................12

David S. Ardia, *Court Transparency and the First Amendment*,
38 Cardozo L. Rev. 836 (2017) ..................................................................12

https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/506df08f-
0f59-4cd3-9a62-fb6e3d555657/121919_2.pdf ........................................10

https://www.ohiohouse.gov/members/brian-stewart/news/house-bill-567-moves-
to-senate-110106 ..................................................................................10

Oversight and Investigations Majority Staff, *A Review of the Data Broker
Industry: Collection, Use, and Sale of Consumer Data for Marketing
Purposes* (Dec. 18, 2013) ......................................................................15

S. Res. S6701B Reg. Sess. (N.Y. 2021) ..................................................11

## PRELIMINARY STATEMENT

Unable to point to any factual evidence to allow the Non-Attorney Access and Dissemination Restrictions to withstand constitutional scrutiny, the Clerk is left to oppose summary judgment mainly by disputing the applicable First Amendment test. At the same time, she admits she bears the burden of justifying the challenged restrictions by showing they are narrowly tailored to achieve a significant government interest. No matter the test, she has not met her burden. Nor has the Commonwealth, which offers little, if any, admissible evidence on the issue. It instead seeks to shift the Court's focus by converting a case about the First Amendment right of access into a debate over good and evil on the Internet. By the Commonwealth's logic, this Court and all other courts that provide online access to court records work against the administration of justice, and virtually any online record assists in the propagation of widespread fraud. This position is a radical one.

Indeed, the materials facts in this case are not genuinely disputed:

- Defendants restrict remote access to attorneys only via OCRA – a permissions-based system, behind a paywall, that requires the Clerk to vet and approve subscribing users – but the same non-confidential records are already disclosed to other members of the public and press at the physical courthouse;

- Defendants seek to justify the challenged restrictions based on privacy concerns, but the Clerk is "unable to provide" information to demonstrate the frequency that personal identifiers actually appear in civil filings at the Prince William Court;

- Filers are already required to redact all information that the General Assembly has deemed statutorily confidential; and

- All federal district courts and courts in at least 38 states – including the Alexandria Circuit Court – provide the press and public with remote access via secure, permissions-based court websites.

Defendants fail to offer any evidentiary basis for concluding that the Clerk, and other Virginia circuit courts that offer OCRA, cannot provide the same remote access that other courts

already do, using safeguards such as filer redaction and paid subscriber agreements. And while privacy interests are undoubtedly important, they do not override the First Amendment.

## ARGUMENT

### CNS IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AND DEFENDANTS HAVE FAILED TO MEET THEIR CONSTITUTIONAL BURDEN

The law is clear: Defendants – not CNS – bear the burden of proof to satisfy the appropriate constitutional test. That is true under either the "compelling government interest" test the Fourth Circuit has said is required before "access may be restricted," *Doe v. Public Citizen*, 749 F.3d 246, 266 (4th Cir. 2014); *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004), or the intermediate TPM test that Defendants say should be applied. *See Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) (once a plaintiff meets its burden of proving "speech was restricted by the governmental action in question, … the burden then falls on the government to prove the constitutionality of the speech restriction").

Even under TPM scrutiny, a defendant must "'*show* [ ] that it seriously undertook to address the problem with less intrusive tools readily available to it,' … and must '*demonstrate* that [such] alternative measures … would fail to achieve the government's interests.'" *Reynolds*, 779 F.3d at 231-32 (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)) (emphasis in *Reynolds*). In other words, Defendants must demonstrate, with factual evidence, that alternatives to the challenged restrictions would fail to achieve their cited privacy interests. They have not.

### A. Defendants are Restricting CNS' First Amendment Right to Access Civil Court Records

As the Clerk concedes, "[t]here is no dispute between the parties that Plaintiff has a First Amendment right of access to the [civil] filings generally." Clerk's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, Dkt. No. 83 ("Clerk Opp.") at 3; *see*

*also* Commonwealth's Memorandum of Law in Support of its Motion for Summary Judgment, Dkt. No. 67 ("Comm. MSJ Br.") at 2 ("the press and public enjoy a qualified right of access to nonconfidential civil court records"); Mem. Op. at 9 ("[i]t is well-settled that the press and public have a right of access to most, if not all, civil court records").[1]

Unable to escape this reality, the Commonwealth relies on a series of mischaracterizations about the First Amendment right at stake in this case. It contends that there is no First Amendment right of *remote* access to civil court records, and because that is the case, the Commonwealth argues that Defendants cannot be violating the First Amendment. Comm. Opp. at 4-5. Relatedly, the Commonwealth argues that the First Amendment only requires that the public and press be permitted to view court records at the physical courthouse. *Id.* at 1, 4, 9. CNS does not contend, however, that there is a *per se* constitutional right to remote access outside of the courthouse. Rather, CNS simply asserts that Defendants must justify, under constitutional scrutiny, the current schema in the Prince William Court, as well as the 104 other Virginia circuit courts utilizing OCRA, that restricts remote access to Virginia-barred attorneys and their staff, while keeping the remaining members of the public and press in the dark.

As CNS emphasized in its opposition to defendants' summary judgment motions, Dkt No. 82 ("CNS Opp."), this Court has already rejected the Commonwealth's attempt to reframe this case. *Id.* at 12 (quoting Mem. Op. at 9). As the Court explained, "Defendants are limiting

---

[1] Contrary to the Commonwealth's suggestion, Commonwealth's Brief in Opposition, Dkt. No. 81 ("Comm. Opp.") at 5, *CNS v. Schaefer*, 2 F.4th 318 (4th Cir. 2021), was not the first case in the Fourth Circuit to determine that a First Amendment right of access attaches to records filed in civil proceedings. *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249 (4th Cir. 1988), first explained that "the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case." *Id.* at 253. And in *Doe*, the Fourth Circuit confirmed that the First Amendment right of access applies to summary judgment materials, as well as judicial opinions and docket sheets. 749 F.3d at 268-69.

an already established fundamental right, the right to access civil court records, in an unconstitutional manner by giving one group, Virginia lawyers, remote access while denying it to others." *Id.* And as the Fourth Circuit explained in *Schaefer*, CNS is entitled to "contemporaneous" access to civil court filings upon the court's receipt "as expeditiously as possible" based on "the context of th[e] case." 2 F.4th at 328. In its motion for summary judgment, CNS illustrated that in the context of a court, like the Prince William Court, where remote access is available, and thus practicable, restricting such access to Virginia-barred attorneys interferes with CNS' right to contemporaneous access "as expeditiously as possible." CNS MSJ Br. at 2, 19. Defendants do not dispute this principle, but the Commonwealth contends that *Schaefer* nonetheless does not support the access CNS seeks. Comm. Opp. at 5-6. The Commonwealth is mistaken.

Consistent with *Schaefer*, the relevant inquiry is whether Defendants have met their burden to show that the challenged restrictions are necessitated by a compelling or significant interest and are '"narrowly tailored to serve that interest."' *Doe*, 749 F.3d at 266 (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)); *see also Va. Dep't of State Police*, 386 F.3d at 575 ("[t]he burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position"). "[A]rgument unsupported by the evidence will not suffice to carry the government's burden." *Schaefer*, 2 F.4th at 329 (quoting *Reynolds*, 779 F.3d at 229).

In *Schaefer*, the Fourth Circuit affirmed this Court's finding, after application of *Press Enterprise Co. v. Superior Court of California for Riverside Cnty.*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), that the defendant clerks, including Clerk Smith, violated the First Amendment by withholding access to new civil complaints until they were "fully indexed and docketed."

*Schaefer*, 440 F. Supp. 3d 532, 560 (E.D. Va. 2020), *aff'd*, 2 F.4th at 328. To justify the access

delays in *Schaefer*, the Clerk relied heavily on the *potential* for filings to contain confidential

information, claiming, with no evidentiary support that her interest in "protecting confidential

information outweigh[s] the public's First Amendment right to contemporaneous access," 440 F.

Supp. 3d at 560. In other words, despite the Commonwealth's suggestion to the contrary,

Comm. Opp. at 6, the Clerk in *Schaefer* offered the same "factually empty justifications"

Defendants offer here. Accordingly, the Fourth Circuit rejected the Clerk's argument, finding

that her policies were not "narrowly tailored and necessary to preserve the court's important

interest in the fair and orderly administration of justice" because the "filer is responsible for

redacting confidential information." 440 F. Supp. 3d at 560 (quoting, in part, *CNS v. Planet*, 947

F.3d 581, 595 (9th Cir. 2020) ("*Planet III*")). The same result is warranted here.

  The Clerk's reliance on *Planet III* to uphold the challenged restrictions is similarly

misguided. The Clerk says that the Ninth Circuit in that case observed that "instantaneous public

access to court filings, especially complaints, could impair the orderly filing and processing of

cases with which clerk's offices are charged," Clerk Opp. at 3, but what *Planet III* ultimately

held is that there is no mandatory right of immediate access, but when a right of access attaches,

as here, "a presumption of access arises," which can be overcome only if defendants show,

through the application of constitutional scrutiny, that the interests claimed to support access

restrictions would otherwise be impaired. 947 F.3d at 594-96. Perhaps more importantly, the

Clerk overlooks that CNS is not seeking a right to "instantaneously" access court filings. In fact,

the Clerk posts filings on OCRA only *after* they have already been made available on public

access terminals at the courthouse, SUF ¶ 35, and it is undisputed that access to filings, even at

the courthouse, is anything but instantaneous: filings go through several stages before they are

available via public access terminals. *Id.*[2]

## B. Defendants Fail to Carry Their Burden of Showing That the Non-Attorney Access and Dissemination Restrictions, <u>and Reliance on the Virginia Code, Survive Constitutional Scrutiny</u>

The Clerk devotes much of her opposition to contend that *Press-Enterprise II* does not

apply because that case involved a preliminary hearing in criminal case. Clerk Opp. at 2-3. The

Clerk is wrong. *Press-Enterprise II* is the seminal case in First Amendment access

jurisprudence, and it established a two-step framework for evaluating *any* claim challenging

access restrictions under the First Amendment. 478 U.S. at 8-10. Once a First Amendment right

of access is established, a defendant must meet its burden of justifying an access restriction by

application of the requisite level of constitutional scrutiny. *Id.*; *see also* CNS MSJ Br. at 16;

CNS Opp. at 10. Case after case in the Fourth Circuit addressing a restriction of access to court

documents or proceedings, whether criminal or civil, has applied the *Press-Enterprise II*

framework. *See, e.g., Va. Dept of State Police*, 386 F.3d at 575; *Stone v. Univ. of Maryland*

*Medical System Corp.*, 855 F.2d 178, 179-180 (4th Cir. 1988); *Rushford*, 846 F.2d at 253. The

Clerk does not address any of these cases.[3]

---

[2] The Clerk also cites *CNS v. N.M. Admin Office of the Courts*, 566 F.Supp.3d 1121, 1171 (D.N.M. 2021) to contend that the First Amendment requires access "in line with what the press has traditionally enjoyed." Clerk Opp. at 4. CNS agrees. As explained by CNS' founder and editor, William Girdner, traditionally everyone, including attorneys, were provided exactly the same type of access to non-confidential court records, soon after new cases crossed the counter (on the day of filing) as well as in the records room, where journalists could review subsequent filings, including motions and rulings. Girdner Decl., ¶¶ 23-25. The challenged restrictions have eviscerated that traditional access in Virginia.

[3] To support her argument, the Clerk oddly points to *Planet III*, but that case applied what it called the "rigorous" standard from *Press-Enterprise II*. *See Planet III*, 947 F.3d at 595-96, 603.

Defendants contend, however, that the challenged restrictions resemble TPM restrictions and thus "relaxed scrutiny" applies, but that would require that the challenged restrictions are content-neutral. The Non-Attorney Access and Dissemination Restrictions are *not* content-neutral because Defendants fail to justify them "without reference to the content of the regulated speech," *McCullen*, 573 U.S. at 480, pointing instead to the fact that civil filings may *contain* personal identifiers.[4] And although the same records posted on OCRA are also available on a court by court basis at the brick-and-mortar courthouses of the Commonwealth, the challenged restrictions do not "leave open ample alternative channels for communication of the information," as would be required to survive TPM scrutiny, *McCullen*, 573 U.S. at 477, because the press or public cannot match the 24/7/365 access allowed to attorneys. SUF ¶ 15; Girdner Decl. ¶¶ 6-7, 10.

But no matter the level of scrutiny, "both standards of review require Defendants to come forward with evidence, not mere argument, to show that the [restrictions] are narrowly tailored to some higher governmental interest." *Schaefer*, 440 F.Supp.3d at 560; *see also Reynolds*, 779 F.3d at 225; Mem. Op. at 10; CNS Opp. at 13-14. Defendants do not disagree.

### 1. Defendants Have Not Demonstrated that the Virginia Code Compels the Challenged Restrictions

In its summary judgment motion, CNS emphasized that Va. Code § 17.1-293(E)(7) does not mandate that clerks withhold remote access for non-attorneys and that, to the contrary, Va. Code § 17.1-225 expressly permits clerks to provide remote access to the non-confidential court records sought in this case. CNS MSJ Br. 14-15, 21-22; *see also* CNS Opp. at 15-16. In response, the Commonwealth misconstrues CNS' argument to be that "Code § 17.1-225

---

[4] At the motion to dismiss stage, this Court specifically noted that it "assumes *without deciding* that the non-attorney access restriction is content neutral." Mem. Op. at 10 (emphasis added). The undisputed facts demonstrate that it, along with the Dissemination Restriction, is not.

overrides the specific provisions of Code § 17.1-293." Comm. Opp. at 11. Based on that misunderstanding, the Commonwealth devotes its response to showing why "the Code is not internally contradictory," *Id.*, but CNS agrees. Both Sections can, and do, exist is tandem: Section 17.1-293(E)(7) permits clerks to provide (to attorneys) the same access permitted by Section 17.1-225, *i.e.*, remote access to *non-confidential* court records.

Indeed, the Commonwealth essentially concedes that Va. Code § 17.1-225 permits OCRA access for non-attorneys because "[t]his section applies to any system the Clerk might use to grant remote access, whether it be OCRA or its own system, such as the Alexandria Justice Information System." Comm. Opp. at 12. What "this section," *i.e.*, Va. Code § 17.1-225, permits is *public* access to non-confidential court filings. And since it is undisputed that the Alexandria Circuit Court does provide the press and public with remote online access to non-confidential court filings, *see* SUF ¶¶ 13-14 – notwithstanding the provisions of Va. Code § 17.1-293 – there plainly is no inconsistency within the Code. To the contrary, the Code permits remote access to non-confidential court filings for non-attorneys and attorneys alike.

Rather than address Sections 17.1-225 or 17.1-293(E)(7) at all, the Clerk simply asserts that Section 17.1-293(B), which prohibits court clerks from posting generally "on the Internet" social security numbers, financial account numbers, dates of birth, maiden names, minor names, and signatures, applies with equal force to a secured permissions-based subscriber system like OCRA. Clerk Opp. at 5. CNS does not dispute that a remote access system, like OCRA, is accessible via the Internet, but, as explained, there is a stark difference between a free, public website available to any internet user and a permissions-based system, which provides the ability to verify users. CNS MSJ Br. at 26; CNS Opp. at 17; *infra* at 18-20. And Section 17.1-293(B)

does not prohibit a clerk from providing remote access to *non-confidential* court records, the very access permitted by §§ 17.1-225 and 17.1-293(E)(7) that CNS seeks in this case.

### 2. Privacy Interests, Shared By All Courts, Many of Which Provide Remote Access to Court Filings, Do Not Trump the First Amendment

As it did in its summary judgment motion, the Commonwealth seeks to justify the Non-Attorney Access and Dissemination Restrictions by relying on academic hand-wringing over the *potential* misuse of private information that *might* appear in a non-confidential civil filing. But instead of presenting any evidence about how often such information appears in the Clerk's filings, or why OCRA would be particularly vulnerable to malicious data mining, the Commonwealth continues to point mainly to law review articles to support the notion that OCRA, if available to non-attorneys, will be abused by data miners to malicious ends. Those secondary sources constitute hearsay and are thus inadmissible. *See, e.g., U.S. v. Taylor*, 2011 WL 13195944, at *3-4 (E.D. Va. Mar. 3, 2011), *aff'd*, 457 F. App'x 282 (4th Cir. 2011); *Francisco v. Verizon S., Inc.*, 756 F. Supp. 2d 705, 713 (E.D. Va. 2010), *aff'd* 442 F. App'x 752 (4th Cir. 2011).

Even so, Defendants' concerns, and the secondary sources they cite in support, are premised on the idea that OCRA, if available to non-attorneys, would be open to any anonymous internet user, like other uncontrolled, free websites. CNS has demonstrated, however, that OCRA is a tightly controlled, permissions-based website behind a paywall that requires the Clerk to vet, approve, and authorize an applicant, who must also sign a subscriber agreement and provide a host of personal information to obtain a user name and password that can be monitored by the Clerk. SUF ¶¶ 24, 26-27; Ex. B.

The parties do not dispute that similar safeguards are used by all federal district courts to provide the press and public with remote online access via PACER, while also addressing

privacy concerns.  SUF ¶ 10.  The parties also do not dispute that courts in 38 states – including

the Alexandria Circuit Court – provide non-attorneys with remote access to non-confidential

civil filings through a permissions-based system that require user credentials.  *Id.*, ¶ 9.  Indeed,

no other state (except, perhaps, one) maintains and defends a system that grants remote access to

attorneys while blacking out the public.  Girdner Decl. ¶ 5.[5]  And one state, Ohio, is on the verge

of legislatively requiring all courts statewide to place non-confidential filings online, Am. H. B.

No. 567, 134th Gen. Assemb., Reg. Sess. (Oh. 2021-2022)  (available at

https://ohiohouse.gov/legislation/134/hb567), because that practice "will enhance the

transparency and customer service of the Ohio Clerks of Courts while removing burdensome and

unnecessary visits to the courthouse."[6]  Defendants too can provide remote access, without

restricting the dissemination of information accessed remotely, consistent with the First

Amendment, while also protecting Defendants' stated interests through user registration, as well

as OCRA's paywall and redaction practices that are already in place.[7]

---

[5] The one state that continues to defend an attorney preference system is Illinois, but the Supreme Court of Illinois has given clerks the green light to open up remote access to the public at the appropriate time.  *See* https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/506df08f-0f59-4cd3-9a62-fb6e3d555657/121919_2.pdf.

[6] *See* https://www.ohiohouse.gov/members/brian-stewart/news/house-bill-567-moves-to-senate-110106.

[7] As explained in the accompanying Declaration of Andras Bodis ("Bodis Decl."), which is submitted with the consent of Defendants in order to assist the Court with understanding some of the points made in the Commonwealth's Knuth Declaration, there are a host of additional mechanisms available to achieve Defendants' stated interests.  *Id.* ¶¶ 10-13.  But for the reasons explained *infra* at 15-16, CNS does not believe that the Knuth Declaration raises any factual issues that are material to the determination of the parties' respective summary judgment motion. CNS has agreed to waive its objection to the late disclosure of Mr. Knuth as a witness in exchange for the opportunity to submit the Bodis Declaration.

The practices of other courts across the county demonstrate that it is not an all or nothing proposition. The Clerk does not address the remote access practices of other courts at all, but the Commonwealth bizarrely asserts they are not relevant because the record does not include evidence of other courts' interests in protecting personal privacy. Comm. Opp. at 2. Privacy concerns, however, are indisputably shared by all courts. The Commonwealth apparently claims that it has a unique interest in protecting personal privacy, based in part on its adoption of the Personal Information Privacy Act, Va. Code § 59.1-442, yet other states that already provide remote access to non-confidential civil filings have, or soon will, enact similar statutes. *See, e.g.*, Cal. Code § 1798.100, *et seq.* (California Consumer Privacy Act); Co. Code § 6-1-1301, *et seq.* (Colorado Privacy Act); S. Res. S6701B Reg. Sess. (N.Y. 2021) (proposed N.Y. Privacy Act).[8]

To be clear, CNS does not contend, despite the Commonwealth's assertion to the contrary, Comm. Opp. at 14, that there is no privacy interest in public records. As Judge Christina Reiss of the District of Vermont recently explained, "the protection of the privacy of litigants…is an important one…It does not, however, trump the First Amendment right of access unless [the challenged restrictions are] narrowly tailored and essential to preserve higher values." *Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *15 (D. Vt. Nov. 19, 2021) (quoting *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 144 (2d Cir. 2016).

### 3. Defendants Do Not Dispute That the Record is Devoid of Any Evidence to Demonstrate the Frequency By Which Personal Identifiers Appear in Prince William Court Filings

While the Clerk does not attempt to offer any evidence to substantiate Defendants'

---

[8] The Commonwealth states that "[i]n the event of a trial, the Commonwealth would demand proof of" other states' online practices but the Commonwealth already stipulated to a list of 37 states that either, on a statewide basis or through individual courts within the state, provide remote access to all non-confidential civil filings and other court records. SUF ¶ 9. Moreover, the Commonwealth could have sought discovery on other states' practices but did not. The time to do so has expired.

concern about the potential for personal identifiers to appear in court filings, the Commonwealth argues, relying solely on a study about North Carolina state court filings, that "[s]ensitive information appears in state court records at an extremely high rate, even when redaction laws are put in place." Comm. Opp. at 8. Not only is the cited source hearsay and immaterial to civil filings at the Prince William Court, but as explained in CNS' Opposition, it does not help Defendants. The 2015 North Carolina Report concluded that "[m]ost of the documents contained very few incidences of sensitive information" and because "court records vary significantly in the types of sensitive information they contain," "when scholars and policymakers discuss privacy and court records, they must be cautious of generalizing." David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30 Berkley Tech. L.J. 1807, 1807-08, 1892 (2015).[9]

In discovery, the Clerk had an opportunity to demonstrate, with factual evidence, the types of sensitive information that appear in filings in the Prince William Court, but she stated that she is "unable to provide" that information because she does not track the frequency that personal identifiers appear in civil filings at her court. SUF ¶ 38. The Clerk says she should not be faulted for not tracking this information, Clerk Opp. at 5, but her argument ignores that she bears the burden of proof and that the information is at her fingertips. The Clerk serves as the custodian of all court records in the Prince William Court, including records stored in electronic format. SUF ¶ 16. Thus, she is able to review those filings to determine the number that contain

---

[9] Another article authored by Professor Ardia, and cited by the Commonwealth, similarly cautions against generalizing, and urges in favor of remote access. David S. Ardia, Court Transparency and the First Amendment, 38 Cardozo L. Rev. 836, 915-19 (2017) ("[t]he debate over how to balance public access and secrecy is an important one, but it cannot be resolved based on abstract assessments of the benefits and harms associated with public access to court proceedings and records;" rather, "case-by-case consideration of the interests closure advances is one of the primary benefits of a presumptive right of access under the First Amendment").

the information Defendants are concerned about but she chose not to.  Defendants have not met their constitutional burden.[10]

### 4. Defendants Do Not Dispute That the Same Records They Shield From Remote Access By Non-Attorneys, And For Which They Prohibit Dissemination, Are Already Disclosed to the Public at the Courthouse

In an effort to avoid the undisputed truth that the non-confidential court records available on OCRA, even to the extent that they *may* contain certain personal information, are the same non-confidential court records that are available to the press and public at the Prince William courthouse, the Commonwealth points to a generalized "cyber security threat" that is not unique to Virginia.  In doing so, the Commonwealth continues to rely heavily on *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989).  Comm. Opp. at 7-9.  That case, as explained in CNS' Opposition, is inapposite.  It held that FBI criminal rap sheets (created by collecting data from records *across the country*) were not subject to disclosure "*within the meaning of the Freedom of Information Act*."  489 U.S. at 751 (emphasis added). But where an access restriction, as here, "implicates First Amendment rights, the standard of review is higher than the standard applied in cases filed under the Freedom of Information Act…, where a plaintiff is merely seeking access to records pursuant to a statutory entitlement." *Shaffer v. Defense Intelligence Agency*, 102 F.Supp.3d 1, 10 n.8 (D.D.C. 1983) (citations omitted).

---

[10] The Commonwealth notes that the "Virginia circuit courts process a very high volume of cases with filings reflecting high amounts of sensitive information, such as domestic relations cases [ ], felonies [ ], and probate matters," Comm. Opp. at 21, but this case is about *civil*, not criminal, filings, and CNS does not cover criminal, domestic relations, or probate matters.  SUF ¶ 7.  To the extent Defendants contend that OCRA cannot be filtered to exclude those types of cases, that argument has been rejected by other courts. *See, e.g., CNS v. Forman*, 2022 WL 2105910, at *15 (N.D. Fla. June 10, 2022) (noting that software can be adjusted to easily filter filings).

And critically, the Supreme Court in *Reporters Committee*, while discussing the difference between public records available at courthouses nationwide and a single computerized summary of that information, was not describing a remote access system, like OCRA, that provides access to the very same records (not a summary) available at a single courthouse (not several). As the Fourth Circuit observed in *Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010), *Reports Committee* does not support precluding the posting of already public records online. *Ostergren*, 615 F.3d at 286.

*U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487 (1994) and *Whalen v. Roe*, 429 U.S. 589 (1977), cited by the Commonwealth, likewise do not justify the Non-Attorney Access and Dissemination Restrictions. *U.S. Dep't of Defense*, like *Reporters Committee*, involved a FOIA request by local unions seeking the home addresses of agency employees in the bargaining units represented by the unions. *Id.* at 490. The Supreme Court held that FOIA disclosure was not warranted because such was prohibited by the Privacy Act of 1974. *Id.* That plainly is not the case here. And in *Whalen*, which upheld the constitutionality (under the Fourteenth Amendment) of a statute requiring that New York State be provided with a copy of every prescription for Schedule II drugs in a centralized computer file, 429 U.S. at 591, Justice Brennan, in a concurring opinion, noted that "central storage and easy accessibility of computerized data vastly increase the potential for abuse of that information" but ultimately concluded that "safeguards intended to forestall the danger of indiscriminate disclosure" effectively protected the stated privacy interest. *Id.* at 607. The same is true here.

Nonetheless, the Commonwealth boldly asserts that "the record is replete with examples of…data brokers harvesting court records remotely." Comm. Opp. at 17. Not so. The Commonwealth only speculates, without any factual foundation, that "court records are routinely

mined for personal information, which is then sold at the expense of the most vulnerable

litigants" and that "there is no reason to believe that Virginia's court records would not be mined

and exploited in the same fashion."  Comm. Opp. at 9; *see also id.* at 14 ("The risk that court

records will be abused to the detriment of Virginia litigants is not an abstract threat—Virginia

court records *will* be abused by data minders if OCRA is opened to the public") (emphasis in

original).  Not only are these self-serving statements offered in the abstract, but they ignore filer

redaction requirements and the Clerk's use of paid subscriber agreements, as discussed at length

in CNS' MSJ and Opposition.  *See also infra* at 16-20.

The only evidence cited in support of the Commonwealth's fear tactics is the Knuth

Declaration, which attests to purported "bot attacks" on Virginia's General OCIS, Circuit OCIS,

and VDBC systems.  *Id.*; *see also* Knuth Decl., ¶¶ 9-16.[11]  As further explained in the Bodis

Declaration, bots are not inherently good or evil; they can be useful and often index web content

to help users find relevant information, whether it be for academic research, to generate news

feeds, or something else, and there a host of ways to protect against bots.  *Id.* ¶¶ 6-8, 10-11.

With respect to OCIS, which allows the general public to search for docket information, *e.g.,*

party names, free of charge, Mr. Knuth only states that "instead of searching for a few cases or

names within a single session, the bots [ ] enter searches for every single possible case number

within the database, sequentially…far faster than what a human is capable of entering."  Knuth

---

[11] The Commonwealth also cites to a Senate Committee Report, Comm. Opp. at 9, 14, but that
report does not discuss the mining of court records accessed remotely; instead, it "focuses
specifically on the collection and sale of consumer information for the purpose of marketing."
*See* Office of Oversight and Investigations Majority Staff, *A Review of the Data Broker Industry:
Collection, Use, and Sale of Consumer Data for Marketing Purposes*, at 1 (Dec. 18, 2013).

Decl. ¶¶ 8-10.[12]  Mr. Knuth does not say that those purported search activities were malicious. They are a far cry from the "threat to national security and democracy" that the Commonwealth posits will happen if OCRA were provided to non-attorneys.  Comm. Opp. at 16.

As to VDBC, that system, which permits employers to perform background checks, is designed, unlike OCRA, to allow registrants to search for the very information Defendants are concerned about, *i.e.*, DOBs and SSNs.  In this case, however, the Commonwealth seeks to protect that information.  The Commonwealth cannot have it both ways.

Also, VDBC is not a paid service, like OCRA, and Defendants do not explain how supposed "data harvesting tactics by bots" on VDBC – which specifically allows users to search for personal identifiers – has any bearing on whether OCRA, if accessible to non-attorneys via a paid subscription agreement vetted and monitored by the Clerk, would be mined to malicious ends.  Nor is there any record evidence to support this supposition.  Moreover, despite supposed data mining, the Commonwealth continues to operate VDBC, casting doubt on the gravity of its "unique privacy concerns raised by remote access to mass quantities of court data."  Comm. Opp. at 14.  Indeed, mass quantities of court data is exactly what is available on Circuit OCIS and General OCIS, yet those systems likewise continue to operate, in fact, without safeguards such as subscriber agreements or a paywall.

5. **Defendants Offer No Evidence to Contest That Redaction Practices and Subscriber Agreements are Less Restrictive, Effective Alternatives That Achieve Defendants' Stated Interests**

CNS has established that because the filing party is required to redact much of the information Defendants are concerned about, *i.e.*, social security numbers and financial account

---

[12] Mr. Knuth's statements concern events that took place in 2010, ten years before he was employed by OES, Knuth Decl. ¶ 1, but he provides no foundation establishing personal knowledge of these events.

numbers, *see* Va. Code § 8.01-420.8(A); SUF ¶ 39, a less restrictive, just as effective, alternative is already in place. Moreover, the Clerk and her staff admittedly redact social security numbers and other identification numbers, such as financial account numbers, before making filings available on OCRA. SUF ¶ 40. These redaction practices alone demonstrate that the challenged restrictions do not pass constitutional scrutiny, even under a TPM analysis. *See Schaefer*, 440 F.Supp.3d at 560, *aff'd*, 2 F.4th at 328.

The Clerk and the Commonwealth offer different arguments as to why redaction is not a reasonable alternative, but their reasons are equally unconvincing. For her part, the Clerk oddly claims that Va. Code § 8.01-420.8(A) "does not require filers to redact, but instead simply requires them to make an effort to do so." Clerk Opp. at 6. This nuanced distinction is contrary to the parties' stipulated facts, SUF ¶ 39, citing Dkt. No. 55 ¶ 51, and is at odds with *Schaefer*. 440 F.Supp.3d at 560 ("filer [in Virginia] is responsible for redacting confidential information").

The Commonwealth takes a different approach, arguing that court records contain personal information not identified in Va. Code § 8.01-420.8(A). This misses the mark. Social security numbers and financial account numbers are the only identifiers that must be redacted by the filer because those are the only identifiers deemed confidential by the General Assembly. *Id.* Thus, the Legislature has already recognized that this specific information is more important to protect than dates of birth, minor names, maiden names, and signatures.[13]

---

[13] Nonetheless, as CNS has established, many cases that concern minors are confidential by statute and thus not available on OCRA. Defendants ignore this fact. Moreover, for those cases involving minors that are available on OCRA, the statutory framework permits minor names (as well as maiden names) to be redacted or sealed where disclosure of the name would pose a health or safety risk. CNS MSJ Br. at 25-26; SUF ¶ 43; Va. Code § 8.01-217(G). The Commonwealth acknowledges these safeguards but appears to contend, without evidentiary support, that the process to seal or redact such names is "burdensome and expensive," Comm. Opp. 21-22, notwithstanding that these practices *are already in place*. Curiously, the Commonwealth also argues that "Virginia's sealing requirements would prompt more First Amendment litigation," *id.* at 22, but does not explain – because it cannot – why this is so. In

While the Commonwealth also asserts that redaction practices are ineffective, as it did in its summary judgment motion, the Commonwealth fails to offer any admissible evidence on this issue. Instead, it now points mainly to a law review article that discusses the AOL and Netflix data breaches of 2006, emphasizing, for example, that "anonymized individuals can be 'reidentified' using trivial personal information, such as how they rate movies," Comm. Br. at 18-19, but the Commonwealth fails to explain how this is pertinent to the First Amendment issue at hand. The article, in fact, has nothing to do with redaction practices or court records at all.

The Commonwealth's reliance on *Northwestern Memorial Hosp. v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004) is similarly misplaced. That case, like many of the others cited, did not involve the First Amendment. Rather, it affirmed an order quashing a subpoena requesting medical records of late-term abortion patients because, even if redacted, the disclosure of such records would have violate Illinois law prohibiting their production in judicial proceedings. *Id.* at 928-29. In reaching its conclusion, the Seventh Circuit noted that it was "hardly a typical case" because it involved the "long-running controversy over the morality and legality of abortion." *Id.* at 929. The court did not state, despite the Commonwealth's suggestion to the contrary, that redaction is generally ineffective at maintaining privacy in court records.

*Gabel*, *supra*, in fact, reached the opposite conclusion. In that case, court clerks defended their practice of withholding access to newly filed complaints until they were reviewed for unredacted confidential information, even though court rules required the filer to redact such information. Because the District of Vermont concluded that filer redaction is "overwhelmingly effective" to "protect[ ] privacy interests," *Id.*, 2021 WL 5416650, at *16 (2 out of 4,156 complaints, *i.e.*, 0.048%, during the relevant time period contained unredacted confidential

---

fact, the opposite is true since redaction and sealing is targeted to protect private, not public, information.

information), it held that the clerks' pre-access review was "not essential to preserve higher values" nor was it narrowly tailored. *Id.* at *15.[14]

The Commonwealth's attempt to discredit the use of OCRA subscriber agreements also lacks merit. It first claims that PACER – which allows every federal district court in the country to provide remote access – is mined by data brokers notwithstanding its requirements of a subscription fee and user agreement, but the articles cited do not support that argument. The Fred Cate article, Comm Br. at 22, does not mention PACER at all, and the other articles focus on a data breach of confidential, sealed documents in the CM/ECF system, *id.* at 14 – not non-confidential court filings available through PACER's paywall. The Commonwealth also contends that the VDBC system – which by design allows registrants to search for personal identifiers – has been "regularly scraped for social security numbers," Comm. Opp. at 22, but they conveniently ignore that VDBC is not a paid service. Paywalls are one of many practices to mitigate the risk of unwanted data mining. *See* Bodis Decl., ¶¶ 10-11.

The Commonwealth's argument also hinges on the false notion that only Virginia-barred attorneys can be "pre-vetted" and that lawyers have professional reasons to refrain from abusing the privilege of remote access. But so do journalists. CNS' reporters, for instance, abide by ethical proscriptions precluding inclusion of personal identifiers in news stories. Girdner Decl. ¶ 43. Moreover, the Clerk must approve any OCRA user, who in order to apply, must provide their name, address, phone number, and email address. Ex. B at 6. And the Clerk has already demonstrated that if OCRA was opened up to non-attorneys, she would add another verifiable credential to the application process, *i.e.*, business name or employer. Ex. J at 6.

---

[14] The Commonwealth references a 2017 report from the Vermont Attorney General that discusses data broker activities generally, not specifically in court records. Comm. Opp. at 15. *Gabel* demonstrates that court records in Vermont, perhaps unlike other publicly available information, are uniquely safeguarded via filer redaction. The same is true in Virginia.

The Commonwealth alludes to supposed cost concerns as another reason to blackout the press and public but that argument has no factual foundation. The only "evidence" cited is the Ferguson Declaration, Comm. Opp. at 6, but as CNS has explained, CNS MSJ. Br. at 27-28; CNS Opp. at 9, 28-29, that declaration is based on guesswork and rank speculation and, in any event, should be disregarded since the witness was disclosed on the evening of the last day of discovery. Rules of evidence aside, CNS has made clear that the practices, and related costs, in Mr. Ferguson's court – which does not utilize OCRA and does not make confidential court records accessible to the public at the courthouse in unredacted form – have no bearing on the practices at the Prince William Court. CNS MSJ. Br. at 27-28; CNS Opp. 28-29.

Neither the Commonwealth nor the Clerk address these arguments. Instead, the Commonwealth incorrectly claims that "Defendants have put forth uncontested evidence that granting the general public OCRA access would require a change in policies, hiring new employees or increasing the hours worked by existing employees, and expenditure of funds to build the server infrastructure for the increased traffic." Comm. Br. at 6. It is hard to fathom why there would be *any* increased cost in allowing the press and public the same remote access to non-confidential court records that Virginia-barred attorneys currently enjoy. To the contrary, each new subscriber would pay the Clerk an annual subscription fee.

## CONCLUSION

Online access to civil court records protects the transparency of the courts guaranteed by the First Amendment. All federal courts and state courts nationwide agree, offering remote access to the press and public while also implementing safeguards that are already in use by the Clerk and all Virginia circuit courts that utilize OCRA. The days of the Commonwealth standing alone in its effort to darken the halls of government by restricting remote access to attorneys and prohibiting the publication of information accessed remotely must come to an end.

Dated: August 8, 2022

Respectfully submitted,

*/s/ Dabney J. Carr*
Dabney J. Carr, IV (VSB No. 28679)
**TROUTMAN PEPPER
HAMILTON SANDERS LLP**
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

Jonathan E. Ginsberg (admitted *pro hac vice)*
**BRYAN CAVE
LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

*Counsel for Plaintiff Courthouse News
Service*