**IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
VIRGINIA
Richmond Division**

COURTHOUSE NEWS SERVICE,

        Plaintiff,

v.

JACQUELINE C. SMITH, in her official
capacity as Clerk of the Circuit Court for
Prince William County, Virginia,

        Defendant,

and

THE COMMONWEALTH OF
VIRGINIA,

        Intervenor-Defendant.

Civil Action No. 3:21-cv-00460-HEH

## DEFENDANT COMMONWEALTH OF VIRGINIA'S REPLY

The Commonwealth of Virginia (the "Commonwealth"), by counsel, submits the

following as its reply brief in support of its motion for summary judgment pursuant to Fed. R.

Civ. P. 56.

## PRELIMINARY STATEMENT

The opening sentence of CNS's opposition to Defendants' motions for summary judgment

truly encapsulates its argument: that the defendants must justify treating members of the press

and the general public differently than licensed attorneys. Dkt. No. 82 at 1. But this court already

addressed and dismissed CNS's Equal Protection claim. Now, following that dismissal, CNS

struggles to articulate its First Amendment claim – as distinct from a Fourteenth Amendment Equal Protection claim – because claiming a First Amendment right to remote access of court records fails as a matter of law. Requiring parties to access court records at the courthouse as they have done since the invention of records and courthouses is clearly constitutional. That state courts could, but choose not to, permit public access via the internet is not a constitutional claim, it is a public policy argument. And the General Assembly of Virginia has clearly set forth that Virginia has a strong public policy of balancing the efficiency of remote access with the privacy rights of litigants.

Plaintiff argues that other methods could satisfy the Commonwealth's public policy of safeguarding litigants' privacy, such as redaction. But this argument fails to address that the entire reason the OCRA system was developed was to provide a channel for attorneys to access unredacted records that they need to facilitate the efficient adjudication of their cases in Virginia's state court system. Not only would redaction require a change in policy, additional employees or contractors to review records and perform the redaction, introduce delays for redaction that do not exist currently, and cause clerks to incur additional costs, but it also would not perform the same function as the current OCRA system because attorneys would still need access to the unredacted records, which would require a trip to the courthouse. CNS attempts to place its desire to increase its profit margin by lowering employee overhead at the expense of increasing the overhead on courts and attorneys. CNS has access; it does not dispute that access. What CNS wants is access that is more profitable. Increasing CNS's bottom line is not a valid state interest, nor is it a constitutional right.

## ARGUMENT

**I.       CNS fails to identify a dispute of material fact.**

At the outset of its Response brief, CNS objects to the Commonwealth's usage of secondary sources throughout its Motion for Summary Judgment, arguing that such sources are "hearsay" which this Court cannot consider on a motion for summary judgment. Dkt. No. 82 at 2-3. But in stating that these facts are "hearsay," CNS fails to show how these facts create a "genuine issue necessary to be litigated" at trial. Local Civil R. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). CNS makes no attempt to either dispute the truth of the underlying facts contained in these sources or claim that they would affect the outcome of the case—CNS merely states that they either constitute "hearsay" or lack relevance to the issue presented in this case. *See generally* Dkt. No. 82 at 3-6. Factual disputes as to relevancy do not preclude summary judgment. *Liberty Lobby*, 477 U.S. at 248.

Moreover, in the Fourth Circuit, "there is no per se prohibition against unsworn hearsay statements being introduced into evidence." *United States v. Mitchell*, 429 Fed. Appx. 271, 274 (4th Cir. 2011). "The evidence rules permit the admission of such statements even at formal proceedings insofar as they possess 'circumstantial guarantees of trustworthiness' equivalent to those embodied in the traditional, codified exceptions." *Id.* (quoting Fed. R. Evid. 807). Accordingly, hearsay evidence is inadmissible to support a motion for summary judgment only if it would be "inadmissible at trial . . ." *See Francisco v. Verizon South, Inc.*, 756 F. Supp. 2d 705, 713 (E.D. Va. 2010). On a motion for summary judgment, the determination as to whether the secondary sources complained of would be "inadmissible at trial" is committed to this Court's

sound discretion. *Id.* (citing *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

The Commonwealth has intervened in this case to defend the constitutionality of Virginia Code § 17.1-293. Dkt. No. 61. Accordingly, this Court has tasked the Defendants with defining the contours of its government interest in OCRA's non-attorney access and dissemination restrictions. Memo. Op. at 11, Dkt. No. 48. As the Commonwealth asserted in its Motions to Dismiss, Motion for Summary Judgment (Dkt. No. 66), and Response Opposing CNS's Motion for Summary Judgment (Dkt. No. 81), it has a significant interest in the fair and orderly administration of its justice system, which OCRA achieves by facilitating attorney access to relevant court records while protecting the private information of Virginia litigants from widespread dissemination.

In order to define the contours of these interests, the Commonwealth has first put forth uncontested evidence as to data harvesting in public records databases accessible on the internet in 2022. Dkt. No. 67 at 3-5. Unlike the specific contents of a newspaper article used to prove an element in a criminal trial, as was the issue in the unpublished case cited in CNS's response, *United States v. Taylor*, 2011 WL 13195944 (E.D. Va. 2011), the Commonwealth has provided this information to demonstrate that data harvesting is a well-known phenomenon with which the Commonwealth and all other providers of publicly-accessible databases must contend. The existence and widespread nature of data harvesting is not subject to reasonable dispute because it is generally known within this Court's territorial jurisdiction and can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. In fact, CNS does not question the accuracy of this information, or that the public has valid concerns about information privacy in a digital age; it simply asserts that articles discussing data

harvesting constitute hearsay. Accordingly, the Court can take judicial notice of the existence of data harvesting.

Likewise, there is no basis to exclude as hearsay the public records offered by the Commonwealth on the harms presented by data harvesting, as the Federal Rules of Evidence specifically exempt public records "in a civil case" which reflect "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8). These records show that the Commonwealth's cyber security concerns as regards publicly accessibly databases are not only matters of public record, they are shared by Congress and the Supreme Court of the United States. *See, e.g.,* Office of Oversight and Investigations Majority Staff, A Review of the Data Broker Industry: Collection, Use and Sale of Consumer Data for Marketing Purposes, Staff Report for Chairman Rockefeller (Dec. 18, 2013), https://www.commerce.senate.gov/services/files/0d2b3642-6221-4888-a631-08f2f255b577 (the "Data Broker Report"); Office of the Attorney General Department of Financial Regulation, Report to the Vermont General Assembly of the Data Broker Working Group (December 15, 2017), https://ago.vermont.gov/wp-content/uploads/2018/02/2017-12-15-Data-Broker-Working-Group-Report.pdf; *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989). Furthermore, the Court can take judicial notice of public records at any stage of litigation. *See Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004).

The secondary sources reflecting empirical data on private information contained in public records and reidentification are equally admissible under either Federal Rule of Evidence 803(18) or Federal Rule 807 at the summary judgment stage. Dkt. No. 67 at 21-23; Dkt. No. 81 at 16-21.  Indeed, under Rule 803(18), statements from "learned treatises" and "periodicals" may

be read into evidence at trial if "the publication is established as a reliable authority by [an] expert's admission or testimony, by another expert's testimony, or by judicial notice." *Id.* at (B).

The empirical data is also admissible under Rule 807, which provides that hearsay is admissible if the statement "is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made . . ." and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. Law review scholarship is highly trustworthy—journal submissions are typically peer-reviewed and pass through multiple layers of editing and analysis by a wide variety of individuals. *See, e.g.,* David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech. L.J. 1807 (2015) (the "2015 Empirical Study") (crediting two law professors, eleven coders, eight research and technical supporters, and nine other individuals who provided comments and suggestions); *see also United States v. Crisp*, 324 F.3d 261, 265-66 (4th Cir. 2003) (whether a theory "has been subjected to peer review and publication" is probative as to the reliability of expert testimony) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993)). Moreover, the empirical data reflected in these sources is highly probative, as the main issue in this case is whether OCRA effectively achieves the Commonwealth's interests in protecting the private information of its litigants. In order to make that determination, the Court must engage with the fact that private information is included in court filings at a very high rate. 2015 Empirical Study at 1860, Table 4. If posted online, that same information will be harvested by data brokers at the expense of Virginia's most vulnerable litigants. Data Broker Report at 15. And the Commonwealth cannot obtain similar evidence through reasonable efforts: there is no other way the Commonwealth can show the Court the rate at which private information appears in court records because of the

dearth of scholarship on the issue, 2015 Empirical Study at 1810, and because no entity tracks that information. *See, e.g.,* Dkt. No. 71 at 23 (citing Defendant Smith's quote that the rate at which private information is included in court filings "is not tracked by the Office of the Clerk of Court or any group."). Simply put—the empirical data is highly probative to the Commonwealth's government interests asserted in this case, and due to the scarcity of such information, the Commonwealth cannot obtain similar evidence through reasonable efforts. CNS has not produced, and cannot produce, evidence undermining the specific data in those articles. And the fact that this data appeared in highly respected and reliable law review articles justifies the Commonwealth's finding the information credible and animating its public policy of protecting electronic records databases differently than paper records.

Although the Commonwealth has relied upon these articles to show the Court empirical data on private information in court records and provide background information on "practical obscurity," which are highly probative, CNS uses the same sources to quote the legal opinions of the authors about how their data should inform legislation. Dkt. No. 82 at 24, 29. Those opinions on drafting legislation are not probative of whether the Commonwealth has a state interest in preventing data harvesting. To the extent that CNS has relied on these same sources to refute the Commonwealth's assertions, CNS has waived its objection to the admission of these sources.

Finally, CNS disputes that OCRA would be targeted for data harvesting, asserting that every court in the United States providing remote access to court records does so "without issue." Dkt. No. 82 at 3-4. In support of this statement, CNS cites one of its own editors, William Girdner, whose declaration is devoid of any facts pertaining to cybersecurity other than an unsupported statement that New York does not require registration for public access to new court filings and has provided access "without incident." Dkt. No. 82 at 4; Dkt No. 71-1, ¶ 4. Mr.

Girdner's sole qualification as a fact witness knowledgeable about Information Technology is anecdotal as a user. Dkt No. 71-1, ¶ 8.

In contrast to Mr. Girdner's blithe assurances that New York provides access with no protections at all "since 2017 without incident," Dkt. No. 71-1, ¶ 4, the public record is replete with examples of court records being used for harmful data harvesting, *see, e.g.,* Data Broker Report at 15, not to mention being outright attacked by foreign actors. United States Courts, Judiciary Addresses Cybersecurity Breach: Extra Safeguards to Protect Sensitive Court Records (January 6, 2021), https://www.uscourts.gov/news/2021/01/06/judiciary-addresses-cybersecurity-breach-extra-safeguards-protect-sensitive-court. Unsubstantiated and uncited claims, such as those contained in Mr. Girdner's declaration, do not create a genuine fact dispute on this point. *See, e.g., Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Circuit 2010) (no genuine issue of fact when only issue is which of two conflicting versions of party's testimony is correct; averments in later-filed affidavits claiming in conclusory fashion that taxpayer had no role in managing company or any control over its financial affairs, which contradicted specific admissions in deposition as to role taxpayer played in company, did not create genuine fact dispute).[1]

## II.     The challenged restrictions are content-neutral.

CNS, for the first time in response to the Commonwealth's Motion for Summary Judgment, argues that the challenged restrictions are "anything but" content-neutral. Dkt. No. 82

---

[1] In CNS's response memorandum, CNS objects to the Commonwealth's Exhibit A to its Motion for Summary Judgment, Dkt. No. 67-1, on the basis that the identity of declarant Joby Knuth was not timely disclosed. Dkt. No. 82 at 4. CNS has agreed to withdraw this objection; in consideration thereof, the Commonwealth has agreed to not object to any counter-declaration CNS might submit in response to Mr. Knuth's declaration. The parties reserve the right to object to either designation as creating an issue of material fact which must be litigated at trial.

at 14. Specifically, CNS argues that the non-attorney access restriction is not content-neutral because of the cybersecurity concerns justifying restriction. Dkt. No. 82 at 14 (citing *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)). But CNS misreads *McCullen* as applied to the facts of this case. In that case, a Massachusetts law creating a buffer zone around abortion clinics, which prohibited leafleting within that buffer zone was content-neutral even though the law applied only to abortion clinics. *Id.* at 480. The Court reasoned, "Whether petitioners violate the Act depends not on what they say, but simply on *where* they say it." *Id.* (emphasis added).

The same reasoning applies in this case. Here, the "regulated speech" is access to court records. Memo. Op. at 10, Dkt. No. 48. And, "[t]he non-attorney access restriction challenged here does not stop CNS from accessing civil court records altogether but instead controls how and when it accesses them." *Id.* OCRA does not regulate the content of the records themselves, nor does OCRA regulate access based on the particular content of the records or the content of CNS's publications: the same access rules apply to all records, and all non-attorneys are treated equally, regardless of how they intend to use the information, unless they are themselves litigants. Dkt. No. 55 ¶ 49; Va. Code § 17.1-293(E)(5). Consequently, should the Court view OCRA's non-attorney access and dissemination limitations as restrictive to CNS's First Amendment rights, those restrictions are nevertheless content-neutral.

### III.   CNS's arguments as to "less restrictive alternatives" are irrelevant under time, place, and manner scrutiny.

CNS continues to misapply the relevant standard of review in assessing whether a time, place, and manner ("TPM") restriction on speech is constitutional. Dkt. No. 82 at 21. The Commonwealth simply needs to prove that its restriction is narrowly tailored in meeting its significant government interest. *Ross v. Early*, 746 F.3d 546, 552-53 (4th Cir. 2014). Under

TPM, a regulation is "narrowly tailored" if the government's interest would be achieved less effectively absent the regulation. *Id.* CNS completely fails to address the efficacy element in both its own Motion for Summary Judgment (Dkt. Nos. 70-71) and in its response to the Commonwealth's Motion for Summary Judgment (Dkt. No. 82). It repeatedly cites to redaction and subscriber agreements as "less restrictive alternatives" that already meet the Commonwealth's interests but does so without any evidence that these measures will actually prevent harmful data harvesting. Dkt. No. 82 at 21-22. Even assuming that redaction and subscriber agreements protect PII with high accuracy (which is not evidenced in the record), these measures protect only the PII outlined in Virginia Code §§ 8.01-420.8, 17.1-293. They have no bearing on the wide swathes of private information included in court filings. 2015 Empirical Study at 1860, Table 4. Redaction simply cannot address the privacy interests implicated by remote access because the government and litigants cannot redact every fact relating to, for example, assets, litigants' home addresses, or the identities from every court filing. *Id.* Requiring such overbroad redaction rules would frustrate the fair and orderly administration of justice in the Commonwealth. Likewise, redaction is ineffective in the world of digital access because data brokers draw information from not just one court record, but from any and all that are available online; as Judge Posner has noted, reidentification of the information contained in redacted records is possible because information "in the cumulative can make the possibility of recognition very high." *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (quoting *Parkson v. Central Dupage Hospital*, 436 N.E.2d 140, 144 (Ill. 1982).

In ignoring the applicable standard of review, CNS asks this Court to hold OCRA's non-attorney access and dissemination restrictions unconstitutional because less-restrictive

alternatives, like subscriber agreements and redaction, can adequately serve the Commonwealth's interests. But TPM scrutiny specifically bars this Court from finding the regulations unconstitutional on this basis: a "regulation will not be invalid simply because a court concludes that the government's interests could be adequately served by some less-speech restrictive alternative." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). "The validity of [TPM] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Id.* (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)) (internal quotations omitted).

## IV.     The practices of other courts are irrelevant to the determination of whether the Commonwealth achieves its significant government interest.

CNS argues that because courts in other states offer the public remote access to court records, then OCRA is not narrowly tailored to serve its interest in the privacy of its litigants. Dkt. No. 82 at 29. "Defendants' concerns regarding fair and orderly administration of justice and protecting privacy . . . are shared by all courts nationwide, state and federal, yet all federal district courts, as well as courts in at least 37 other states, give the press and public remote online access to civil court records." *Id.*

This argument lacks any factual basis whatsoever. CNS has not cited to any information, on the record or otherwise, which would support the proposition that other states have a specific policy goal of preventing remote data harvesting of information contained in court records. CNS likewise fails to identify if these courts have successfully prevented harmful data harvesting at all. The only evidence on the record as to other states' practices is that some courts in some states provide remote access to civil filings. Dkt. No. 55 ¶ 10. Without facts as to other states'

11

policy interests and how they are achieved, CNS's argument completely fails to engage in the analysis required under time, place, and manner scrutiny, which is that a regulation is narrowly tailored if the government would achieve its significant interest less effectively absent the challenged regulation. *Ross*, 746 F.3d at 552-53. Without information relevant to either prong of the analysis, comparison to the practices of other states is irrelevant. Instead, CNS's argument amounts to advocating for Virginia to change its public policy. The place for this argument is Virginia's General Assembly, not the Federal district courts.

## **CONCLUSION**

Wherefore, for the foregoing reasons, the Commonwealth respectfully requests that this Court grant the Commonwealth's Motion for Summary Judgment and award the defendants any further relief that the Court deems necessary and proper.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA

By: */s/ Robert B. McEntee, III*
Counsel

Jason S. Miyares
   *Attorney General*

Steven G. Popps
   *Deputy Attorney General*

Jacqueline C. Hedblom
   *Senior Assistant Attorney General/*
   *Acting Trial Section Chief*

Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-8198 – Telephone
(804) 371-2087 – Facsimile
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2022, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record for the parties.

_/s/ Robert B. McEntee, III_
Robert B. McEntee, III