# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

COURTHOUSE NEWS SERVICE,    )
)
              Plaintiff,    )
)
v.                      )      Civil Action No. 3:21-cv-460–HEH
)
KARL R. HADE, *et al.*,        )
)
           Defendants.    )

## MEMORANDUM OPINION
### (Resolving Cross-Motions for Summary Judgment)

This case involves a dispute between a nationwide news service, Courthouse News Service ("CNS" or "Plaintiff"), and Jacqueline C. Smith ("Defendant Smith") in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia, and Intervenor Commonwealth of Virginia (the "State") (collectively, "Defendants"). At issue is whether a web of Virginia statutes governing access to civil court records violates the First Amendment of the United States Constitution.[1] (Compl. ¶ 1–5, ECF No. 1.)[2] Specifically, Plaintiff argues that the enforcement of two Virginia Statutes—Va. Code §§

---

[1] Plaintiff also sought to have Virginia's regulatory scheme declared unconstitutional under the Fourteenth Amendment of the United States Constitution, but the Court previously granted Defendants' motion to dismiss that claim. (Order, ECF 49.)

[2] Plaintiff filed its Complaint on July 15, 2021 (ECF No. 1), then subsequently filed an Amended Complaint on September 14, 2021 (ECF No. 21).

17.1-293(E)(7)[3] and 17.1-293(H)[4]—violate the First Amendment. (*Id.*) Virginia Code § 17.1-293(E)(7) gives the public unfettered access to nonconfidential civil court records while physically at the courthouse but denies non-Virginia-barred attorneys *remote* access to the same records. Virginia Code § 17.1-293(H) prevents individuals who have remote access to these records from selling, posting, or redistributing data obtained from these records to third parties.

The case is presently before the Court on cross-motions for summary judgment.[5] (ECF Nos. 66, 70, 74.) Both Plaintiff and Defendants have submitted detailed memoranda supporting their respective positions, and the Court heard evidence and oral argument on August 18, 2022. While many of the principles governing public access to

---

[3] The full text of Va. Code § 17.1-293(E)(7) reads:

> [A clerk may provide] secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk.

[4] The full text of Va. Code § 17.1-293(H) reads:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

[5] The State filed its Motion for Summary Judgment on July 9, 2022. (Def.'s Mot. Summ. J., ECF No. 66.) Plaintiff filed its Cross-Motion for Summary Judgment on July 11, 2022. (Pl.'s Mot. Summ. J., ECF No. 70.) Defendant Smith filed her Motion for Summary Judgment on July 14, 2022. (Def.'s Mot. Summ. J., ECF No. 74.)

2

civil court records have been well-developed in courts of the United States, their application to a regulatory scheme that allows the public to freely access such records while physically at the courthouse, yet limits remote access to state-barred attorneys, is a venture into a new frontier. Judicial authority applying the First Amendment to the right to access civil court records is finite, and no federal court has had occasion to decide whether the public has a fundamental First Amendment right to remotely access civil court records where barred attorneys may access such records and such records are already accessible at the courthouse. As Defendants aptly pointed out, this case presents First Amendment issues in a unique context.

For the reasons detailed below, on Plaintiff's First Amendment claim against Defendants' enforcement of the non-attorney access restriction, Va. Code § 17.1-293(E)(7) (Count I), the Court will grant Defendants' Motion for Summary Judgment. On Plaintiff's First Amendment claim against Defendants' enforcement of the dissemination restriction, Va. Code § 17.1-293(H) (Count II), the Court will grant Defendants' Motion for Summary Judgment. The Court will deny Plaintiff's Motion for Summary Judgment in its entirety.

## I.   BACKGROUND

In reviewing cross-motions for summary judgment, the Court must consider each motion separately on its own merits to determine if either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In considering each motion, the Court will resolve any factual disputes and "competing, rational inferences" in the light most favorable to the opposing party. *Id.*

3

(internal quotation marks and citation omitted).  The following narrative represents the

undisputed facts for the purpose of resolving the cross-motions for summary judgment.[6]

In Virginia, the clerk of the circuit court for each county "shall have custody of

and shall keep all court records . . . in their offices or at such location otherwise

designated by the clerk."  Va. Code § 17.1-242.  In all Virginia circuit courts, clerks

provide the public with access to these court records at the physical courthouse.[7]  (Joint

Stipulation of Facts (hereinafter, "JSF") ¶ 24.)  Beyond access at the courthouse, some

circuit courts provide access to civil court records remotely, via the internet, on a system

called "Virginia Officer of the Court Remote Access" ("OCRA").  (*Id.* ¶ 27.)  It is

*optional* for each circuit court clerk to have their records accessible via OCRA, and

approximately 104 circuit courts provide that access.  Va. Code § 17.1-293(E)(7); (*Id.*).

OCRA provides online access to the same civil court records that are accessible at

physical courthouses.  (Am. Compl. ¶ 49.)  However, OCRA is subject to two important

statutory limitations.  First, OCRA is only accessible to Virginia-licensed attorneys, their

staff, and related government officials (the "non-attorney access restriction").  Va. Code

---

[6] Plaintiff objected to the State's usage of various secondary sources throughout its Motion for
Summary Judgment, arguing that such sources are hearsay, which the Court cannot consider at
this posture. (Pl.'s Mem. in Opp'n at 2–3, 24–25, ECF No. 82.)  The State, on the other hand,
asserted that Plaintiff failed to show how such facts create a genuine issue necessary to be
litigated. (Def.'s Reply at 3–8, ECF No. 86.)  The Court did not consider nor rely upon the
contested, secondary sources in reaching its decision.  Aside from the objection to the
admissibility of those secondary sources, Plaintiff has stated that it "does not believe that any
issues of fact raised by either of Defendants' motions are material to the determination of the
parties' respective summary judgment motions." (Pl.'s Mem. in Opp'n at 5 n.2.)

[7] Those filing civil court records must redact all but the last four digits of social security
numbers, driver's license numbers, and other identification numbers.  Va. Code § 8.01-420.8(A).

4

§ 17.1-293(E)(7).  Second, OCRA users may not sell, post, or redistribute to a third party any data accessed on OCRA unless the data is included in a product or service created by the OCRA user and the data is not made available to the general public (the "dissemination restriction").  *Id.* § 17.1-293(H).

For circuit courts that use OCRA, the clerk, or someone designated by the clerk, serves as the court's OCRA Administrator and this person is responsible for screening, approving, adding, and removing subscribers.  (JSF ¶ 41.)  The court's OCRA Administrator is responsible for providing subscribers with login information and addressing subscribers' questions about subscriber access.  (*Id.*)  The Office of the Executive of the Supreme Court of Virginia ("OES") does not in any way evaluate or screen subscribers once the clerk determines they are authorized users—this responsibility falls on the clerk.  (*Id.*)  The clerk must pay the OES for maintenance and technical support based on the number of private subscribers.  (*Id.* ¶ 38.)  The Prince William County Clerk currently has 269 private subscribers to OCRA and pays OES an annual maintenance charge of $9,500.  (*Id.* ¶ 39.)  The clerk charges OCRA subscribers a fee to use the secure remote access system pursuant to the subscriber agreement and applicable Virginia law.  (*Id.* ¶ 40.)

Circuit court clerks may provide the public with remote online access to civil court records via their own case management system outside of OCRA.  Va. Code § 17.1-225. Although this option is available, the Amended Complaint does not mention any circuit

court that has created such a system.[8]

CNS is a nationwide news service that reports on civil cases in all 50 states, including Virginia. (*Id.* ¶ 1.) CNS reporters have traditionally traveled to Virginia circuit courts in each county to access the civil court records provided in physical courthouses. (*Id.* ¶ 44.) In an effort to save money and travel time, CNS asked many circuit court clerks for access to OCRA even though its staff members are not licensed attorneys. (*Id.* ¶ 53.) Every circuit court clerk denied CNS such access. (*Id.*)

Despite the statutory prohibition, the Clerk of the Circuit Court for Prince William County, Defendant Smith, offered to give CNS access to OCRA for a higher price than Virginia attorneys. (*Id.* ¶¶ 54–59.) At the hearing on January 10, 2022, however, counsel for Defendant Smith made clear that she no longer offers CNS access to OCRA and, in her opinion, the Virginia law bars her from doing so. (*Id.* ¶ 59.)

As CNS was seeking access to OCRA through individual circuit court clerks, it also sought access through OES. (*Id.* ¶ 58.) Defendant Hade is the Executive Secretary of OES. (*Id.* at 1.) While circuit court clerks upload court records to the system and control those records, OES "operates and maintains" the servers and websites that OCRA exists on. Va. Code § 17.1-502(A); (*Id.* ¶¶ 35–36.)

---

[8] The information a circuit court clerk may provide via a public remote access system is more limited than the information available on OCRA. OCRA may contain documents with actual signatures, dates of birth, maiden names, and the names of minor children, while public online remote systems may not. *See* Va. Code §§ 17.1-293(B), (E)(7). Of course, records in OCRA, or an additional system created by a circuit court clerk, would also have confidential information redacted according to Va. Code § 8.01-420.8(A); *see id.* § 17.1-293(A) (requiring full redaction in a non-OCRA online system).

When CNS asked OES for access to OCRA, OES stated that it was not legally authorized to provide access because OCRA is limited to "members in good standing with the Virginia State Bar" and all court documents are "under the custody and control of the circuit court clerks." (Am. Compl. ¶ 59.) Moreover, OCRA's website, which OES controls, states that OCRA "is intended solely for the use of authorized Officer of the Court personnel . . . and [a]ll other use is expressly prohibited." (*Id.* ¶ 40.)

Defendants state various governmental interests for limiting *electronic* access to civil court records to only Virginia-barred attorneys, and preventing the selling, posting, and redistributing of such records accessed *electronically* to third parties. First, Defendants assert that they have an interest in promoting critical privacy and security interests of Virginia litigants by sharply reducing the amount of private, sensitive information let out into the world and limiting the potential for widespread data harvesting which is often done by bots.[9] (Def.'s Mem. in Supp. at 13–18, ECF No. 67; Def.'s Mem. in Supp. at 13–16, ECF No. 75.) The one central concern is that this data

---

[9] While the Court could not identify a case in which the United States Court of Appeals for the Fourth Circuit defined the term "bot," the Court notes that the State's definition of the term coincides with definitions used by other courts. Specifically, the State explains that:

> a 'bot' is a computer program that operates as an agent for a user or other program. Bots are used to automate tasks and therefore can operate without specific input from a human user once activated. Bots can replace a repetitive task a human would otherwise have to perform and are often faster at performing those tasks than a human user would be. One common task for a bot program is to gather information from websites.

(Def.'s Mem. in Supp. at 7 n.18, ECF No. 67.) The United States District Court for the Central District of California likewise said that a bot is "a program that runs on a computer 24/7, automating mundane tasks for the owner, even if the owner is not logged in." *United States v. Krug*, No. 09-1148-GHK, 2013 WL 12205704, at *12 n.11 (C.D. Cal. Aug. 8, 2013).

may be later resold or disseminated.  Second, Defendants claim that the regulations promote the fair, orderly, and efficient administration of justice.  According to Defendants, the regulations aid attorneys in executing their duties as officers of the court while reducing the burden placed upon the clerk's office to provide filings directly to those attorneys physically at the courthouse.  (Def.'s Mem. in Supp. at 24–25, ECF No. 67; Def.'s Mem. in Supp. at 16–18, ECF No. 75.)

The State's Declaration of Joby Knuth, the Deputy Director and Application Manager of the Department of Judicial Information Technology at OES, and Plaintiff's Declaration of Andras Bodis, acting Technology Director for CNS and partner in a software development firm, further inform this matter.[10]  (Knuth Decl., ECF No. 67-1; Bodis Decl., ECF No. 85-1.)  From reading both Declarations, it is clear that (1) Virginia's publicly available court databases have been mined by bots for Personally Identifiable Information ("PII"); (2) remote access to information, including "secure remote access," poses unique privacy concerns in contrast to information available only in person because the amount of data that can be pulled from a physical courthouse is limited, whereas one can download every available nonconfidential court record containing PII instantaneously and without any limitations; (3) bot management tactics,

---

[10] The admissibility of these Declarations is undisputed by the parties.  CNS stated that it "does not believe that the Knuth Declaration raises any factual issues that are material to the determination of the parties' respective summary judgment motion[s] [sic].  CNS has agreed to waive its objection to the late disclosure of Mr. Knuth as a witness in exchange for the opportunity to submit the Bodis Declaration."  (Pl.'s Reply at 10 n.7, ECF No. 85.)  The Court considered the Knuth and Bodis Declarations in reaching its decision.

which allow website operators to reasonably prevent against abusive data mining, has not been successful in the Virginia management systems; and (4) there are many documented bot management tactics that could theoretically be used to guard against data mining.

## II. STANDARD OF REVIEW

The standard of review for cross-motions for summary judgment is well-settled in the United States Court of Appeals for the Fourth Circuit:

> On cross-motions for summary judgment, a district court should "rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the [Federal Rule of Civil Procedure] 56 standard." Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (alteration in original) (first quoting *Monumental Paving & Excavating, Inc. v. Pennsylvania Mfrs' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999), and then quoting Fed. R. Civ. P. 56(c)).

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at

247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Id.*

To defeat an otherwise properly supported motion for summary judgment, the non-moving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or "the mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (first quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985), and then quoting *Anderson*, 477 U.S. at 252). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). "Thus, if the evidence is 'merely colorable' or 'not sufficiently probative,' it may not be adequate to oppose entry of summary judgment." *Id.* (citing *Anderson*, 477 U.S. at 249–50). The Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *See Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

## III.   DISCUSSION

### A. Enforcement of the Non-Attorney Access Restriction (Count I)

In Count I, Plaintiff asserts that Defendants' enforcement of OCRA's non-attorney access restriction, Va. Code § 17.1-293(E)(7), violates the First Amendment because it allows only Virginia-barred attorneys—not the public or press—access to electronic civil court records at the Prince William Circuit Court. Defendants, on the other hand, assert that the restriction passes constitutional muster because it resembles a time, place, and manner restriction and is content-neutral, narrowly tailored, and preserves significant government interests. (Def.'s Mem. in Supp. at 3, ECF No. 67.) Such interests include "protect[ing] the private information contained in nonconfidential court filings while preserving the fair, orderly and efficient administration of justice." (*Id.*)

In relevant part, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This prohibition is made applicable to the States by the Fourteenth Amendment. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 245 n.10 (4th Cir. 1999). It is well-settled that the press and public have a right of access to most, if not all, civil court records. *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021) (finding a right to reasonable contemporaneous access to civil complaints); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) (finding a right to access summary judgment documents). Federal courts and most state courts allow the public to access these civil records via an online remote system, however, no court has held that there is a fundamental First Amendment right to access such civil records over the internet. (Pl.'s Mem. in Opp'n at

11

23–24.) Thus, Plaintiff is not alleging that the public has a fundamental right to remotely access civil court records guaranteed by the First Amendment.[11] Rather, Plaintiff argues that *if* Defendants provide Virginia attorneys remote access to civil court records, *then* the First Amendment also requires them to provide the public with remote access. In effect, Plaintiff argues that Defendants are limiting an already established fundamental right— the right to access civil court records—in an unconstitutional manner by giving one group, Virginia lawyers, remote access while denying it to others.[12] The precise question presented by Plaintiff is whether the First Amendment provides Plaintiff, as a member of the public, a right of electronic access to civil court records that are already physically accessible at the courthouse.

Strict scrutiny ordinarily applies to an alleged violation of the First Amendment. *Schaefer*, 2 F.4th at 328; *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596, 606 (1982). But when a limitation on a right of access resembles a "time, place, and

---

[11] If that were Plaintiff's contention, the experience and logic test would guide this Court's analysis. *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 8–10 (1986); *Schaefer*, 2 F.4th at 326. While parties discuss the experience and logic test at length in their briefs, the Court need not do so here because, applying the test, the Fourth Circuit has already held that the public has the right to "reasonably contemporaneous access to civil complaints." *Schaefer*, 2 F.4th at 328.

[12] The Court rejects Plaintiff's assertion that its First Amendment rights are violated under *Schaefer* because Plaintiff cannot access civil court records at exactly the same rate as Virginia-barred attorneys, who have electronic access. 2 F.4th at 328. Plaintiff does not assert that access to civil court records at the Prince William Circuit Court are not "reasonably contemporaneous." *Id.* In fact, "[o]nce a new civil filing is scanned into CIS, it can be viewed by the press and public via public access terminals at [the] courthouse[] . . . almost immediately." (JSF ¶ 47.) Plaintiff claims that because there is a faster way to access such records—*i.e.*, electronic access without having to drive to the courthouse—its First Amendment rights are violated. (Pl's. Mem. in Opp'n at 12.) This reading of *Schaefer* contorts its holding. Indeed, civil court records are accessible more rapidly at the courthouse than they are electronically. (JSF ¶ 47.)

manner" restriction, the Court should apply more relaxed scrutiny. *Schaefer*, 2 F.4th at 328; *Globe Newspaper*, 457 U.S. at 607 n.17. The non-attorney access restriction challenged here does not stop Plaintiff from accessing civil court records altogether—Plaintiff can freely access the records at the courthouse. Instead, the access restriction merely controls how and when Plaintiff can access such records. Thus, the restriction resembles a time, place, and manner restriction and relaxed scrutiny applies.

Relaxed scrutiny requires the limitation to be "content-neutral, narrowly tailored and necessary" to preserve a significant governmental interest. *Schaefer*, 2 F.4th at 328 (quoting *Courthouse News Serv. v. Planet*, 947 F.3d 581, 585 (4th Cir. 2020)). "A regulation is narrowly tailored under this standard if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation' and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Ross v. Early*, 746 F.3d 546, 552–53 (4th Cir. 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1981)).

The Court turns first to whether the non-attorney access restriction is a content-neutral regulation. Plaintiff contends that the Virginia non-attorney access restriction is not content-neutral because it is "expressly supported by concerns *over content, i.e.*, that civil filings might contain certain personal identifiers," are "based on content Defendants believe would otherwise result in exploitation of litigants' personal information," and "provid[e] remote access only to a special class" of people—Virginia-barred attorneys. (Pl.'s Mem. in Opp'n at 14.) Defendants, on the other hand, assert that the regulations are content-neutral because the regulations "apply equally to all court records" and "do

13

not turn upon the communicative contents of the court records." (Def.'s Mem. in Supp. at 11, ECF No. 67.)

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (citing *Clark v. Community for Creative Non-violence*, 468 U.S. 288, 293 (1984)). The government's purpose behind the regulation "is the controlling consideration." *Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (citing *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47–48 (1986)); *see also Wag More Dogs, Ltd. Liability Corp. v. Cozart*, 680 F.3d 359, 638 (4th Cir. 2012). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642–43 (1994).

Virginia Code § 17.1-293(E)(7) permits a Virginia court clerk to provide remote access to nonconfidential court records "to members in good standing with the Virginia State Bar and their authorized agents[.]" The purpose of the regulation is to promote effective advocacy with the need for protecting litigants' private information by generally limiting access to personal information online except to Virginia-barred attorneys, who are self-regulated officers of the court and held to a higher standard than the public.

Plaintiff relies on one out-of-context line from the United States Supreme Court case, *McCullen v. Coakley*, to support its argument that the regulation is content-based.

14

(Pl.'s Mem. in Opp'n at 14); 573 U.S. 464, 480 (2014) (stating that a restriction is content-neutral only if it is "justified without reference to the content of the regulated speech.")  However, a closer reading shows that the case supports the conclusion that the regulation at issue is content-neutral.  *McCullen*, as in this case, involves a state regulation which implicates the First Amendment and treats a class of individuals differently than the general public.  573 U.S. at 482.  Specifically, *McCullen* considered the constitutionality of a state regulation that prohibited leafletting, sign displaying, engaging in oral protest, and counseling, within an 18-foot radius around the entrances of reproductive health care facilities.  *See id.*  The regulation exempted certain classes of people—individuals entering or leaving such facility, employees of such facility, law enforcement, or persons walking through the area to reach another destination.  *See id.*  Petitioners in *McCullen* asserted that the regulation was content-based because it allowed certain individuals to remain in the buffer zones but not the general public.  *See id.*  The Court rejected this argument because "[t]here is nothing inherently suspect about providing some kind of exemption to allow individuals who work at the clinics to enter or remain within the buffer zones" and the "qualification simply ensures that the exemption is limited to its purpose of allowing the employees to do their jobs."  *Id.* at 465, 483.

The line of text upon which Plaintiff relies—a restriction is content-neutral only if it is "justified without reference to the content of the regulated speech"—does not transform Virginia's restriction to a content-based one.  *Id.* at 480.  Indeed, Virginia's restriction applies to all nonconfidential civil court records in the same fashion and does not treat civil court records about a certain subject or topic differently than others.

15

Furthermore, as in *McCullen*, "[t]here is nothing inherently suspect about providing some kind of exemption to allow individuals who" are Virginia-barred attorneys to access electronic civil court records so such attorneys can "do their jobs." 573 U.S. at 483. The regulation does not center around disagreement with the message it conveys, turn upon the communicative contents of the court records, nor change based on viewpoint or subject matter. Rather, it applies to all civil court records in the same fashion, and merely controls *how* individuals—attorneys, who have ethical obligations as court officers and need such access to do their jobs—may access these same records electronically. As such, the Court finds that the non-attorney access restriction is content-neutral.

The Court must next determine whether Virginia's non-attorney access restriction is "'narrowly tailored to serve a significant government interest.'" *Ross*, 746 F.3d at 552 (quoting *Ward*, 497 U.S. at 791). This standard is met if the regulation "'promotes a substantial government interest that would be achieved less effectively absent the regulation' and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 552–53 (quoting *Ward*, 491 U.S. at 799). The Court considers each of these elements in turn.

In order to meet its burden under the first prong of the narrow tailoring requirement, the State must demonstrate that the regulation "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 555 (quoting *Ward*, 491 U.S. at 799). The State's express purpose in creating the regulation is two-fold. One purpose of the regulation is that it protects citizens' privacy and security and prevents widespread disclosure of litigants' private information, such as

16

signatures, residential addresses, dates of birth identified with a particular person, maiden names, financial account numbers, and names of minor children. (Def.'s Mem. in Supp. at 14, ECF No. 67.) According to the State, while the same records are available at the courthouse, the facilitation of complete and instantaneous access to all records electronically heightens the potential for abuse of the information contained within those records. (*Id.* at 15.) The State asserts that if such information is available electronically, it would be subject to mass data harvesting that could be sold or used for criminal and quasi-criminal purposes.[13] (*Id.*) This purpose is still served by allowing attorneys to access such data because lawyers are held to a higher standard than the public and face losing their livelihoods should they fail to meet those standards.

The second stated purpose of the regulation is that it ensures the orderly and efficient administration of the State's justice system. (Def.'s Mem. in Supp. at 16–18, ECF No. 75.) Forcing the court clerk to make all nonconfidential civil court records available online would require resource-intensive and costly processing before the documents are uploaded, as well as resource-intensive policing and monitoring of such documents once they are available electronically. (*Id.*) Furthermore, because barred attorneys can immediately access civil court records necessary to do their job, they are able to do their job more efficiently and clerks are freed up from having to respond to attorneys' requests at the courthouse. (*Id.* at 18.) Specifically, the clerk's office no

---

[13] The State cites to various secondary sources in an attempt to demonstrate the pervasiveness and impact of data harvesting, however, the Court did not rely upon this evidence in reaching its decision.

longer must dedicate staff to handle in-person requests to retrieve and copy files. (*Id.*)

Our jurisprudence makes clear that a state has an interest in policing sensitive information. *See Ostergren v. Cuccinelli*, 615 F.3d 263, 275 (4th Cir. 2010) (citing *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989)). Indeed, the United States Court of Appeals for the Fourth Circuit explained that "'[t]o the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify information, establish and enforce procedures ensuring its redacted release[.]'" *Id.* (quoting *The Florida Star*, 491 U.S. at 534). On this strength of authority, the Court has little trouble concluding the State's asserted interest in protecting citizens' privacy qualifies as "substantial."

Moreover, federal appellate courts have recognized the State's interest in ensuring the orderly and efficient administration of justice. In fact, this interest was recognized in two recent decisions involving CNS. In one case, the Fourth Circuit recognized "the court's important interest in the fair and orderly administration of justice." *Schaefer*, 2 F.4th at 328. In another case, the United States Court of Appeals for the Ninth Circuit recognized governmental entities' "legitimate administrative concerns about privacy and confidentiality, accounting protocols, quality control and accuracy, [and] efficient court administration." *Planet*, 947 F.3d at 597 (holding a county's policy of no public access prior to processing violated the First Amendment but that its policy of scanning new civil complaints and making scans available at the courthouse complied with the First Amendment). Based on this authority, the Court also concludes the State's interest in ensuring the orderly and efficient administration of justice qualifies as "substantial."

18

This conclusion does not end the Court's inquiry, however, "as it is not enough for the State to identify interests that are significant in the abstract." *Ross*, 746 F.3d at 556 (citing *Turner Broad. Sys., Inc.*, 512 U.S. at 622 ("That the Government's asserted interests are important in the abstract does not mean, however, that the [challenged law] will in fact advance those interests.")). Rather, the State "must demonstrate that the [regulation] 'materially advances an important or substantial interest by redressing past harms or preventing future ones.'" *Id.* (quoting *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 356 (4th Cir. 2001)). While courts "do not require the government to present a panoply of empirical evidence in order to satisfy this standard . . . it must nonetheless make some evidentiary showing that the recited harms are 'real, not merely conjectural,' and that the [regulation] 'alleviate[s] these harms in a direct and material way.'" *Id.* (quoting *Satellite Broad. & Commc'ns Ass'n*, 275 F.3d at 356).

With these principles in mind, the Court is satisfied the State has adequately demonstrated that the electronic publication of litigants' personal data is a plausible threat to citizens' privacy and the fair and orderly administration of justice. In reaching this conclusion, the Court "emphasize[s] that the [State] is 'entitled to advance its interests by arguments based on appeals to common sense and logic.'" *Id.* (quoting *Multimedia Publ'g Co. of S. Carolina, Inc. v. Greenville-Spartanburg Airport*, 991 F.2d 154, 160 (4th Cir. 1993)). This is particularly true where, as here, the burden on speech is relatively small—civil court records are already accessible at the courthouse. *See Ross*, 746 at 556 (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 14 (1st Cir. 2004) ("[H]eavier burdens on speech must . . . be justified by more cogent evidentiary predicates.")).

19

The undisputed evidence reveals that the regulation materially advances an important interest by preventing future harms. Knuth explained that he "found an inordinate amount of traffic coming from IP addresses identified as 'bots' through log analysis" on two related record filing systems for civil court documents even where such systems complied with Virginia laws governing the use of technology as applied to court records. (Knuth Decl. ¶¶ 9–10, ECF No. 67-1.) While it is true that such systems did not require a Subscriber Agreement or paywall, as pointed out by Plaintiff, a Subscriber Agreement and paywall does not eviscerate the risks the State intends to prevent. Furthermore, while bots may not be inherently bad, the Court is convinced that there is enough evidence to show that the regulation currently prevents the mass collection of PII by bots and need not analyze this further. A quick review of CNS's website shows that in addition to publishing news articles, it markets a case search engine—"CasePortal"—to anyone who subscribes to CNS.[14] (JSF ¶ 7; Ex. A, ECF 88-1.) If CNS, or any other third party, were given access to the civil court records, there would be nothing stopping such entities from downloading all content from the clerk's software, only paying one fee, and then posting such information on their own website for profit, exploitation, or to sell such information to third parties. If, on the other hand, the State would stop allowing all electronic access to civil court records, Virginia-barred attorneys would then be required

---

[14] CASEPORTAL BY COURTHOUSE NEWS SERVICE, https://cnscaseportal.com (last visited Sept. 13, 2022) ("Quit bouncing between multiple services while you're trying to research. When you use CasePortal, you can find cases and opinions from federal and state courts all across the nation . . . With CasePortal, case summaries display in the search results, making it easier and faster to research past reports and filter out irrelevant matches . . . You can even search the text of filed documents and opinions!").

to drive to courthouses—here, the Prince William Circuit Court—whenever they need to access any document filed with the court, thus impeding on the efficiency of the judicial system. By limiting electronic access of civil court records to Virginia-barred attorneys—who are officers of the court—the regulation materially reduces the risk the State intends to prevent by controlling who has unlimited access to electronic civil court records and how such individuals may access them. The regulation thus "promotes the [State's] significant interest in a manner 'that would be achieved less effectively absent the regulation.'" *Ross*, 746 F.3d at 556 (quoting *Ward*, 491 U.S. at 799).

Next, we must ask whether the regulation "'burden[s] substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward*, 491 U.S. at 799). "To satisfy this standard, the State need not regulate using 'the least restrictive or least intrusive means' available to achieve its goals." *Id.* at 557 (quoting *Ward*, 491 U.S. at 799). In other words, "'[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.'" *Id.* (quoting *Ward*, 491 U.S. at 800).

The challenged regulation allows a clerk to provide secure remote access to nonconfidential civil court records to Virginia-barred attorneys. Va. Code § 17.1-293(E)(7). The regulation is limited in scope because it allows the public and press access to all nonconfidential civil court records physically at the courthouse. The provision of the statute restricting the posting of PII on the internet is specifically targeted

21

to prevent data mining and keep such information out of the hands of third parties who could engage in criminal conduct or otherwise misuse that information. However, it does not restrict access to that information entirely. Instead, it simply makes that information unavailable to the public *over the internet*, where it would be much easier to access significant amounts of data from anywhere in the world with an internet connection and quickly republish it or download it for illegitimate or improper purposes.

The provision of the statute exempting attorneys from the restrictions on clerks posting certain information on the internet is also narrowly tailored to promote the significant governmental interest in the orderly and efficient administration of the justice system. The exemption is narrow and applies only to attorneys and their staff. Attorneys are an essential part of the justice system and their access to this information is necessary for them to perform their professional obligations. Such attorneys are officers of the court—they stand on entirely different footing than members of the general public. In sum, the regulation "does no more than 'target[] and eliminate[] . . . the exact source of 'evil' it seeks to remedy.'" *Ross*, 746 F.3d at 557 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

Although Plaintiff does not dispute the fact that all nonconfidential civil court records are physically available at the courthouse, Plaintiff nonetheless contends the regulation is not narrowly tailored because Defendants shield these same records—in electronic format—from non-attorneys. (Pl.'s Mem. in Opp'n at 14.) This contention confuses the applicable standard and misses the mark. The purpose of the regulation is to control *how* the public utilizes records that often contain litigants' personal information—

22

such as their signatures, residential addresses, dates of birth identified with a particular person, maiden names, financial account numbers, and names of minor children—not *what* the public utilizes. Public access to civil court records while physically at the courthouse is far different from public access to such records on the internet because when such records are accessible online, there is a real threat that third parties will access such information who may engage in identity theft, data mining, and other crimes.

If OCRA were available to the global community, the State would have to pass a host of legislative measures to protect the widespread distribution of PII and it is unclear to the Court whether the State's interests would be adequately served with these new policies. Additionally, the State and clerks would be forced to expend substantial resources to police OCRA user activity to limit exploitation of personal information. This kind of significant policy change is not one that this Court should mandate upon the State. Rather, the state courts are best positioned to craft an informed and proper balance between its legitimate institutional needs and the public's interest in electronic access to civil court records. Even though the State's interests could be served by some less-speech-restrictive alternative, the State's means chosen to achieve its goals are not substantially broader than necessary. *See Ross*, 746 F.3d at 556.

Plaintiff further asserts that the regulation is not narrowly tailored because less-restrictive alternatives such as redaction, subscriber agreements, and combinations of bot management tactics could achieve Defendants' interests. (Pl.'s Mem. in Supp. at 18–26, ECF No. 71.) This contention similarly confuses the applicable standard and fails to consider the burden it entails. As it currently stands, the redaction mandates of Va. Code

23

§ 8.01-420.8 place requirements on attorneys and litigants.  This section requires redaction of "all but the last four digits of the identification number" of social security numbers, driver's license numbers, and credit card, debit card, bank account, or other numbers associated with electronic billing and payment systems.  The Code explicitly waives civil liability "against the party or lawyer who filed the document or any court personnel, the clerk, or any employees of the clerk's office who received it for filing." Va. Code § 8.01-420.8(C).  Thus, the redaction regulations do not meet the requirements for such materials to be posted online pursuant to Va. Code § 17.1-293(A)-(B).  This means that in order for the public to access the records online, a new host of information would need to be redacted on all documents including signatures, residential addresses, dates of birth identified with a particular person, maiden names, financial account numbers, and names of minor children.

Currently, this PII is accessible on the internet only to attorneys, a self-policing, pre-vetted group subject to codified Rules of Professional Conduct and serious professional sanctions for violating those Rules.  Even if redaction of such information was possible, it is unclear whether such redactions would be enough to protect PII. Subscriber agreements likewise do not adequately achieve Defendants' interests because such agreements are easily ignored or circumvented.  While applicants agree not to abuse the system, some users may nevertheless violate the terms and conditions.  For example, a user agreement would not stop an entity from accessing and downloading the civil court records and uploading such documents on their own portal—*e.g.*, CasePortal—for profit. Moreover, while a combination of bot safeguards *could* potentially alleviate the State's

24

concerns over data mining, employing such programs would mean that the State would have to purchase, implement, and monitor such programs. This would be a dramatic policy change for the State, riddled with labor- and resource-intensive repercussions, and it would be less effective than the State's current regulation. The Court is not positioned to mandate this change in policy upon the State, nor is that the legal standard at issue in this case. Rather, the State's current regulation promotes its significant interest in a manner that would be achieved less effectively absent the regulation, and the State is not required to use the least restrictive means possible to achieve its goals. *See Ross*, 746 F.3d at 553.

Lastly, Plaintiff contends that Defendants' regulation is not narrowly tailored because other courts provide electronic access to civil court records. (Pl.'s Mem. in Opp'n at 29–30.) Again, Plaintiff confuses the applicable standard. Plaintiff has not drawn the Court's attention to other states that have adopted specific policy goals of preventing remote data harvesting of information contained in court records while maintaining order and efficiency in the judicial system, nor that other such courts have successfully achieved these goals. Plaintiff merely shows that some courts in some states provide remote access to civil records without further explanation of the effectiveness of protective measures. Plaintiff fails to engage in the analysis required under time, place, and manner scrutiny. That analysis looks to whether a regulation would achieve its significant interest less effectively absent the challenged regulation. *Ross*, 746 F.3d at 556 (quoting *Ward*, 491 U.S. at 799). Without information relevant to either prong of the analysis, comparison to the practices of other states is irrelevant. Plaintiff's argument

25

amounts to advocating for Virginia to change its public policy—not a valid First Amendment violation claim—and the place for this argument is the Virginia General Assembly, not the federal judiciary.

For all these reasons, the Court concludes that the regulation's grant of authority to clerks to provide secure remote access to nonconfidential civil court records to Virginia-barred attorneys is narrowly tailored to address the threats to citizens' privacy and security and the fair and orderly administration of justice.

**B. Enforcement of the Dissemination Restriction (Count II)**

In Count II, Plaintiff alleges that Defendants' enforcement of OCRA's dissemination restriction, Va. Code § 17.1-293(H), violates the First Amendment because it "impermissibly burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports." (Am. Compl. ¶ 91.) Defendants counter that the regulation passes constitutional muster because it resembles a time, place, and manner restriction and is content-neutral, narrowly tailored, and preserves significant governmental interests. (Def.'s Mem. in Supp. at 10–11, ECF No. 67.)

Virginia Code § 17.1-293(H) states that it shall not be "construed to permit any data *accessed by secure remote access* to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, in [her] discretion, may deny secure remote access to ensure compliance with these provisions." § 17.1-293(H) (emphasis added). Because only Virginia-barred attorneys may electronically access civil court records, this regulation only prevents those attorneys with electronic access to such records from selling, posting, or redistributing data obtained in the records to third

26

parties.  The regulation *does not* prevent Plaintiff from selling, posting, or redistributing

data obtained from records located at the courthouse to third parties.

It is widely accepted that "state action to punish the publication of truthful

information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publ'g Co.*,

443 U.S. 97, 102 (1979) (striking down a statute which made it a crime for a newspaper

to publish truthful and legally obtained information); *Bartnicki v. Vopper*, 532 U.S. 514,

527 (2001) (finding the First Amendment protects speech that discloses the contents of an

illegally intercepted communication).  However, Plaintiff does not allege that the

regulation punishes the press or public from publishing legally obtained, truthful

information.  Rather, Plaintiff argues that even though it may sell, post, and redistribute

information from civil court records obtained physically at the courthouse, Plaintiff's

First Amendment rights are violated because it may not do the same with civil court

records obtained *electronically*.  The precise question presented by Plaintiff is whether

the First Amendment provides Plaintiff, as a member of the public, a right to sell, post,

and redistribute information obtained from *electronic* civil court records while it may

already sell, post, and redistribute information obtained *physically* from the courthouse.

As with Count I, when a limitation on a right of access resembles a "time, place,

and manner" restriction, the Court should apply more relaxed scrutiny.  *Schaefer*, 2 F.4th

at 328; *Globe Newspaper*, 457 U.S. at 607 n.17.  The dissemination restriction challenged

here does not stop Plaintiff from selling, posting, or redistributing information obtained

from civil court records—Plaintiff can freely sell, post, or redistribute information from

such records obtained at the courthouse.  Instead, the access restriction merely prevents

information from such records *obtained electronically* from being sold, posted, or distributed to third parties.  Thus, the restriction resembles a time, place, and manner restriction and relaxed scrutiny applies.  Relaxed scrutiny requires the limitation to be "'content-neutral, narrowly tailored and necessary'" to preserve a "'significant governmental interest.'"  *Schaefer*, 2 F.4th at 328 (quoting *Planet*, 947 F.3d at 585).

The Court turns first to whether the dissemination restriction is a content-neutral regulation.  Plaintiff raises the same argument regarding content-neutrality for Count II as it did for Count I.  Specifically, Plaintiff claims that the dissemination restriction is not content-neutral because the statute is supported by concerns over content.  (Pl.'s Mem. in Opp'n at 14.)  Defendants, on the other hand, contend that the regulation is content-neutral because it "appl[ies] to all non-confidential filings equally" and "do[es] not turn upon the communicative contents of the court records."  (Def.'s Mem. in Supp. at 11, ECF No. 67.)

The dissemination restriction is content-neutral for the same reason the attorney-access restriction is content-neutral.  That is, the State did not adopt the regulation "because of disagreement with the message it conveys."  *Ward*, 491 U.S. at 791 (citing *Clark*, 468 U.S. at 293).  Rather, the government's purposes behind the regulation, which "is the controlling consideration," are to promote the fair and orderly administration of justice by protecting citizens' privacy and security and ensure the orderly and efficient administration of its justice system.  *Id.*  The dissemination requirement does not, "by [its] terms[,] distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based."  *Turner Broad. Sys., Inc.*, 512 U.S. at 642–43.

28

Instead, it treats all electronically accessed civil court records the same.

The Court must next determine whether Virginia's dissemination restriction is "'narrowly tailored to serve a significant government interest.'" *Ross*, 746 F.3d at 552 (quoting *Ward*, 491 U.S. at 791.)  As stated above, a regulation is narrowly tailored if it "'promotes a substantial government interest that would be achieved less effectively absent the regulation' and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Ross*, 746 F.3d at 552–53 (quoting *Ward*, 491 U.S. at 799).  The Court will consider each of these elements in turn.

To meet its burden under the first prong of the narrow tailoring requirement, the State must demonstrate that the regulation "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 555 (quoting *Ward*, 491 U.S. at 799).  The State's express purposes in creating this regulation are the same justifying the attorney-access restriction—to promote the fair and orderly administration of justice by protecting citizens' privacy and security and ensure the orderly and efficient administration of its justice system.  For the reasons stated in Count I, such purposes justifying the regulation qualify as "substantial."  But "the [State] must demonstrate that the [dissemination restriction] 'materially advances an important or substantial interest by redressing past harms or preventing future ones.'" *Id.* at 556 (quoting *Satellite Broad. & Comm'cns Ass'n*, 275 F.3d at 356).  Although the State is not required to "present a panoply of empirical evidence in order to satisfy this standard . . . it must nonetheless make some evidentiary showing that the recited harms are 'real, not merely conjectural,' and that the regulation 'alleviate[s] these harms in a direct and material way.'" *Id.*

29

(quoting *Satellite Broad. & Comm'cns Ass'n*, 275 F.3d at 356).

With these principles in mind, the Court is satisfied that the State has adequately demonstrated that allowing individuals with electronic access to civil court records to sell, post, or redistribute such data to third parties would present a plausible threat to citizens' privacy and security and potentially undermine the orderly and efficient administration of the justice system. In reaching this conclusion, the Court again "emphasize[s] that the [State] is 'entitled to advance its interests by arguments based on appeals to common sense and logic.'" *Id.* (quoting *Greenville-Spartanburg Airport*, 991 F.2d at 160). This is particularly true here, "where the burden on speech is relatively small." *Id.* (citing *Bl(a)ck Tea Soc'y*, 378 F.3d at 14).

Common sense and logic support the notion that if any individual with electronic access to all nonconfidential civil court records could freely sell, post, or redistribute such data to third parties, it could jeopardize citizens' privacy and security as well as the orderly and efficient administration of its justice system. While attorneys and litigants currently redact some confidential information from records (*i.e.*, all but the last four digits of the identification number of social security numbers, driver's license numbers, and numbers associated with electronic billing and payment systems), the redaction requirements do not cover the entirety of the sensitive information described in Va. Code § 17.1-293(A)-(B). The Court agrees with the State that "public access to records at a physical courthouse serves as a bulwark against widespread dissemination of this private information," and is convinced that without the dissemination restriction, any entity could sell, post, or redistribute the information and write an algorithm to harvest such private

30

information from the records and use that information to the detriment of Virginia

litigants. The regulation thus promotes the State's significant interest in a manner "'that

would be achieved less effectively absent the regulation.'" *Ross*, 746 F.3d at 556

(quoting *Ward*, 491 U.S. at 799).

Next, the Court must ask whether the regulation "'burden[s] substantially more

speech than is necessary to further the government's legitimate interests.'" *Id.* at 557

(quoting *Ward*, 491 U.S. at 799). For this standard, the State "need not regulate using

'the least restrictive or least intrusive means' available to achieve its goals." *Id.* (quoting

*Ward*, 491 U.S. at 800). "'So long as the means chosen are not substantially broader than

necessary to achieve the government's interest . . . the regulation will not be invalid

simply because a court concludes that the government's interest could be adequately

served by some less-speech-restrictive alternative.'" *Id.* (quoting *Ward*, 491 U.S. at 800).

The regulation prevents Virginia-barred attorneys from selling, posting, or

redistributing data from civil court records that were obtained electronically to third

parties. The policy is limited in scope because it only applies to individuals who have

access to the civil court records *electronically* (*i.e.*, Virginia-barred attorneys) and only

prevents data obtained electronically from being sold, posted, or redistributed. The

regulation leaves ample channels for Plaintiff to post about any civil court record that is

obtained physically from the courthouse. On its face, as with the regulation in Count I,

this regulation does no more than prevent the mass publication of Virginians' private

information from being posted online and the likely data mining that would result, which

is "'the exact source of 'evil' it seeks to remedy.'" *Ross*, 746 F.3d at 557 (quoting

31

*Frisby*, 487 U.S. at 485).

Plaintiff asserts the same arguments as discussed above regarding a lack of narrow tailoring for both regulations, the attorney-access restriction, and the dissemination restriction. Specifically, Plaintiff claims that the dissemination restriction is not narrowly tailored because redactions and subscriber agreements are plausible alternatives that would burden less speech. Yet, for the same reasons as addressed in Count I, "'even if such alternatives are plausible, they do not alter [the Court's] conclusion that the [regulation] does not burden *substantially* more speech than necessary.'" *Ross*, 746 F.3d at 557 (quoting *Ward*, 491 U.S. at 797).

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to both Count I and Count II and deny Plaintiff's Motion for Summary Judgment as to both Count I and Count II.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: Sept. 27, 2022
Richmond, Virginia

32